FILED
2022 Aug-31 PM 04:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

**United States District Court**
**Northern District of Alabama**
**Northwestern Division**

2022 AUG 31 P 12:36

Case No. *3:22 CV 1112 - HNJ*

**President**
**Eric Ingram Bey**
**and the People of**
**Moorish National**
**Republic of Peace**
    **Plaintiff,**

**v.**

**United States of America**              **Diversity of Citizenship**
**Federal Corporation**                    **28 U.S. Code § 1332**
    **Defendant,**

## Civil Complaints/Motions/Relief

1.  Comes now Eric Jamar Ingram: Bey, President of the Moorish National Republic of Peace "M.N.R.P." **motions this court using Rule 65.1** to bring all sureties to the jurisdiction of the court, appointing the Clerk of Court as the surety's agent. We bring forth the surety ERIC JAMAR INGRAM XXX-XX-9162 as security to be held responsible for any liability.

2.  We as Moorish American Nationals are protected with Immunities by United States of America Constitution 1774, and the Peace and Friendship Treaty Between Empire of Morocco and United States revised 1836. I motion this court to proceed in equity.

3.  On June 15th,2016 United States adopted American Declaration on the Rights of Indigenous Peoples. This also applies to all union states of the Federal Government known as the United States.

**American Declaration on the Rights of Indigenous Peoples Article 1:**

1. The American Declaration on the Rights of Indigenous Peoples applies to the indigenous peoples of the Americas.

2. Self-identification as indigenous peoples will be a fundamental-criteria for determining to whom this Declaration applies. The states shall respect the right to such self-identification as indigenous, individually or collectively, in keeping with the practices and institutions of each indigenous people.

**Article X. Rejection of assimilation**

1. Indigenous peoples have the right to maintain, express, and freely develop their cultural identity in all respects, free from any external attempt at assimilation.

1

2. The States shall not carry out, adopt, support, or favor any policy to assimilate the indigenous peoples or to destroy their cultures.

### Article XI. Protection against genocide

Indigenous peoples have the right to not be subjected to any form of genocide or attempts to exterminate them.

### Article XII. Guarantees against racism, racial discrimination, xenophobia, and other related forms of intolerance

Indigenous peoples have the right not to be subject to racism, racial discrimination, xenophobia, and other related forms of intolerance. The states shall adopt the preventive and corrective measures necessary for the full and effective protection of this right.

### Article XXI. Right to autonomy or self-government

1. Indigenous peoples, in exercising their right to self-determination, have the right to autonomy or self-government in matters relating to their internal and local affairs, as well as ways and means for financing their autonomous functions.

2. Indigenous peoples have the right to maintain and develop their own decision- making institutions. They also have the right to participate in the decision making in matters which would affect their rights. They may do so directly or through their representatives, and accordance with their own norms, procedures, and traditions. They also have the right to equal opportunities to access and to participate fully and effectively as peoples in all national institutions and fora, including deliberative bodies.

### Article XXII. Indigenous law and jurisdiction

1. Indigenous peoples have the right to promote, develop and maintain their institutional structures and their distinctive customs, spirituality, traditions, procedures, practices and, in the cases where they exist, juridical systems or customs, in accordance with international human rights standards.

2. The indigenous law and legal systems shall be recognized and respected by the national, regional and international legal systems.

3. The matters referring to indigenous persons or to their rights or interests in the jurisdiction of each state shall be conducted so as to provide for the right of the indigenous people to full representation with dignity and equality before the law. the law, including the use of linguistic and cultural interpreters.

4. The States shall take effective measures in conjunction with indigenous peoples to ensure the implementation of this article.

### Article XXIV. Treaties, agreements, and other constructive arrangements

1. Indigenous peoples have the right to the recognition, observance, and enforcement of the treaties, agreements and other constructive arrangements concluded with states and

2

their successors, in accordance with their true spirit and intent in good faith and to have the same be respected and honored by the States. States shall give due consideration to the understanding of the indigenous peoples as regards to treaties, agreements and other constructive arrangements.

2. When disputes cannot be resolved between the parties in relation to such treaties, agreements and other constructive arrangements, these shall be submitted to competent bodies, including regional and international bodies, by the States or indigenous peoples concerned.

### Article XXV. Traditional forms of property and cultural survival. Right to land, territory, and resources

1. Indigenous peoples have the right to maintain and strengthen their distinctive spiritual, cultural, and material relationship to their lands, territories, and resources and to assume their responsibilities to preserve them for themselves and for future generations.

2. Indigenous peoples have the right to the lands, territories and resources which they have traditionally owned, occupied or otherwise used or acquired.

3. Indigenous peoples have the right to own, use, develop and control the lands, territories and resources that they possess by reason of traditional ownership or other traditional occupation or use, as well as those which they have otherwise acquired.

4. States shall give legal recognition and protection to these lands, territories and resources. Such recognition shall be conducted with due respect to the customs, traditions and land tenure systems of the indigenous peoples concerned.

5. Indigenous peoples have the right to legal recognition of the various and particular modalities and forms of property, possession and ownership of their lands, territories, and resources in accordance with the legal system of each State and the relevant international instruments. The states shall establish the special regimes appropriate for such recognition, and for their effective demarcation or titling.

### Article XXX. Right to peace, security, and protection

1. Indigenous peoples have the right to peace and security.

2. Indigenous peoples have the right to recognition and respect for their institutions for the maintenance of their organization and control of its communities and peoples.

3. Indigenous peoples have the right to protection and security in situations or periods of internal or international armed conflict pursuant to international humanitarian law.

4. States, in compliance with international agreements to which they are party, in particular international humanitarian law and international human rights law, including the Fourth Geneva Convention of 1949 relative to the protection of civilian persons in time of war, and Protocol II of 1977 relating to the protection of victims of non-international armed conflicts, in the event of armed conflicts shall take adequate

measures to protect the human rights, institutions, lands, territories, and resources of the indigenous peoples and their communities. Likewise, States:

a. Shall not recruit indigenous children and adolescents into the armed forces under any circumstances;

b. Shall take measures of effective reparation and provide adequate resources for the same, in jointly with the indigenous peoples affected, for the damages incurred caused by an armed conflict.

c. Shall take special and effective measures in collaboration with indigenous peoples to guarantee that indigenous women, children live free from all forms of violence, especially sexual violence, and shall guarantee the right to access to justice, protection, and effective reparation for damages incurred to the victims.

6. Military activities shall not take place in the lands or territories of indigenous peoples, unless justified by a relevant public interest or otherwise freely agreed with or requested by the indigenous peoples concerned

**American Declaration on the Rights of Indigenous Peoples Article XXXIV**

In case of conflicts and disputes with indigenous peoples, states shall provide, with the full and effective participation of those peoples, just, equitable and effective mechanisms and procedures for their prompt resolution. For this purpose, due consideration and recognition shall be given to the customs, traditions, norms or legal systems of the indigenous peoples concerned

4.    **Article VI of the United States Constitution states**: All Debts contracted and Engagements entered into, before the Adoption of this Constitution, shall be as valid against the United States under this Constitution, as under the Confederation.

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution; but no religious Test shall ever be required as a Qualification to any Office or public.

5.    **What is M.N.R.P. (Moorish National Republic of Peace)?**
M.N.R.P. is a de jure government of an autonomous nation of indigenous people known as Moors/Moorish Americans, successors of the Empire of Morocco. M.N.R.P. was established by a Moorish Society on June 19th, 2020 with inalienable rights, endowed by the Creator of the Universe, instituted for the benefit of its Nationals and Citizens. M.N.R.P. consists of Board of Directors and Community associates upholding the Treaty

4

of Peace and Friendship Between Morocco and United States 1786/1787/1836, Moorish National Republic of Peace Constitution, and the L.EYE.P Creed. All Nationals and Citizens of M.N.R.P. are part and parcel to its government; however, M.N.R.P. is part and partial of the United States of America because of the Treaty mentioned above, and Article VI of the Constitution for the United States of America.

The Moorish Nationals and Citizens of M.N.R.P. are successors of the tribe Lamtunah/Lamthoonah/Lumthunes, the Marabout/Morabite/Morabathoon race, of the Great Chief Abu Tashufin/Tashfin succeeded by Yusuf ibn Tashufin the founders of the Empire of Morocco.

**The Law of Nations: Or, Principles of the Law of Nature Applied to the Conduct and Affairs of Nations and Sovereigns is a legal treatise on International Law by Emerich de Vattel,**
Chapter 18 Section 204: This right comprehends two things. 1. The domain, by virtue of which the nation alone may use the country for the supply of its necessities, may dispose of it as it thinks proper, and derive from it every advantage it is capable of yielding. 2. The empire, or the right of sovereign command, by which the nation directs and regulates at its pleasure everything that passes in the country.

Chapter 18 Section 205: When a nation takes possession of a country to which no prior owner can lay claim, it is considered as acquiring the empire or sovereignty of it, at the same time with the domain. For, since the nation is free and independent, it can have no intention, in settling in a country, to leave to others the right of command, or any of those rights that constitute sovereignty. The whole space over which a nation extends its government, becomes the seat of its jurisdiction, and is called its territory.

Chapter 18 Section 206: If a number of free families, scattered over an independent country, come to unite for the purpose of forming a nation or state, they altogether acquire the sovereignty over the whole country they inhabit: for, they were previously in possession of the domain- a proportional share of it belonging to each individual family: and since they are willing to form together a political society, and establish a public authority, which every member of the society shall be bound to obey, of command over the whole country.

6.   **22 U.S. Code Chapter 2 Section 141 to 143-** Act Aug. 1, 1956, repealed sections 141 to 143 effective upon the date which the President determined to be appropriate for the relinquishment of jurisdiction of the United States in Morocco. Jurisdiction of the United States in Morocco was relinquished by memorandum of President Eisenhower dated Sept. 15, 1956. Notice was given to Morocco on Oct. 6, 1956, and all pending cases were disposed of by 1960. See Bulletin of the State Department Vol. 35:909, page 844. Section 141, R.S. §§ 4083, 4125, 4126, 4127; act June 14, 1878, ch. 193, 20 Stat. 131, related to judicial authority generally of ministers and consuls of United States in China, Siam, Turkey, Morocco, Muscat, Abyssinia, Persia, and territories formerly part of Ottoman Empire including Egypt.

Section 142, R.S. § 4084, related to general criminal jurisdiction of ministers and consuls of United States.
Section 143, R.S. § 4085, related to general jurisdiction of ministers and consuls of United States and venue in civil cases.

7.  The United States Federal Corporation is in violation for the following acts of Genocide on the Moors in America:

1. The CointelPro Program established by J. Edgar Hoover- COINTELPRO was a series of covert and illegal projects conducted by the United States Federal Bureau of Investigation aimed at surveilling, infiltrating, discrediting, and disrupting American political organizations

2. The Tuskegee Experiments- The Tuskegee Study of Untreated Syphilis in the African American Male was a clinical study conducted between 1932 and 1972 by the United States Public Health Service. The purpose of this study was to observe the natural history of untreated syphilis; the African American men in the study were only told they were receiving free health care from the Federal government of the United States.

3. Ku Klux Klan Lynching Moors also known by the misnomer African Americans, Colored, Negro, Black American

4. Jim Crow Laws and the Black Christian Codes 1724, the "Sundown" Laws- Jim Crow laws were state and local laws that enforced racial segregation in the Southern United States. These laws were enacted in the late 19th and early 20th centuries by white Democratic-dominated state legislatures to disenfranchise and remove political and economic gains made by Black people during the Reconstruction period.

The Black Codes, sometimes called Black Laws, were laws governing the conduct of African Americans. The best known of them were passed in 1865 and 1866 by Southern states, after the American Civil War, in order to restrict African Americans' freedom, and to compel them to work for low wages.

5. The Assassination of: Martin Luther King Jr, Fred Hampton and various Black Panthers, etc.

6. The Bombing of Tulsa, Oklahoma (Black Wall Street)- The Tulsa race massacre took place on May 31 and June 1, 1921, when mobs of white residents, many of them deputized and given weapons by city officials, attacked black residents and businesses of the Greenwood District in Tulsa, Oklahoma. It has been called "the single worst incident of racial violence in American history." The attack, carried out on the ground and from private aircraft, destroyed more than 35 square blocks of the district—at that time, the wealthiest black community in the United States, known as "Black Wall Street".

6

7. Slavery of Moors- Slavery in the United States was the legal institution of human chattel enslavement, primarily of native Africans and African Americans, that existed in the United States of America from the beginning of the nation in 1776 until passage of the Thirteenth Amendment in 1865.

8. Denationalizing Moors, labeling Moors as a Misnomer (Black, African-American, Hispanic, Jamaican, Puerto Rican, Negro, Indians, Afro-American) Practicing Color of Law

9. The Casual Killing Act- Casual Killing Act of 1669 which declared it legal to kill a slave while correcting because malice could not be presumed. The "casual killing of slaves" says that if a slave dies while resisting his master, the act will not be presumed to have occurred with "prepensed malice."

10. Human Trafficking of Moorish Women and Children

11. The euthanization of Moorish Women by Planned Parenthood

12. The flooding of Drugs into Moorish American Communities

13. The Distribution of Illegal Firearms into Moorish American Communities

14. The Murders of Eric Garner, Michael Brown, Sandra Bland, Laquan McDonald, and various unarmed others Killed by Police, nation-wide

15. States and Counties nationwide in violation of the Treaty of Peace and Friendship Between Empire of Morocco and the United States Revised 1836.

16. U.S. Courts abroad refusing the Aboriginal Title from Moors in America.

17. Violation of Article VI of the U.S. Constitution.

18. Practicing of Color of Law against Moors

19. Coronavirus Pandemic aiming to vaccinate (poison) Black/African Americans

20. Indian Removal Act- On March 28, 1830, Congress passed the Indian Removal Act, beginning the forced relocation of thousands of Native Americans in what became known as the Trail of Tears.

21. Forced assimilation is an involuntary process of cultural assimilation of religious or ethnic minority groups during which they are forced to adopt language, identity, norms, mores, customs, traditions, values, mentality, perceptions, way of life, and often religion and ideology of established and generally larger community belonging to dominant culture by government. Also, enforcement of a new language in legislation, education, literature, worshiping

7

counts as forced assimilation. Unlike ethnic cleansing, the local population is not outright genocide and may or may not be forced to leave a certain area. Instead the population becomes assimilated by force. It has often been used after an area has changed nationality, often in the aftermath of war. Some examples are both the German and French forced assimilation in the provinces Alsace and (at least a part of) Lorraine, and some decades after the Swedish conquests of the Danish provinces Scania, Blekinge and Halland the local population was submitted to forced assimilation. Forced assimilation is also called cultural genocide and ethnocide.

Moors was forced to adopt the slave badge names known as: Blacks, negro, colored, African American, Afro American. The miseducation taught through the Public School system of the United States forced Moors to adopt language, identity, norms, morals, customs, traditions, values, mentality, perceptions, way of life, and to see themselves as minorities, and inferior to the "White Race".

8.  **Motion for Evidence Pursuant to Rule 43**
    1. The Moorish National Republic of Peace enters the Aboriginal Title to Morocco, modernly known as America.
    2. Constitution for Moorish National Republic of Peace
    3. Declaration of Independence of the M.N.R.P.
    4. U.S. Government Found guilty in conspiracy to Assassinate Dr. Martin Luther King Jr.
    5. Ku Klux Klan
    6. Tuskegee Experiment
    7. Assassination of Fred Hampton
    8. The Present State of the Empire of Morocco- Proof of Bloodline
    9. The Holy Koran Circle 7- Proof of Bloodline
    10. Black Codes
    11. Jim Crow Laws
    12. Negro Act
    13. FBI COINTELPRO
    14. Tulsa Massacre

9.  Moorish National Republic of Peace, Nationals and Citizens are Secured Party Creditors of the United States Federal Corporation. The people of M.N.R.P. fully operate in commerce by the Uniform Commercial Code, 31 U.S. Code Subsection 5118, and the HJR 192 Resolution.

10. **Injunction Motion for injunction pursuant to Rule 65. Federal Rules of Civil Procedure**
    Notice of Estoppel and Stipulation of Constitutional Challenge to the States Statutes where no ex post facto law, nor any law impairing the obligation of contacts shall be passed. And Motion to intervene with an injunction for the Moorish American People DBA Moorish National Republic of Peace.

    Whereas, there is no question that a "Bench Summons", a detention, an arrest, a ticket or citation, issued by a Police Officer or by others for parking or traveling with no driver's

8

license, a foreign driver's license, no current registration, or no mandatory insurance, or Capital, etc., which carries a fine or jail time, is a penalty or sanction; and is indeed "converting a right into crime", thus, violating substantive rights. It is reasonable to assume that the Court's judicial decisions are straight and to the point, and that there is no lawful method for government to put restrictions or limitations on Rights belonging to the people. The right to own and to possess Private Property and Personality, and to be secure in those rights, is preserved and secured for the people and the citizens, by the Constitution. Government does not give rights, for it has no rights to give or to sell, nor to license. Government is put in place to protect and to secure the preexisting, Inalienable Rights of the People, and the Citizens.

Pursuant to National and International Law, to respect and to honor all Substantive Rights of the people of Moorish National Republic of Peace, and to respect the Constitutional Immunities of these Aboriginals and Indigenous Sundry Free and Sovereign Moors (Natural People); with all Private Property Rights secured and reserved. You are to enlist all available and appropriate measures to ensure that all Substantive Rights and Constitutional Immunities are not abridged or breached. The Sovereign, Natural People named herein, is not to be arrested or held for detention under any circumstances except Murder, Rape or Treason. The Natural People named herein is, furthermore, exempt from, and not obligated to, Customs, Tariffs, Taxation, and is to be secured from any other hindrance or restriction of His or Her Rights or Freedom of movement within member states or non-member states. The Bearer of this Document is to be treated with all due respect; and all available and appropriate measures are to be taken to prevent injustice, harm or attack on the Natural People person, property, freedom, and/or dignity.

11. **Damages and Relief**
**Motion for Execution Pursuant to Rule 69, Motion for Exemption Pursuant Rule 64A**
**1. Acts of Genocide- $1,000,000,000,000 in gold**
**2. Full Security and Protection of Rights all Nationals and Citizens of M.N.R.P. while building the infrastructure of this Republic form of Government.**
**Relief**
**1. Abolish the 13th and 14th amendment upon all Moors labeled as Black/African American, Colored, Negro**
The 14th amendment made all Moors labeled as Black/African Americans chattel property of the United States. This is dehumanizing the Indigenous people of the Empire of Morocco. The United States has issued "Birth Certificates"(which are security instruments/Bonds) labeling Moors as chattel property. Black Americans are stateless and labeled as nationals but non-citizens with only "privileges" and immunities as a ward of the state within the United States Constitution. This is considered commercial warfare which constitutes a modern-day form of slavery. From 1619-1865 even until today under the 13 and 14th amendment, the United States of America has benefited from Black Americans being labeled as Chattel property. According to Article VI of the U.S. constitution, the Peace and Friendship Treaty between Empire of Morocco and the United States revised 1836 is the supreme law of the land for the United States. The United

9

States has showed many signs and acts of war against Moorish Americans of the Empire of Morocco by breaching the Treaty.

The Treaty states:  ART. 3. If either of the parties shall be at war with any nation whatever, and take a prize belonging to that nation, and there shall be found on board **subjects** or effects belonging to either of the parties, the **subjects** shall be set at Liberty, and the effects returned to the owners. And if any goods, belonging to any nation, with whom either of the parties shall be at war, shall be loaded on vessels belonging to the other party, they shall pass free and unmolested, without any attempt being made to take or detain them.

ART. 4.

A signal, or pass, shall be given to all vessels belonging to both parties, by which they are to be known when they meet at sea: and if the Commander of a ship of war of either party shall have other ships under his convoy, the declaration of the Commander shall alone be sufficient to exempt any of them from examination.

The Moorish Americans of the Empire of Morocco, known as Region 6 according to the African Union Diaspora, are subjects to the Empire of Morocco. M.N.R.P. Secretary has issued its Board of Directors, Nationals and Citizens a **National Passport Identification** according to their Provinces; all vessels will be equipped with M.N.R.P. private trust vehicle plates.

M.N.R.P. is the "Corporate Trustee" for all Nationals and Citizens, who have sworn their allegiance and to obey the Constitutional Laws and Public Laws of M.N.R.P.

Real Property is Controlled by the laws of the Jurisdiction in which it lies. The validity of the purpose of trust of real property is, in accordance with this principle, determined by the law of situs. M.N.R.P. has personal matter and subject matter jurisdiction over all Nationals, Citizens and their property. Jurisdiction is power to declare the law! Capron v. Van Noordenm 6 US 126, 2 Cranch 126(1804)

The United States needs to grant all Nationals and Citizens of the Moorish National Republic of Peace (Foreign Government) and Black/African Americans (Region 6 of African Union Diaspora) full diplomatic immunities Under Title 22 USC § 254a.

The M.N.R.P. National and Citizens have the right to travel freely abroad the American Continent and shall not be detained nor hindered from meeting the end of its government institution.

**2.  Aborigine/Indigenous Moors of Morocco/Al Maurikan/America are not subject to the Laws, statutes, codes ordinances, taxes, tariffs of the United States.**
The Nationals and Citizens of Moorish National Republic of Peace are only subject to the Constitution and Public laws of M.N.R.P. Any issues with United States Government Must Now Be Settled by the Peace and Friendship Treaty Between Empire of Morocco and the United States revised 1836. Nationals and Citizens of M.N.R.P. will not appear in the U.S. Courts, the violators of our Human Rights Now Risk Extradition.

### 3. Any and all applications related to commerce/ Identification

All applications now need to include the Asiatic race and Moorish American Nationality as an option to self-identify according to our nature and status. The passport Identification of the Moorish National Republic of Peace shall be put into all Commercial buildings to help recognize the identification of the M.N.R.P.

### 4. Develop a Restitution Agreement

We are ordering the United States of America, Federal Corporation to develop an restitution agreement with the Moorish National Republic of Peace to identify the best strategies of leveraging United States of America, Federal Corporation resources including but not limited to finance, tax credits, insurance, state owned properties etc. to atone for the crimes against Moors by the state.

### 5. Meetings to organize all relations between Moorish National Republic of Peace

The pain and suffering of Moors who were prisoners of war, cannot morally be valued monetarily, but a budget of $2,000,000.00 lawful tender of gold to setup series of meeting to discuss all business between M.N.R.P. and the United States of America, Federal Corporation.

### 6. Creditors

Due to the amount $1,000,000,000,000.00 in lawful gold tender, pursuant to 31 U.S. Code § 5118.Gold clauses and consent to sue. The Plaintiff orders the defendant to be listed as Creditors of the United States of America, Federal Corporation.

12.    **Motion for deposit in Court Pursuant to Rule 67**.

For the relief of all damages to the people of M.N.R.P., and Human Rights violations against the Moors in M.N.R.P. the beneficiaries (of the Empire of Morocco) demands compensation of $1,000,000,000,000 in lawful gold tender, pursuant to 31 U.S. Code § 5118.Gold clauses and consent to sue. Make payments out to the order of Moorish National Republic of Peace, Treasurer Keela-Walker: El. The Injunction relief for all Moorish American People in Moorish National Republic of Peace. We pray to our Creator Allah in full faith that no other injustice caused by defendants or this court falls upon us.

I declare under Penalty and Perjury under the laws of Moorish National Republic of Peace that this is true to the best of my knowledge.

By: President of M.N.R.P.
Eric Jamar-Ingram: Bey,

M.N.R.P.
950 No Head Hollow Rd
Muscle Shoals, Province of Alabama
Non Domestic, Without United States

11

THIS SPACE PROVIDED FOR RECORDERS USE ONLY

WHEN RECORDED RETURN TO:
Moorish National Republic of Peace
950 No Head Hollow Rd
Muscle Shoals, Province of Alabama Near 35661

Non-taxable

---

# Aboriginal Title

# MOORISH NATIONAL REPUBLIC OF PEACE

## A Moorish American Society

Know ALL Men by these Presents that heirs to the land, **Moorish American Nationals of Moorish National Republic of Peace, A Moor/Muur Moorish American Nationals, Natural Heirs to the land – Northwest/Southwest Amexem- Northwest/Southwest Africa – North/South/Central America- North Gate- Morocco, Heir Beneficiary to the Moors of**

**Moorish National Republic of Peace Vas Estate Express Trust**

Morocco's- Treaty of Peace and Friendship 1786,1787,1836

Federal Code 463 Asiatic

Federal code 667 Moors

Hierarchical Code R101 052 004

The Heirs makes a claim that is indefinite, valid, stare decisis, res judicata and collateral estoppel to the land described below.

(legal Description of Continent of America) North America at latitude longitude coordinates, fifty-four point five two six zero degrees N [54.5260°N], one hundred five point two five five one degrees W [105.2551°W];

South America-at eight point seven eight three two degrees S [8.7832°S], fifty-five point four nine one five degrees W [55.4915°W], and

Central America-at twelve point seven six nine zero degrees N [12.7690° N], eighty-five point six zero two four degrees W [85.6024°W].

Metes and Bounds-Extends from North-East and South-West Africa across great Atlantis even unto the present North, South and Central America and also into Mexico and the Atlantis Islands; Amexem, Turtle Island, Frog Island.

Moorish American Nationals of Moorish National Republic of Peace, Beneficial Heirs, successors of Morabethoon/Morabites of the Empire of Morocco, to all land and resources hereby, may inherit or otherwise purchase and receive, take, hold, buy and possess any lands, tenements or hereditaments within the same places, and as heirs, successor or assign, we may occupy, possess and enjoy, give, sell, aliene

or bequeath. Whereas, MOORISH NATIONAL REPUBLIC OF PEACE is the Trustee, To have and to hold, the same together with all and singular the appurtenances thereunto belonging or in anywise appertaining, and all the estate, right, title, interest, lien, equity

1

and claim whatsoever for the use of All Moorish American Nationals and Citizens of MOORISH NATIONAL REPUBLIC OF PEACE.

This aboriginal title invokes the unalienable /inalienable secured rights and authority as a lord bailiff, Moor and Al Maurikanos Estados National and beneficiary to all Moorish American Nationals and Citizens of MOORISH NATIONAL REPUBLIC OF PEACE.

**Our Authority comes from the God of the Universe "Allah":**

**United States Supreme Court: Supreme Law - Acts of State**

**United States Republic Constitution: Article VI**

**American Declaration on the Rights of Indigenous Peoples: Article XXV. Traditional forms of property and cultural survival. Right to land, territory, and resources**

1. Indigenous peoples have the right to maintain and strengthen their distinctive spiritual, cultural, and material relationship to their lands, territories, and resources and to assume their responsibilities to preserve them for themselves and for future generations.

2. Indigenous peoples have the right to the lands, territories and resources which they have traditionally owned, occupied or otherwise used or acquired.

3. Indigenous peoples have the right to own, use, develop and control the lands, territories and resources that they possess by reason of traditional ownership or other traditional occupation or use, as well as those which they have otherwise acquired.

4. States shall give legal recognition and protection to these lands, territories and resources. Such recognition shall be conducted with due respect to the customs, traditions and land tenure systems of the indigenous peoples concerned.

5. Indigenous peoples have the right to legal recognition of the various and particular modalities and forms of property, possession and ownership of their lands, territories, and resources in accordance with the legal system of each State and the relevant international instruments. The states shall establish the special regimes appropriate for such recognition, and for their effective demarcation or titling.

**Article XXIV. Treaties, agreements, and other constructive arrangements**

1. Indigenous peoples have the right to the recognition, observance, and enforcement of the treaties, agreements and other constructive arrangements concluded with states and their successors, in accordance with their true spirit and intent in good faith and to have the same be respected and honored by the States. States shall give due consideration to the understanding of the indigenous peoples as regards to treaties, agreements and other constructive arrangements.

2. When disputes cannot be resolved between the parties in relation to such treaties, agreements and other constructive arrangements, these shall be submitted to competent bodies, including regional and international bodies, by the States or indigenous peoples concerned.

**The Law of Nations: Or, Principles of the Law of Nature Applied to the Conduct and Affairs of Nations and Sovereigns is a legal treatise on International Law by Emerich de Vattel,**

Chapter 18 Section 204: This right comprehends two things. 1. The domain, by virtue of which the nation alone may use the country for the supply of its necessities, may dispose of it as it thinks proper, and derive from it every advantage it is capable of yielding. 2. The empire, or the right of sovereign command, by which the nation directs and regulates at its pleasure everything that passes in the country.

2

Chapter 18 Section 205: When a nation takes possession of a country to which no prior owner can lay claim, it is considered as acquiring the empire or sovereignty of it, at the same time with the domain. For, since the nation is free and independent, it can have no intention, in settling in a country, to leave to others the right of command, or any of those rights that constitute sovereignty. The whole space over which a nation extends its government, becomes the seat of its jurisdiction, and is called its territory.

Chapter 18 Section 206: If a number of free families, scattered over an independent country, come to unite for the purpose of forming a nation or state, they altogether acquire the sovereignty over the whole country they inhabit: for, they were previously in possession of the domain- a proportional share of it belonging to each individual family: and since they are willing to form together a political society, and establish a public authority, which every member of the society shall be bound to obey, of command over the whole country.

**Moorish National Republic of Peace is the secured party creditor, the beneficiaries are holder in due course. Moorish National Republic of Peace has a bond of $999 Trillion Dollars backed by "PURE SILVER" held with the U.S. Treasury Department since June 2020.**

**Universal Declaration of Human Rights - United Nations - Human Rights [Article Fifteen (15) J.**

**Rights of Indigenous Peoples - UN: General Assembly - Part 1, Article 4.**

**the Act of Redemption at the Pan American Conference in 1928**

**Treaty of Marrakesh [ Treaty of Peace and Friendship of 1786/1836 between the Empire Morocco and United States]**

Non-taxable

Aboriginal Title Drafted By: Eric Jamar-Ingram: Bey, A Muur/Moor
950 No Head Hollow Rd,
Muscle Shoals, Province of Alabama
near 35661

Signature

Date 6-19-2020

Assignee/Secured Party/
Eric Jamar-Ingram: Bey-President,
Moorish National Republic of Peace
Corporate Trustee
950 No Head Hollow
Muscle Shoals, Province of Alabama
near [35661]

3

# CONSTITUTION

# FOR

# MOORISH NATIONAL REPUBLIC OF PEACE

## ESTABLISED

## JUNE 19TH, 2020



## THE PREAMBLE

*We, The People of the MOORISH NATIONAL REPUBLIC OF PEACE (M.N.R.P.) with inalienable rights, endowed by the Creator of the Universe, forms an Indigenous Independent and Free government for the benefit of its Nationals and citizens. We, the Moorish Society of America are uplifting humanity with Love, Truth, Peace, Freedom, and Justice to provide for the common defense. We are promoting the general welfare and securing the foundation of liberty to our Nationals, citizens, and our posterity. We, The People of M.N.R.P. do ordain and establish this Constitution for the MOORISH NATIONAL REPUBLIC OF PEACE, as the law of the land; We, The People of M.N.R.P. pledge Our Lives and Property to each other; to gain equal footing in the affairs of men and for purposes to establish justice, health, wealth, and safety. Our Board of Directors in Convention, ordain and establish the following Constitutional Republic form of Government. We, The People of M.N.R.P. mutually agree with each other to form an Indigenous Free and Independent State by the name of: MOORISH NATIONAL REPUBLIC OF PEACE. We do hereby ratify the boundaries assigned to such State by the Act of Redemption at the Pan American Conference in 1928; the aforesaid which are as follows to wit: Extends from North-East and South-West Africa across great Atlantis even unto the present North, South and Central America and also into Mexico and the Atlantis Islands; Amexem, Turtle Island, Frog Island, Ancient Morocco, Al Marrakesh, Al Moroc, Al Maghreb Al Aqsa, . The life of the future generations of moors will now depend, on the conduct of this Indigenous Political Sovereign Nation State of Moorish American Nationals and Citizens. Let us put forth action and encourage each other and show our Creator that we as Moorish American Nationals and Citizens stand for the will of Allah as Moslems on Earth; We now renew our Covenant with our Creator. We are One and One is All.*

## ARTICLES OF UNICORPORATED ASSOCIATION
### (Created June 19, 2020)

### ARTICLE I-NAME

The MOORISH NATIONAL REPUBLIC OF PEACE shall be known as the Moorish National Republic of Peace and shall be referred to as the "Moorish National Republic of Peace"/ M.N.R.P. and the Board Members shall be referred to as "Directors" whose principal place of business is 950 NO HEAD HOLLOW ROAD MUSCLE SHOALS, PROVINCE OF ALABAMA [35661].

### ARTICLE II-PURPOSE

a.   This Indigenous Sovereign Nation State Moorish American Government is invested with the Powers and Authority of the Creator to Create and Enforce laws and impose taxes while providing protection of lives and property by maintenance of a Moorish Security Force. This Government will assist individuals in Declaring their Moorish Nationality while creating a Moorish American Society built by Moorish American Nationals for Moorish American Nationals administrated by Moorish American Nationals.   The Moorish National Republic of Peace will provide protection, life, and liberty, as well as teach Moorish Science, Civics, Health and Wellness, to help the physical, mental, and moral development of all Moorish Americans, and to "Up-Lift Fallen Humanity".

b.   To protect and promote the mutual interests of Moorish American Nationals.

c.   This Moorish National Republic of Peace is organized as a National agency exclusively for charitable and educational purposes and to foster Moorish American commerce locally, regionally and nationally within the meaning of section 508(c) 1 (a) with respects to section 501 (c) (3)of the Internal Revenue Code of 1986 (as amended), including for such purposes, the making of distributions to organizations which are recognized as exempt from tax under section 501 (c) (3) of the Internal Revenue Code of *1986, as now enacted or hereafter amended. All funds, whether income or* principal, and whether acquired by gift or contributions or otherwise, shall be devoted to said purpose. The Moorish National Republic of Peace is tax exempt as well by the Treaty of Peace and Friendship Between Empire of Morocco and United States revised in 1836.

### ARTICLE III–MISSION STATEMENT

The mission of the MOORISH NATIONAL REPUBLIC OF PEACE (M.N.R.P.) is to develop Moorish American leadership, high moral values and character based on the Constitution of the MOORISH NATIONAL REPUBLIC OF PEACE AND the L.EYE.P

CREED to provide a platform to up-lift fallen humanity, to gain a firm footing with other nations of the world, and to build a foundation for a better tomorrow. An immediate goal of MOORISH NATIONAL REPUBLIC OF PEACE is to create and provide a self-autonomous environment, Moorish culture, Moorish Traditions, Moorish education, economic growth, to be fully self-sufficient as a Moorish Society.

## ARTICLE IV – MEMBERSHIP

### SECTION 1:  CLASSES

Membership shall consist of two (2) classes.

a.      Board.  Board members are elected or chosen officials and the Directors of the Moorish National Republic of Peace. Board members shall manage the business and affairs of the Moorish National Republic of Peace and are the sole voting members of the Moorish National Republic of Peace. A Board member may serve as a board member in addition to any other capacity within the Moorish National Republic of Peace, at the discretion of the other Board Members.

b.      Nationals and Citizens. National and Citizen members consist of Moorish Americans currently domiciled in or transitioning into the MOORISH NATIONAL REPUBLIC OF PEACE. National and Citizen members shall have a voice but no vote at the Board of Directors meetings.

### SECTION 2: QUALIFICATIONS

a.      Nationals and Citizens join the Moorish National Republic of Peace by completing the proper application form, providing the required documentation and paying the appropriate fees in accordance and meeting the requirements for board or National and Citizen memberships as stated in these By-Laws.

## ARTICLE V -  MEETINGS

### SECTION  1:  ANNUAL GENERAL MEMBERSHIP MEETING

All board positions are up for renewal every four years. The membership shall meet every year as a group to vote for additional Directors of the Board, discuss the affairs of the Moorish National Republic of Peace, and conduct any other business as deemed necessary. The Annual General Membership Meeting shall be held on a date, time, and location as determined by the President. Notice of stating the date, time, and place of Annual General Membership Meeting shall be communicated to the members no less than   ten (10) no more than (50) days before the date of

meeting. This information shall be communicated by phone, mail, or e-mail, by or at the direction of the President or any other Officer. The Board of Directors shall meet as necessary to conduct the business of the Moorish National Republic of Peace.

**SECTION 3: SPECIAL MEETINGS**

Special meetings may be called any time as needed by the President or in his/her absence by the Vice-President or by any two Directors.

**SECTION 4: ORDER OF BUSINESS**

1. Roll Call
2. Reading, correction and adoption of minutes from preceding m eetings.
3. Unfinished Business
4. Reports of Directors
5. Reports of Committees
6. The regular election of Directors at every fourth-year meeting in June only.
7. New Business
8. Resolutions and Orders
9. Adjournment.

## ARTICLE VI - DIRECTORS AND THEIR DUTIES

### SECTION 1: DIRECTORS

a.    The Directors of the Moorish National Republic of Peace, all whom are members of the Board, shall consist of the following individuals:

- President-Eric Jamar Ingram: Bey
- Vice-President-Jameel Clark: El
- Secretary-Courtney Williamson: Bey
- Treasurer – Keela Walker: El
- Registrar – Rickey Williams: Bey
- Educational Director –appointed
- Finance Collector – appointed
- Humanitarian Director – appointed
- Conflict Resolution Director – appointed
- National and Citizen Director – appointed
- Liaison – appointed
- Chief of Security Director – Elwood Evans: El
- Information Technology Director –
- Infrastructure Director – Don Marcus Mitchell Bey
- Food & Drug Director – Clayton Henderson: El
- Spiritual Advisor – Shirley Anderson: Bey
- Heritage Keeper – appointed
- Jurist – appointed

b.    Directors receive no compensation other than reasonable expenses, with Presidential Approval (Net 30).

c.    Five (5) members of the Board shall constitute a quorum to conduct business at Board meetings.

d.    For the year 2020-2021, the Directors shall be voted upon and serve a term of four years.
*Afterwards, Directors, including the President and Vice* President, must be voted on by the members of the board at the annual General Membership Meeting and serve a term of four years, but are eligible for re-election to be elected by a majority vote of the board members. Directors shall serve until their successors are elected and qualified. The term of office shall begin at the end of the fiscal year following the election.

e.    For each election year, the Board shall solicit the members for Nationals and Citizens to serve as Directors for the subsequent four-year period. The slate of interested Nationals and Citizens must be provided to the President or the President 's designee, and the Secretary at least 10 days prior to the announced date of the Annual General Membership Meeting. Members may nominate themselves or other members. The slate will be presented to board members at the Annual General Meeting and be voted on by all Board members present.

f.   Any Director may resign at any time by giving written notice to the President or Vice President or to any available member of the board or Directors and such resignation shall take effect upon receipt of such letter or at any later time specified therein.

g.   If a Director has three or more unexcused absences from Board meetings over a length of one year, the Board may, at its discretion, take a vote to remove the Director from his/her current position.

h.   A Director, including the President and Vice President, may be removed, with cause, by a three-fourths vote of the Board of Directors.

i.   Board Members/Directors may (at the discretion of the board) serve in any other position/capacity within the organization.

The President shall be the Chief Executive Officer of the Moorish National Republic of Peace and shall have general supervision, direction, and control the business and affairs of the Moorish National Republic of Peace. He/She shall preside at all meetings, appoint all special committees subject to the approval of the Board, and enforce the Articles of Unincorporated Association, By-Laws, and such rules and regulations as have been enacted by the Moorish National Republic of Peace. He/She shall call such meeting as required to conduct business; cast a deciding vote on all issues on which members of the Board find themselves deadlocked; approve any voucher for payment of monies which have been duly authorized; sign along with the Treasurer all contracts and documents that bind the Moorish National Republic of Peace, and serves as the Moorish National Republic of Peace's representative at all events in which they participate, and all other duties as necessary.

The Vice-President shall, in the absence or incapacity of the President, perform the duties of the President; and assume the office of the President in the event of the President 's resignation. The Vice-President shall also serve on other committees as designated by the Board and sign with the President all contracts and documents. The Vice-President shall keep records of all proceedings of the board and every yearly General Membership Meeting. The Vice-President shall also supervise all correspondence and the preparation and revisions of all publications of the Moorish National Republic of Peace; and serve on other committees as designated by the Board.

The Treasurer shall have the custody of the Moorish National Republic of Peace's funds, shall deposit/invest all funds in the name of the Moorish National Republic of Peace in checking and/or savings accounts or reputable institution, pay all approved invoices, report the state of finances at every Board meeting or whenever required by the President and submit a written statement of accounts at the Annual General Membership Meeting. The Treasurer shall also supervise any fundraising committee and serve on other committees as designated by the Board. The Treasurer will coordinate efforts with the Board to prepare and submit to the general membership for approval and annual budget that shall include the projected income and expenses for the fiscal year, and all other duties as necessary.

The Registrar Director shall maintain all the records of the Moorish National Republic of Peace and maintain a reference file on all rules and regulations established by the Moorish National Republic of Peace. The Registrar shall verify the eligibility of every National and Citizen, supervise all registration activities of the Moorish National Republic of Peace, and serve on committees as designated by the Board and perform all other registration related duties as necessary.

The Secretary shall record meeting minutes. Write or answer letters on behalf of the Moorish National Republic of Peace with the approval and signature of the President. Give a detailed report at every meeting. File minutes into archive record. Perform all other clerical and administrative duties as necessary.

The Educational Director shall create and maintain an educational curriculum, maintain and track the scholastic information for the Moorish National Republic of Peace. Shall maintain a copy of each National and Citizen's Orientation progression through Moorish Science and Civics to ensure the National and Citizen meets the minimum educational standards for Moorish National Republic of Peace. In the event a participant does not meet the scholastic standards, the scholastic coordinator shall follow up with the National and Citizen to provide a one on one tutoring environment. The Educational Coordinator will also identify those participants who meet the criteria for the Moorish National Republic of Peace Advance Studies and give the Nationals and Citizens directions on how to proceed, and all other duties as necessary.

The Conflict Resolution Director shall develop and implement an ongoing plan to recognize and deal with disputes in a rational, balanced and effective way in support of the Moorish National Republic of Peace Constitution and L.EYE.P Creed; work in mediation, arbitration and conciliation to find resolutions between Moorish National Republic of Peace and disputing parties without having to resort to the court system; and facilitate conversation and dialogue to produce positive outcomes. He or She shall serve on other committees as designated by the Board and all other duties as necessary.

The Information Technology Director shall effectively oversee the technical processes and operations of information technology of the Moorish National Republic of Peace to include the future planning, as well as for the implementation and maintenance of current systems. Organizing the implementation and maintenance of current systems. He/She also must ensure maximum uptime and stability in the M.N.R.P. computer systems and networks.

The Finance Collection Director shall oversee the Moorish National Republic of Peace financial collection department, develop and administer collection programs, oversee investigation of credit risk in customers and suppliers. He/She supervises staff to ensure that all money owed to the Moorish National Republic of Peace is billed and received correctly and in a timely fashion. He/She shall design and implement processes to improve cash flow.

The Liaison Director shall liaise between the Moorish National Republic of Peace and other organizations to communicate and coordinate their activities by serving as an official go-between for the senior officials of the Moorish National Republic of Peace and other organizations. The Liaison is also expected actively communicate with other organizations to expand partnerships and attend meetings with outside organizations.

The National and Citizen Director shall oversee, manage all interactions between the Nationals and Citizens and the Board of Directors as well as maintain documents pertaining to such interactions and refer all issues to the Board of Directors as appropriate.

The Infrastructure Director shall oversee the operations of construction sites, from planning to completion of all erected structures and buildings of the government outreach. His/Her duties will vary from being responsible for daily scheduling, supervising all activities and tasks, to ensuring the safety and compliance of all jobs on the site.

The Food & Drug Director shall oversee the operations of growing/maintaining healthy food and water and holistic medicinal herbs for the purposes of nutrition as well as health and wellness.

The Spiritual Advisor shall provide private counsel to the President as needed and requested.

Heritage Keeper is responsible for the unique identity, values, traditions, culture, and artifacts of the Moorish National Republic of Peace.

Jurist shall oversee the operations of the Judicial system, as well as bring forth charges against any violators of the Constitution or the Public laws of M.N.R.P

## ARTICLE VII - NATIONALS AND CITIZENS AND THEIR DUTIES

### SECTION 1 – NATIONAL AND CITIZEN

Every associate with the Moorish National Republic of Peace will be represented by a National and Citizen who shall serve as the final arbitrating authority of associates of the government.  The National and Citizen is also responsible for ensuring that all actions, and activities sponsored by the Moorish National Republic of Peace adhere to MOORISH NATIONAL REPUBLIC OF PEACE Constitutional Laws and the L.EYE.P.

### SECTION 2 – TRANSITIONAL NATIONAL AND CITIZEN

The Transitional National and Citizen shall serve as the representative for all individuals transitioning into or out of the government. They shall be responsible for those individuals needs and concerns, providing structured time to learn and apply all rules and regulations, assess their strengths and weaknesses and assist with vocational placement beneficial to the government.

### SECTION 3 – SENIOR NATIONAL AND CITIZEN

The Senior National and Citizen will serve as the representative for all seniors 55 and older in the government. They shall be responsible for organizing and ensuring all actions and activities for seniors sponsored by the Moorish National Republic of Peace that will adhere to the MOORISH NATIONAL REPUBLIC OF PEACE Laws and the L.EYE.P Creed. This National and Citizen shall also coordinate with the Food & Drug Director to implement a plant-based meal plan to work towards no longer needing the assistance of all man-made medications for the seniors of the government.

### SECTION 4 - REHABILITATION NATIONAL AND CITIZEN

The Rehabilitation National and Citizen will be appointed and serve to ensure that all associates that are newly released from incarceration or continuing to pay their debt to society are fully integrated once completing the rehabilitation program and upholding the MOORISH NATIONAL REPUBLIC OF PEACE Laws and the L.EYE.P Creed.

### SECTION 5 – THE ASSOCIATES

The Associates include but are not limited to all the Nationals and Citizens of the MOORISH NATIONAL REPUBLIC OF PEACE and will always represent the Moorish National Republic of Peace in a professional manner, upholding the Constitution and Laws of the MOORISH NATIONAL REPUBLIC OF PEACE and the L.EYE.P Creed, while holding each other accountable.

<u>**ARTICLE VIII-COMMITTEES**</u>

**SECTION I: UTILIZATION OF COMMITTEES**

The Board of Directors may *appoint* committees from time to time to assist in the operations of the Moorish National Republic of Peace, have power as designated by the Board, and serve at the pleasure of the Board.

**SECTION 2: STANDING COMMITTEE**

1. Board members are free to attend all committee meetings, but should not feel obligated to do so unless otherwise required in the by-laws or appointed to a committee by the President.

2. There shall be three (3) standing Committees: Finance, Public Relations, and Disciplinary.

3. The Chair of each committee will be a Board member.

4. The body of the committees will be comprised of Board members, Nationals and Citizens, and other interested associates from the government.

5. Committee members will be appointed annually.

**SECION 3: COMMITTEE MINUTES**

All committees created by the Board shall keep regular and detailed records of their activities and make regular reports to the full Board of Directors.

<u>**ARTICLE IX-STANDING COMMITTEES**</u>

**SECTION I: COMMITTEE CHAIR DUTIES**

1. The duties of the Chair of all committees are as follows: President Presides at all meetings of the committees.

2. See that all duties and responsibilities of the committee are properly and promptly followed out.

3. Communicates with the Committee members to keep them fully informed of the happenings and necessary decisions to carry out the committee's responsibilities.

**FINANCE COMMITTEE**

1. The Treasurer is chair of the Finance Committee, which is responsible for coordinating and implementing all aspects of the Finances for the Moorish National Republic of Peace.

2. The Finance Committee shall develop and maintain a Financial Database, which will include all receipts and expenditures for the Moorish National Republic of Peace.

3. The Finance Committee shall coordinate and train volunteer associates to assist with the registration process for all Moorish National Republic of Peace events and activities.

DISCIPLINARY COMMITTEE

1. The Vice-President shall chair the Disciplinary Committee.

2. The Disciplinary Committee will meet as needed to rule on any written grievance submitted to the Moorish National Republic of Peace.

3. The Disciplinary Committee shall exist of all Board members except for the President.

4. The President will hear and rule on all appeals, and have the final say on such matters.

PUBLIC RELATIONS COMMITTEE

1. The Public Relations Committee will meet as needed to decide the best course of action for any events that the Moorish National Republic of Peace sponsors as well as be responsible for the final correspondence/ notices that will be disseminated to the Public (with prior approval) which will mold the image of the Moorish National Republic of Peace.

2. The Public Relations Committee shall consist of Associates that will be selected at the discretion of the Chairpersons.

## ARTICLE X—CODE OF CONDUCT

### SECTION 1 – DIRECTORS

1. SEE THE MOORISH NATIONAL REPUBLIC OF PEACE CONSTITUTION AND LAWS AND THE L.EYE.P CREED.

### SECTION 2 – NATIONALS AND CITIZENS

1. SEE THE MOORISH NATIONAL REPUBLIC OF PEACE CONSTITUTION AND LAWS AND THE L.EYE.P CREED.

### SECTION 3 - ASSOCIATES

1. **SEE THE MOORISH NATIONAL REPUBLIC OF PEACE CONSTITUTION AND LAWS AND THE L.EYE.P CREED.**

## ARTICLE XI-MOORISH NATIONAL REPUBLIC OF PEACE RECORDS AND REPORTS

### SECTION 1 – RECORDS

The Moorish National Republic of Peace shall maintain accurate and correct books, records and accounts of its business and properties. All such books, records and accounts shall be kept at a place of business as fixed by the Board of Directors, except as otherwise provided by law.

### SECTION 2 – INSPECTION

All books and accounts of the Moorish National Republic of Peace shall be open to inspection by the government in the manner and to the extent required by law and by appointment.

### SECTION 3 – CERTIFICATION AND INSPECTION OF BY LAWS

The original or a copy of the Bylaws, shall be open to inspection by the Nationals and Citizens and Directors in the manner and to the extent required by law.

### SECTION 4 – CHECKS, DRAFTS, ETC

All checks, drafts or other orders for payment of money, notes or other evidences of indebtedness, issued in the name of or payable to the MOORISH NATIONAL REPUBLIC OF PEACE OR M.N.R.P. shall be signed or endorsed by such person or persons and in such manner as shall be determined by the Board of Directors.

## ARTICLE XII - GENERAL PROVISIONS

### SECTION 1: FISCAL YEAR

The fiscal year shall be January 1 through December 31.

### SECTION 2: NAME AND SEAL

MOORISH NATIONAL REPUBLIC OF PEACE



## <u>ARTICLE XIII-FINANCES SECTION 1: REGISTRATION FEES</u>

1. **Fees will be assessed as needed and approved by the Board of Directors.**

### SECTION 2: FINANCE COMMITTEE

1. **The Treasurer is the chair of the Finance Committee.**

2. **The Finance Committee is responsible for developing and enforcing fiscal procedures.**

3. **The finance Committee is responsible for developing the annual budget, which must be approved by the Board.**

4. **The fiscal year shall follow the M.N.R.P. calendar year. Annual reports are required to be submitted to the Board of Directors showing income, expenditures and pending income.**

5. **The financial reports of the Moorish National Republic of Peace are government information and shall be made available to the Board and the people in the manner and to the extent required by law.**

### SECTION 3: INDEMNIFICATION

**The Moorish National Republic of Peace does hereby save and hold harmless and indemnify the officers, members and directors of the Moorish National Republic of Peace to the fullest extent allowed by law while acting reasonable within the scope of their capacity as an officer, member or director under MOORISH NATIONAL REPUBLIC OF PEACE Constitution and Laws.**

### SECTION 4: FEES AND DUES

**The Board of Directors determines annual membership fees and categories.**

1. **Nationals and Citizens**
   a. **Are required to pay filing fees to Declare Nationality.**
   b. **Nationals and Citizens are required to be a member of the MOORISH NATIONAL REPUBLIC OF PEACE. To apply for membership, you must fill out a MOORISH NATIONAL REPUBLIC OF PEACE application and Trustee Package.**

2. **Directors**

    a. Directors are required to be domiciling at **MOORISH NATIONAL REPUBLIC OF PEACE** base within the Provinces secured.

3. **Identification Instruments – Prices TBD**
    a. **MOORISH NATIONAL REPUBLIC OF PEACE National Passport Identification Card**
    b. **Birth Certificate**
    c. **Marijuana Card**

## ARTICLE XIV PERSONAL USE OF MARIJUANA AND OTHER SUBSTANCES

### PURPOSE AND FINDING

1. **In the interest of the efficient use of law enforcement resources and enhancing revenue for public purposes and individual freedom, The People of the Moorish National Republic of Peace hereby find and declare that the use of marijuana, iboga, psilocybin mushrooms, peyote, and dimethyltryptamine should be legal for persons eighteen years of age or older and taxed in a manner similar to alcohol.**

2. **In the interest of the health and public safety of our citizenry, The People of the MOORISH NATIONAL REPUBLIC OF PEACE further find and declare that marijuana should be regulated in a manner similar to alcohol so that:**

    a. **Individuals will have to show proof of age before purchasing marijuana;**
    b. **Selling, distributing, or transferring marijuana to minors and other individuals under the age of eighteen shall remain illegal;**
    c. **Driving under the influence of marijuana shall remain illegal;**
    d. **Legitimate, taxpaying business people, and not criminal actors, will conduct sales of marijuana;**
    e. **Marijuana sold in this Republic will be labeled and subject to additional regulations to ensure that consumers are informed and protected.**

3. **In the interest of enacting rational policies for the treatment of all variations of the cannabis plant, The People of MOORISH NATIONAL REPUBLIC OF PEACE further find and declare that industrial hemp should be cultivated and regulated separately from strains of cannabis with higher delta-9 tetrahydrocannabinol (THC) concentrations.**

4. **The People of the MOORISH NATIONAL REPUBLIC OF PEACE further find and declare that it is necessary to ensure**

consistency and fairness in the application of this section throughout the Republic; and therefore, the matters addressed by this section are, except as specified herein, matters of Republic concern.

DEFINITIONS: As used in this section, unless the context otherwise requires,

a.  "Iboga" and "Ibogaine" means all parts of the plant of the genus Tabernanthe, Voacanga Africana, and Tabernaemontana undulate whether growing or not, the seeds thereof, the resin extracted from any part of the plant, and every compound, manufacture, salt, derivative, mixture, or preparation of the plant, its seeds, or its resin, including concentrated forms.

b.  "Peyote" or "mescaline" means all parts of the plant of the genus Lophophora williamsii whether growing or not, the seeds thereof, the resin extracted from any part of the plant, and every compound, manufacture, salt, derivative, mixture, or preparation of the plant, its seeds, or its resin, including concentrated forms.

c.  "Psilocybin" or "Psilocybin mushrooms" means all parts of the plant of the genus Psilocybe whether growing or not, the seeds thereof, the resin extracted from any part of the plant and every compound, manufacture, salt, derivative, mixture, or preparation of the plant, its seeds, or its resin, including concentrated forms.

d.  "Dimethyltryptamine" or "ayahuasca" means all parts of the plants of the genus Banisteriopsis caapi, Diploterys cabrerana, Psychotria and all other plants from which may be derived the structural analog of serotonin and melatonin and a functional analog of other psychedelic tryptamines such as 4-AcO-DMT, 5-MeO-DMT, 5-OHDMT, psilocybin (4-PO-DMT), and psilocin (4-OH-DMT), whether growing or not, the seeds therefrom, the resin extracted from any part of the plant, and every compound, manufacture, salt, derivative, mixture, or preparation of the plant, its seeds, or its resin, including concentrated forms.

e.  "Consumer" means a person twenty-one years of age or older who purchases marijuana or marijuana products for personal use by persons eighteen years of age or older, but not for resale to others.

f.  "Department" means the department of revenue or its successor

Page **16** of **34**

agency.

g. "Industrial Hemp" means the plant of the genus cannabis and any part of such plant, whether growing or not, with a delta-9 tetrahydrocannabinol concentration that does not exceed three-tenths percent on a dry weight basis

h. "Locality" means county, municipality, or city and county.

i. "Marijuana" or "Marihuana" means all parts of the plant of the genus cannabis whether growing or not, the seeds thereof, the resin extracted from any part of the plant, and every compound, manufacture, salt, derivative, mixture, or preparation of the plant, its seeds, or its resin, including marihuana concentrate, "marijuana or marihuana does not include industrial hemp, nor does it include fiber produced from the stalks, oil, or cake made from the seeds of the plant, sterilized seed of the plant which is incapable of germination, or the weight of any other ingredient combined with marijuana to prepare topical or oral administrations, food, drink, or other product.

j. "Marijuana accessories" means any equipment, products, or materials of any kind which are used, intended for use, or designed f or use in planting, propagating, cultivating, growing, harvesting, composting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, vaporizing, or containing marijuana or for ingesting, inhaling, or otherwise introducing marijuana into the human body.

k. "Marijuana cultivation facility" means an entity licensed to cultivate, prepare, and package marijuana and sell marijuana to retail marijuana stores, to marijuana product manufacturing facilities, and to other marijuana cultivation facilities, but not to consumers.

l. "Marijuana establishment" means a marijuana cultivation facility, marijuana testing facility, a marijuana product manufacturing facility, or a retail marijuana store.

m. "Marijuana product manufacturing facility" means and entity licensed to purchase marijuana; manufacture, prepare, and package marijuana products; and sell marijuana and marijuana product manufacturing facilities and to retail marijuana stores,

but not to consumers.

n.       "Marijuana products" means concentrated marijuana products and marijuana products that are comprised of marijuana and other ingredients and are intended for use or consumption, such as, but not limited to edible products, ointments, and tinctures.

o.       "Marijuana testing facility" means an entity licensed to analyze and certify the safety and potency of marijuana.

p.       Medical marijuana center" means an entity licensed by a Republic agency to sell Marijuana and marijuana products.

q.       "Retail marijuana store: means an entity licensed to purchase marijuana from marijuana cultivation facilities and marijuana and marijuana products from marijuana product manufacturing facilities and to sell marijuana products to consumers.

r.       "Unreasonably impracticable" means that the measures necessary to comply with the regulations require such a high investment of risk, money, time, or any other resource asset that the operation of a marijuana establishment is not worthy of being carried out in practice by a reasonably prudent businessperson.

s.       For sake of common use and brevity under this article, the regulations adopted herein with specific reference to "marijuana" are simultaneously adopted where their application would be synonymous or analogous to those of "peyote" "mescaline", "iboga", "ibogaine", "psilocybin", "DMT", and "ayahuasca". Wherever in these regulations enacted within this article the word "marijuana" is used, the terms "peyote", "mescaline", "iboga", "ibogaine", "psilocybin", "DMT", and "ayahuasca" may be substituted in every place and in every section where the word "marijuana" is used and shall be enacted as though adopted to the same as far as applicable, reasonable, and of worthwhile mental, spiritual, physical, and societal benefit to The People of the MOORISH NATIONAL REPUBLIC OF PEACE .


PERSONAL USE OF MARIJUANA

Notwithstanding any other provision of law, following acts are not unlawful and shall not be an offense under the MOORISH NATIONAL REPUBLIC OF PEACE or the law of any locality within the Provinces of the MOORISH NATIONAL REPUBLIC

OF PEACE or be a basis for seizure or forfeiture of assets under the MOORISH NATIONAL REPUBLIC OF PEACE Laws for persons eighteen years of age or older.

a.    Possessing, using, displaying, purchasing, or transporting marijuana accessories or one pound or less marijuana.

b.    Possessing, growing, processing, or transporting no more than six marijuana plants, with three or fewer being mature, flowering plants, and possession of the marijuana produced by the plants on the premises where the plants were grown, provided that the growing takes place in an enclosed, locked space, is not conducted openly or publicly, and is not made available sale.

c.    Transfer of one pound or less of marijuana without remuneration to a person who is eighteen years old or younger.

d.    Consumption of marijuana provided that nothing in this section shall permit consumption that is conducted openly and publicly or in a manner that endangers others.

e.    Assisting another person who is eighteen years of age or older in any of the acts described in paragraphs (a) through (d) of this subsection.

## LAWFUL OPERATION OF MARIJUANA-RELATED FACILITIES

Notwithstanding any other provision of law, the following acts are not unlawful and shall not be an offense under the MOORISH NATIONAL REPUBLIC OF PEACE Laws or be a basis for seizure or forfeiture of assets under law for persons eighteen years of age or older:

a.    Manufacture, possession, or purchase of marijuana accessories or the sale of marijuana accessories to a person who is eighteen years of age or older.

b.    Possessing, displaying, or transporting marijuana or marijuana products; purchase of marijuana from marijuana cultivation facility; purchase or marijuana or marijuana products to consumers, if

## REGULATION OF MARIJUANA

Page **19** of **34**

a.    Not later than January 1, 2021, the department shall adopt regulations necessary for implementation of this section. Such regulations shall not prohibit the operation of marijuana establishments, either expressly or through regulations that make their operation unreasonably impracticable. Such regulations shall include:

1.    Procedures for the issuance, renewal, suspension, and revocation of a license to operate a marijuana establishment;

2.    A schedule of application, licensing and renewal fees, provided, application fees shall not exceed five thousand dollars, with this upper limit adjusted annually for inflation, unless the department determines a greater fee is necessary to carry out its responsibilities under this section;

3.    Qualifications for licensure that are directly and demonstrably related to the operation of a marijuana establishment;

4.    Security requirements for marijuana establishments;

5.    Labeling requirements for marijuana products sold or distributed by a marijuana establishment.

6.    Health and safety regulations and standards for the manufacture or marijuana products and the cultivation of marijuana.

7.    Restrictions on the advertising and display of marijuana and marijuana products; and

8.    Civil penalties for the failure to comply with regulations made pursuant to this section.

b.    In order to ensure the most secure, reliable, and accountable system for the production and distribution of marijuana and marijuana products in accordance with this subsection, in any competitive application process the department shall have as a primary consideration whether an applicant;

1.    Has prior experience producing or distributing marijuana products pursuant to section k of this article in the locality in which the applicant seeks to operate a marijuana establishment; and

2.      Has prior experience described in subparagraph (1), compiled consistently with section k of this article, and conforming regulations.

c.      In order to ensure that individual privacy is protected, notwithstanding paragraph (a) the department shall not require a consumer to provide a retail marijuana store with personal information other than government-issued identification to determine the consumer's age, and a retail marijuana store shall not be required to acquire and record personal information about consumers other than information typically acquired in a financial transaction conducted a retail liquor store.

d.      The general assembly shall enact an excise tax to be levied upon marijuana sold or otherwise transferred by a marijuana cultivation facility to a marijuana product manufacturing facility or to a retail marijuana store at a rate not to exceed fifteen percent prior to November 1, 2020 and at a rate to be determined by the general assembly thereafter, and shall direct the department to establish procedures for the collection of all taxes levied. Provided the first forty million dollars in revenue raised annually from any such excise tax shall be credited to an established government trust fund to be named at a later time or any successor fund dedicated to a similar purpose. Provided further, no such excise tax shall be levied upon marijuana intended for sale at medical marijuana centers pursuant to section k of this article.

e.      Not later than November 1, 2020, each locality shall enact an ordinance or regulation specifying the entity within the locality that is responsible for processing applications submitted for a license to operate a marijuana establishment within the boundaries of the locality and for the issuance of such licenses should the issuance by the locality become necessary because of a failure by the department to adopt regulations pursuant to paragraph (g).

f.      A locality may enact ordinances or regulations, not in conflict with this section or with regulations or legislation enacted pursuant to this section, governing the time, place, manner and number of marijuana establishment operations; establishing procedures for the issuance, suspension, and revocation of a license issued by the locality in accordance with paragraph (h) or

(i) establishing a schedule of annual operating, licensing, and application fees for marijuana establishments, provided, the application fee shall only be due if an application is submitted to a locality in accordance with paragraph (i) and licensing fee shall only be due if a license is issued by a locality in accordance with paragraph (h) or (i) and establishing civil penalties for violation of an ordinance or regulation governing the time, place, and manner of a marijuana establishment that may operate in such locality. A locality may prohibit the operation of marijuana cultivation facilities, marijuana product manufacturing facilities, marijuana testing facilities, or retail marijuana stores through the enactment of an ordinance or through an initiated or referred measure; provided, any initiated or referred measure to prohibit the operation of marijuana cultivation facilities, marijuana product manufacturing facilities, marijuana testing facilities, or retail marijuana stores through the enactment of an ordinance or through an initiated or referred measure; provided, any initiated or referred measure to prohibit the operation of marijuana cultivation facilities, marijuana product manufacturing facilities marijuana testing facilities, or retail marijuana stores must appear on a general election ballot during an even numbered year.

g.   Each application for an annual license to operate a marijuana establishment shall be submitted to the department. The department shall:

1.   Begin accepting and processing applications on January 1, 2021;

2.   Immediately forward a copy of each application and half of the license application fee to the locality in which the applicant desires to operate the marijuana establishment;

3.   Issue an annual license to the applicant between forty-five (45) and ninety (90) days after receipt of an application unless the department finds the applicant is not in compliance with regulations enacted pursuant to paragraph (a) or the department is notified by the relevant locality that the applicant is not in compliance with ordinances and regulations made pursuant to paragraph (f) and in effect at the time of the application, provided, where a locality has enacted a numerical limit on the number of marijuana establishments and a greater number of applicants seek licenses, the department shall solicit and consider input from the locality as to the locality's preference or

preferences for licensure; and

4.     Upon denial of an application, notify the application in writing of the specific reason for its denial.

h.     If the department does not issue a license to an applicant within ninety days of receipt of the application filed in accordance with paragraph (g) and does not notify the applicant of the specific reason for its denial, in writing and within such time period, or if the department has adopted regulations pursuant to paragraph (a) and has accepted applications pursuant to paragraph (g) but has not issued by licenses by January 1, 2021, the applicant may resubmit its application directly to the locality, pursuant to paragraph (e), and the locality may issue an annual license to the applicant. A locality issuing a license to an applicant shall do so within ninety days of receipt of the resubmitted application unless the locality finds and notifies the applicant that the applicant is not in compliance with ordinances and regulations mad pursuant to paragraph (f) in effect at the time the application is submitted to a locality under this paragraph, the department shall forward to the locality the application fee paid by the applicant to the department upon request by the locality. A license issued by a locality in accordance with this paragraph shall have the same force and effect as a license issued by the department in accordance with paragraph (g) and the holder of such license shall not be subject to regulation or enforcement by the department during the term of that license. A subsequent or renewed license may be issued under this paragraph on an annual basis only upon resubmission to the locality of a new application submitted to the department pursuant to paragraph (g).

i.     An applicant may submit an application directly to a locality after January 1, 2021 and the locality may issue an annual license to the applicant. A locality issuing a license to an applicant shall do so within ninety days of receipt of the application unless it finds and notifies the applicant that the applicant is not in compliance with ordinances and regulations made pursuant to paragraph

f      in effect at the time of application and shall notify the department if an annual license has been issued to the applicant. A license issued by a locality in accordance with this paragraph shall have the same force and effect as a license issued by the department in accordance with paragraph (g) and the holder of such license shall not be subject to regulation or enforcement by the

department during the term of that license. A subsequent or renewed license may be required by paragraph (a) at least ninety days prior to the date upon which such subsequent or renewed license would be effective or if the department has adopted regulations pursuant to paragraph (a) but has not, least ninety days after the adoption of such regulations, issued licenses pursuant to paragraph (g).

j.       Not later than January 1, 2021, the general assembly shall enact legislation governing the cultivation, processing and sale of industrial hemp.

k.       TAKING PRIVATE PROPERTY FOR PRIVATE USE. Private property shall not be taken for private use unless by consent of the owner, except for private ways of necessity and except for reservoirs, drains, flumes or ditches on or across the lands of others for agricultural, mining, milling, or domestic or sanitary purposes.

## EMPLOYERS, DRIVING, MINORS AND CONTROL OF PROPERTY

a.       Nothing in this section is intended to require an employer to permit or accommodate the use, consumption, possession, transfer, display, transportation, sale or growing of marijuana in the workplace or to affect the ability of employers to have policies restricting the use of marijuana by employees.

b.       Nothing in this section is intended to allow driving under the influence of marijuana or driving while impaired by marijuana or to supersede statutory laws related to driving under the influence or marijuana or driving while impaired by marijuana, nor shall this section prevent the Republic from enacting and imposing penalties for driving under the influence of or while impaired by marijuana

c.       Nothing in this section is intended to permit the transfer of marijuana, with or without remuneration, to a person under the age of twenty-one or to allow a person under the age of twenty-one to purchase, possess, use, transport, grow, or consume marijuana.

d.       Nothing in this section shall prohibit a person, employer, school, hospital, detention facility, corporation or any other entity who occupies, owns or controls a property from prohibiting or

Page **24** of **34**

otherwise regulating the possession, consumption, use, display, transfer, distribution, sale, transportation, or growing of marijuana on or in that property.

## MEDICAL MARIJUANA PROVISIONS UNAFFECTED

Nothing in this section shall be construed:

a.        To limit any privileges or rights of a medical marijuana patient, primary caregiver, or license entity as provided in Section k of this article;

b.        To permit a medical marijuana center to distribute marijuana to a person who is not a medical marijuana patient;

c.        To permit a medical marijuana center to purchase marijuana or marijuana products in a manner or from a source not authorized;

d.        To permit any medical marijuana center licensed pursuant to section k of this article to operate on the same premises as a retail marijuana store;

SELF-EXECUTING, SERVERABILITY, CONFLICTING PROVISIONS. All provisions of this section are self-executing except as specified herein, are severable, and except where otherwise indicated in the text, shall supersede conflicting Republic statutory, local charter, ordinance, or resolution, and other Republic and local provisions.

EFFECTIVE DATE. Unless otherwise provided by this section, all provisions of this section shall become effective upon official declaration of the vote, pursuant to article VI (c).

## ARTICLE XV FULL FAITH AND CREDIT, PRIVILIGES AND IMMUNITIES

### Section 1. Full Faith and Credit among Provinces

Full Faith and Credit shall be given in each Province to the Public Acts, Records, and judicial proceedings of every other Province; and the Board of Directors may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the effect thereof.

### Section 2. Privileges and Immunities, Fugitives

Clause 1.　　The Citizens of the MOORISH NATIONAL REPUBLIC OF PEACE shall be entitled to all Privileges and Immunities of Citizens in the United States of America.

Clause 2.　　An Individual charged in any Province or State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another Jurisdiction, shall on Demand of the executive Authority of the Province or State from which he fled, be delivered up, to be removed to the Province or State having Jurisdiction of the Crime.

Clause 3.　　No individual held to Service or Labour in one Province or State, under the Laws thereof, escaping into another, shall, in consequence of any Law or Regulation therein, be discharged from such Service or Labour, but shall be delivered up on Claim of the Party to whom such Service or Labour may be due.

## Section 3. Admission of New Provinces

Clause 1.　　New Provinces may be admitted by the Board of Directors into this State; but no new Province shall be formed or erected within the Jurisdiction of any other Province; nor any Province be formed by the Junction of two or more Provinces, or Parts of Provinces, without the Consent of the Board of Directors of the Provinces concerned, as well as of the MOORISH NATIONAL REPUBLIC OF PEACE Board of Directors.

Clause 2.　　The Board of Directors shall have power to dispose of and make all needful Rules and Regulations respecting the Provinces or other Property belonging to the MOORISH NATIONAL REPUBLIC OF PEACE. Nothing in this Constitution shall be so construed as to Prejudice any Claims of the MOORISH NATIONAL REPUBLIC OF PEACE or of any particular Province.

## Section 4. Guarantee of a "Republic" Government

The MOORISH NATIONAL REPUBLIC OF PEACE shall guarantee to every Province in this State a Republic Form of Government, and shall protect each of them against Invasion; and on Application of the Board of Directors against domestic violence.

## ARTICLE XVI AMENDMENT OF CONSTITUITON

The Board of Directors, whenever two thirds of the Board shall deem it necessary, shall propose Amendments to this Constitution or on the Application of the Board of Directors of two thirds of the Provinces, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes as Part of this Constitution when ratified by the Board of Directors of three fourths of the Provinces or by Conventions in the three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Board of Directors.

## ARTICLE XVII DEBTS, SUPREMACY, OATHS

**Clause 1.**      All Debts contracted and Engagements entered into, before the Adoption of this Constitution, shall be as valid against the MOORISH NATIONAL REPUBLIC OF PEACE under this Constitution, as under the Confederation.

**Clause 2.**      This Constitution, Treaty of Peace and Friendship Between the Empire of Morocco and United States 1786/1787/1836, and the Laws of the MOORISH NATIONAL REPUBLIC OF PEACE, which shall be made in Pursuance thereof, and all Treaties made or which shall be made, under the Authority of the MOORISH NATIONAL REPUBLIC OF PEACE, shall be the supreme Laws of the Land; and the Board of Directors of the MOORISH NATIONAL REPUBLIC OF PEACE, and the Provinces of the MOORISH NATIONAL REPUBLIC OF PEACE shall be bound thereby; anything in the Constitution or Laws of any State to the contrary notwithstanding.

**Clause 3.**      The Board of Directors before mentioned, the Members of the Provincial Board of Directors, and all members of the MOORISH NATIONAL REPUBLIC OF PEACE, shall be bound by Oath or Affirmation, to support this Constitution; and no religious test shall be required as Qualification to any Office or Public Trust under the MOORISH NATIONAL REPUBLIC OF PEACE.

## AMENDMENTS
## BILL OF RIGHTS

## AMENDMENT I
## Freedom of Religion, of Speech, and of the Press

Board of Directors shall make no law respecting an establishment

Page **27** of **34**

of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or the press; or the right of The People peaceably to assembly, and to petition the Government for redress of grievances.

## AMENDMENT II
## Right to Keep and Bear Arms

A well-regulated Militia being necessary to the security of a Free State, the right of The People to keep and Bear Arms shall not be infringed. Not to be construed with granting the individual Nationals or citizens the right to bear arms.

Sec. 1.    The MOORISH NATIONAL REPUBLIC OF PEACE militia being the Law Enforcement of this Sovereign Nation State whose sworn duty is the protection of the MOORISH NATIONAL REPUBLIC OF PEACE.

Sec. 2.    The MOORISH NATIONAL REPUBLIC OF PEACE and The People of the MOORISH NATIONAL REPUBLIC OF PEACE are one and the same.

## AMENDMENT III
## Quartering of Soldiers

No soldier shall, in time of peace be quartered in any house, without consent of the Owner, nor in time of war, but in a manner to be prescribed by law.

## AMENDMENT IV
## Security from Unwarrantable Search and Seizure

The right of The People to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall be issued, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

## AMENDMENT V
## Rights of Accused in Criminal Proceedings

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

## AMENDMENT VI
### Right to a Speedy Trial, Witnesses, etc.

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the Province or State wherein the crime shall have been committed, which Province or State shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.

## AMENDMENT VII
### Trial by Jury in Civil Cases

In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the MOORISH NATIONAL REPUBLIC OF PEACE, than according to the rules of the common law.

## AMENDMENT VIII
### Bails, Fines, Punishments

Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

## AMENDMENT IX
### Reservation of Rights of The People

The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by The People.

**AMENDMENT X**
**Powers Reserved to Provinces or People**

The powers not delegated to the MOORISH NATIONAL REPUBLIC OF PEACE by the Constitution, or where it prohibits the Provinces, United States and several states, are reserved to the MOORISH NATIONAL REPUBLIC OF PEACE respectively, or to The People.

**AMENDMENT XI**
**Restriction of Judicial Power**

The Judicial power of the United States or the several States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the Citizens of the MOORISH NATIONAL REPUBLIC OF PEACE by Citizens of the United States, another State, or by Citizens or Subjects of any Foreign State.

**AMENDMENT XII**
**Abolition of Slavery**

Section 1. Abolition of Slavery; Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the MOORISH NATIONAL REPUBLIC OF PEACE or any place subject to their jurisdiction.

Section 2. Power to enforce this Article; Board of Directors shall have power to enforce this article by appropriate legislation.

Section 3. The prohibition of slavery contained in the Twelfth Amendment extends not only to slavery per se, but also to the "badges and incidents" of slavery such as Negro, black, colored, Afro American, African American shall be recognized as slave brands or badges.

Section 4.    Shall Prohibit the Provinces, UNITED STATES as well as the states from making or enforcing any law which shall abridge the privileges or immunities of citizens of the MOORISH NATIONAL REPUBLIC OF PEACE; from depriving any person of life, liberty, or property, without due process of law; and from

denying to any person within their jurisdiction the equal protection of the laws.

## AMENDMENT XIII
## REPATRIATION

Section 1.    This State shall have the power of repatriation; the repatriation of coloreds, negroes, black, afro-Americans and African-Americans back to the divine creed of their forefathers; Back to Statehood, back to the Constitutional fold of this free National Government; Back to being Moors, Moorish Americans, Moorish Nationals, and National Citizens.

Section 2.    All Nationals and Citizens of the MOORISH NATIONAL REPUBLIC OF PEACE, upon taking the Oath of Allegiance to the MOORISH NATIONAL REPUBLIC OF PEACE, shall be pardoned of all past crimes of colorable laws. The United States, or several states, shall not use such criminal records against a National or Citizen of the MOORISH NATIONAL REPUBLIC OF PEACE. No pardon shall be given for capital crimes, murder, rape or treason.

Section 3.    Expatriation shall be voluntary. No National or Citizen of this State shall be forced to Expatriate by the State. Expatriation as well as Repatriation is an Unalienable Right of each National or Citizen.

Section 4.    This Amendment includes all Moorish Americans who have declared their Nationality before or after the adoption of this Constitution; No paperwork needs to be filed; declaration of Nationality begins when Nationality is stated; which can be verified by a phone call or writing by the Nation concerned.

## AMENDMENT XIV
## Public Ministers

Ambassadors and other Public Ministers and Consuls Shall hold office of trust, or profit under the MOORISH NATIONAL REPUBLIC OF PEACE and are Delegated with the Powers of the MOORISH NATIONAL REPUBLIC OF PEACE and are vested with the powers to;

Page **31** of **34**

Section 1.           Exercise the principal diplomatic functions to conduct foreign relations with foreign Nations, to Establish and Enforce Treaty Agreements as well as the pursuit of Justice in Domestic and International Affairs and shall have Power to Enforce the "Laws of Nations", "The American Declaration on the Rights of Indigenous Peoples", "Universal Declaration of Human Rights", the "International Covenant on Civil and Political Rights", "Vienna Declaration and Programme of Action", "Convention on the Rights of the Child", "Declaration on the Elimination of all Forms of Intolerance and Discrimination Based on Religion or Belief", and the "Geneva Convention";

Section 2.           Shall have power to make agreements and Enforce agreements and other constructive arrangements made with States, or their successors according to their original spirit and intent; shall have the Powers of handling Negotiations and extradition of Political Prisoners and Hostage Release; the Power to Assert their Sovereign Prerogative in any Court of Law;

Section 3.           Ambassadors, others, Public Ministers, and Consuls are vested with the Powers, Privileges, and Immunities of the State and shall have the Power to Repatriate, or Expatriate negroes, blacks, African-Americans and other Indigenous Aboriginal people back to, or from the Jurisdiction of the MOORISH NATIONAL REPUBLIC OF PEACE;

Section 4.           Public Ministers shall enforce all the laws of the MOORISH NATIONAL REPUBLIC OF PEACE and shall enforce them with no malicious intent; Public Ministers shall always seek truth over convictions and no Public Minister shall use his/her office for personal vendetta or for his/her personal gain. Public Ministers have one rule to live by, "Justice";

Section 5.           Public Ministers serve a Lifetime Appointment and shall hold their offices during Good Behavior;

                     Public Ministers shall have power to arrest, enforce and issue indictments for violations of the above Sections.

## AMENDMENT XV
### Province Recorder

                     Each State within the MOORISH NATIONAL REPUBLIC OF PEACE Provinces shall keep and Guarantee a Province

Recorder. The Province Recorder shall maintain records at all times for Public Record and or the National Archive for the MOORISH NATIONAL REPUBLIC OF PEACE.

## AMENDMENT XVI
### Divine Founders

Section 1.    We, as a clean and pure Nation descended from the inhabitants of Africa, do not desire to Amalgamate or marry into Families of the pale skin nations of Europe; nor serve the gods of their religion because our Forefathers are the true and Divine Founders of the first religious Creed for the Redemption and salvation of mankind on Earth.

Section 2.    Therefore, we are returning the Church and Christianity back to the European Nations, as it was prepared by their Forefathers for their earthly salvation. While we, the Moorish Americans, are returning to Islam, which was founded by our Forefathers for our earthly and Divine salvation.

Section 3.    The Covenant of the Great Creator, "Honor thy Father and thy Mother that thy days may be longer upon the Earth and Land, which the Creator hath given thee!

## AMENDMENT XVII
### State Sovereignty

Section 1.    No Sovereign State Government Citizen shall sit in judgment over another Sovereign State Government Citizen.

Section 2.    The United States or the several States cannot enforce its Statutes, ordinances, codes, regulations, or customs against a Moorish National or citizen of the MOORISH NATIONAL REPUBLIC OF PEACE.

Section 3.    The State may prosecute citizens of another State only in cases of capital crimes such as murder, rape, treason; the prosecuting State must prosecute in the State of the citizen accused of a capital crime, before a jury of their peers.

Section 4.    The MOORISH NATIONAL REPUBLIC OF PEACE shall retain the Right to waive prosecution and to give the State of the citizen accused of a capital crime the opportunity to prosecute the accused.

**AMENDMENT XVIII**
**Perpetual Government**

Section 1.      The MOORISH NATIONAL REPUBLIC OF PEACE shall be Perpetual, it shall remain forever, a State for the Moorish American People by the Moorish American People; it shall forever stand for love, truth, peace, freedom and justice with its sole purpose to uplift fallen humanity wherever it has fallen.

Section 2.      The MOORISH NATIONAL REPUBLIC OF PEACE shall always stand for freedom, being a people of peace. The MOORISH NATIONAL REPUBLIC OF PEACE's first priority shall always be a peaceful solution; to reconcile differences and find common ground with our neighbors and those who sojourned with us.

The MOORISH NATIONAL REPUBLIC OF PEACE shall make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the MOORISH NATIONAL REPUBLIC OF PEACE , or any Department or Officer thereof.

Articles of Incorporation/Bill of Rights Accepted and Voted on by the Board Members of the MOORISH NATIONAL REPUBLIC OF PEACE on the 19th day of June 2020.

### CONSTITUTIONAL VOTES

*Eric-Ingram: Bey- President- YES*
*LeThomas Clark: El- Vice President-YES*
*Courtney-Williamson: Bey- Secretary- YES*
*Keela-Walker: El- Treasurer-YES*
*Elwood-Evans: El- Chief of Security Director- YES*
*Shirley-Anderson: Bey-Spiritual Advisor- YES*
*Rickey-Williams: Bey- Registrar-YES*
*Don-Marcus Mitchell: Bey-Infrastructure Director- YES*
*Clayton Henderson: El- Food&Drug Director- YES*
*Marvin Morris: El- National/Citizen- YES*
*Geoffery Robinson: El- National/Citizen-YES*

# *MOORISH NATIONAL REPUBLIC OF PEACE*
## *DECLARATION OF INDEPENDENCE*
### JUNE 19TH 2020

*We, the People of the Moorish National Republic of Peace, in General Board of Directors assembled, in support of this Declaration, form reliance on the protection of the Divine right to Self-Autonomy. We pledge our lives to each other, our fortunes, and our Sacred honor to our posterity. We, the Moorish Society of the Moorish National Republic of Peace have removed ourselves from any foreign legislations. We have established ourselves in the Free lands of our ancestors the Empire of Morocco, upholding the Treaty of Peace and Friendship Between Empire of Morocco and the United States 1786,1787,1836. We are endowed by our creator with unalienable rights; that among these are life, liberty, and pursuit of happiness. Sovereignty belongs to the public authority, which commands in civil society, and orders and directs what each citizen is to perform, to obtain the end of its institution. We, the Moorish Society of the Moorish National Republic of Peace have personal matter and subject matter jurisdiction over all Nationals, Citizens of this Nation-State Government and their property. Jurisdiction is power to declare the law; the Constitution for the Moorish National Republic of Peace is the Supreme law of the land. Let us uplift the fallen in humanity with Love, Truth, Peace, Freedom, and Justice. Inshallah!*

*Eric-Ingram: Bey- President*
*LeThomas Clark: El- Vice President*
*Courtney-Williamson: Bey- Secretary*
*Keela-Walker: El- Treasurer*
*Elwood-Evans: El- Chief of Security Director*
*Shirley-Anderson: Bey-Spiritual Advisor*
*Rickey-Williams: Bey- Registrar*
*Don-Marcus Mitchell: Bey-Infrastructure Director*
*Clayton Henderson: El- Food&Drug Director*
*Marvin Morris: El- National/Citizen*
*Geoffery Robinson: El- National/Citizen*





**NATION**

Home › Nation

# Did You Know? US Gov't Found Guilty In Conspiracy To Assassinate Dr. Martin Luther King, Jr

CLOSE

 Posted January 20, 2014



Though the United States government has wrapped Dr. **Martin Luther King Jr.**'s legacy in the American flag, waving his words to symbolize racial harmony and patriotic solidarity even as institutionalized White supremacy remains embedded in policies detrimental to the very Black community he tirelessly strived to uplift, very little is spoken of the fact that a Memphis jury found the United States government guilty of conspiring to assassinate Dr. King on the balcony of the Lorraine Motel on April 4, 1968.

*MORE: FBI 'Honors' Martin Luther King With Tone-Deaf Tweet That Revises Black History*

After four weeks of testimony and over 70 witnesses in a civil trial in Memphis, Tennessee, twelve jurors reached a swift unanimous verdict on December 8, 1999 that Dr. King was assassinated as a result of a conspiracy, the NY Times reported at the time.



**Loyd Jowers**, owner of Jim's Grill, which was close to the Lorraine Motel, claimed that the shot which killed Dr. King was fired from behind his restaurant, and that local, state and federal U.S government agencies, and the Mafia, were all involved. **James Earl Ray**, who pleaded guilty to assassinating King, was renting a room above Jower's establishment and was allegedly an unwitting scapegoat.

The restaurant owner named Memphis Police Department Officer, Lt. **Earl Clark** as Dr. King's assassin, according to a press conference transcript. A claim that would later be called into question along with other shocking details.

According to the U.S. Justice Department, which painstakingly attempted to dismantle Jowers' claims and the mountain of evidence presented in the Memphis trial, Jowers insisted that "…a Memphis produce dealer, who was involved with the Mafia, gave [Jowers] $100,000 to hire an assassin and assured him that the police would not be at the scene of the shooting. Jowers also reported that he hired a hit man to shoot Dr. King from behind Jim's Grill and received the murder weapon prior to the killing from someone with a name sounding like Raoul. Jowers further

participated in the conspiracy.

King's widow, **Coretta Scott-King**, expressed her gratitude to the jury and called on media to get the truth to the public:

*There is abundant evidence of a major high level conspiracy in the assassination of my husband, Martin Luther King, Jr. And the civil court's unanimous verdict has validated our belief. I wholeheartedly applaud the verdict of the jury and I feel that justice has been well served in their deliberations. This verdict is not only a great victory for my family, but also a great victory for America. It is a great victory for truth itself. It is important to know that this was a SWIFT verdict, delivered after about an hour of jury deliberation. The jury was clearly convinced by the extensive evidence that was presented during the trial that, in addition to Mr. Jowers, the conspiracy of the Mafia, local, state and federal government agencies, were deeply involved in the assassination of my husband. The jury also affirmed overwhelming evidence that identified someone else, not James Earl Ray, as the shooter, and that Mr. Ray was set up to take the blame. I want to make it clear that my family has no interest in retribution. Instead, our sole concern has been that the full truth of the assassination has been revealed and adjudicated in a court of law. As we pursued this case, some wondered why we would spend the time and energy addressing such a painful part of the past. For both our family and the nation, the short answer is that we had to get involved because the system*

Case 3:22-cv-01112-LCB   Document 1   Filed 08/31/22   Page 52 of 139



*painful experience to revisit this tragedy, but we felt we had an obligation to do everything in our power to seek the truth. Not only for the peace of mind of our family but to also bring closure and healing to the nation. We have done what we can to reveal the truth, and we now urge you as members of the media, and we call upon elected officials, and other persons of influence to do what they can to share the revelation of this case to the widest possible audience.*

Dr.King's son, **Dexter Scott King,** called his father's assassination "the most incredible cover-up of the century" and released the following statement regarding the verdict:

*"We can say that because of the evidence and information obtained in Memphis we believe that this case is over. This is a period in the chapter. We constantly hear reports, which trouble me, that this verdict creates more questions than answers. That is totally false. Anyone who sat in on almost four weeks of testimony, with over seventy witnesses, credible witnesses I might add, from several judges to other very credible witnesses, would know that the truth is here."*

CLOSE

*"The question now is, "What will you do with that?" We as a family have done our part. We have*

*researcher who wants to know what happened can find out."*

King's other children, Martin Luther King III and Bernice King, also expressed relief at the verdict.

Author, political historian and theologian Jim Douglass said that the truth was in that Memphis courtroom in 1999, but barely anyone was there to meet it face-to-face:

*I can hardly believe the fact that, apart from the courtroom participants, only Memphis TV reporter Wendell Stacy and I attended from beginning to end this historic three-and-one-half week trial. Because of journalistic neglect scarcely anyone else in this land of ours even knows what went on in it. After critical testimony was given in the trial's second week before an almost empty gallery, Barbara Reis, U.S. correspondent for the Lisbon daily Publico who was there several days, turned to me and said, "Everything in the U.S. is the trial of the century. O.J. Simpson's trial was the trial of the century. Clinton's trial was the trial of the century. But this is the trial of the century, and who's here?"*

*What I experienced in that courtroom ranged from inspiration at the courage of the Kings, their lawyer-investigator William F. Pepper, and the witnesses, to amazement at the government's carefully interwoven plot to kill Dr. King. The seriousness with which U.S. intelligence agencies*

Case 3:22-cv-01112-LCB    Document 1    Filed 08/31/22    Page 53 of 139



As previously stated, the Justice Department methodically countered every shred of evidence presented in the trial, and many people laugh it off as mere conspiracy theory, but Douglass insists that is not surprising at all:

*Thirty-two years after Memphis, we know that the government that now honors Dr. King with a national holiday also killed him. As will once again become evident when the Justice Department releases the findings of its "limited re-investigation" into King's death, the government (as a footsoldier of corporate power) is continuing its cover-up – just as it continues to do in the closely related murders of John and Robert Kennedy and Malcolm X.*

The intense irony in the U.S. Justice Department presenting a case to delegitimize a verdict reached in an American courtroom is not lost on anyone.

## TRANSCRIPTS

◀

CLOSE   ◀

View Full Trial Transcript

View Transcript of King Family Press Conference on the verdict

## SEE ALSO:

## The Retweet: Stop Using MLK Quotes Against The Movement

## 5 Surprising Lines From MLK's "Mountaintop" Speech



**HISTORY**

UPDATED: FEB 21, 2020 · ORIGINAL: OCT 29, 2009

# Ku Klux Klan

**HISTORY.COM EDITORS**

### CONTENTS

1. Founding of the Ku Klux Klan
2. Ku Klux Klan Violence in the South
3. The Ku Klux Klan and the End of Reconstruction
4. Revival of the Ku Klux Klan

Founded in 1865, the Ku Klux Klan (KKK) extended into almost every southern state by 1870 and became a vehicle for white southern resistance to the Republican Party's Reconstruction-era policies aimed at establishing political and economic equality for Black Americans. Its members waged an underground campaign of intimidation and violence directed at white and Black Republican leaders. Though Congress passed legislation designed to curb Klan terrorism, the organization saw its primary goal–the reestablishment of white supremacy–fulfilled through Democratic victories in state legislatures across the South in the 1870s. After a period of decline, white Protestant nativist groups revived the Klan in the early 20th century, burning crosses and staging rallies, parades and marches denouncing immigrants, Catholics, Jews, African Americans and organized labor. The civil rights movement of the 1960s also saw a surge of Ku Klux Klan activity, including bombings of Black schools and churches and violence against Black and white activists in the South.

## Founding of the Ku Klux Klan

A group including many former Confederate veterans founded the first branch of the Ku Klux Klan as a social club in Pulaski, Tennessee, in 1865. The first two words of the organization's name supposedly derived from the Greek word "kyklos," meaning circle. In the summer of 1867, local branches of the Klan met in a general organizing convention and established what they called an "Invisible Empire of the South." Leading Confederate general Nathan Bedford Forrest was chosen as the first leader, or "grand wizard," of the Klan; he presided over a hierarchy of grand dragons, grand titans and grand cyclopses.

*Did you know?* At its peak in the 1920s, Klan membership exceeded 4 million people nationwide.

The organization of the Ku Klux Klan coincided with the beginning of the second phase of post-Civil WarReconstruction, put into place by the more radical members of the Republican Party in Congress. After rejecting President Andrew Johnson's relatively lenient Reconstruction policies, in place from 1865 to 1866, Congress passed the Reconstruction Act over the presidential veto. Under its provisions, the South was divided into five military districts, and each state was required to approve the 14th Amendment, which granted "equal protection" of the Constitution to former slaves and enacted universal male suffrage.

## Ku Klux Klan Violence in the South

From 1867 onward, African-American participation in public life in the South became one of the most radical aspects of Reconstruction, as Black people won election to southern state governments and even to the U.S. Congress. For its part, the Ku Klux Klan dedicated itself to an underground campaign of violence against Republican leaders and voters (both Black and white) in an effort to reverse the policies of Radical Reconstruction and restore white supremacy in the South. They were joined in this struggle by similar organizations such as the Knights of the White Camelia (launched in Louisiana in 1867) and the White Brotherhood. At least 10 percent of the Black legislators elected during the 1867-1868 constitutional conventions became victims of violence during Reconstruction, including seven who were killed. White Republicans (derided as "carpetbaggers" and "scalawags") and Black institutions such as schools and churches—symbols of Black autonomy—were also targets for Klan attacks.

By 1870, the Ku Klux Klan had branches in nearly every southern state. Even at its height, the Klan did not boast a well-organized structure or clear leadership. Local Klan members–often wearing masks and dressed in the organization's signature long white robes and hoods–usually carried out their attacks at night, acting on their own but in support of the common goals of defeating Radical Reconstruction and restoring white supremacy in the South. Klan activity flourished particularly in the regions of the South where Black people were a minority or a small majority of the population, and was relatively limited in others. Among the most notorious zones of Klan activity was South Carolina, where in January 1871 500 masked men attacked the Union county jail and lynched eight Black prisoners.

## The Ku Klux Klan and the End of Reconstruction

Though Democratic leaders would later attribute Ku Klux Klan violence to poorer southern white people, the organization's membership crossed class lines, from small farmers and laborers to planters, lawyers, merchants, physicians and ministers. In the regions where most Klan activity took place, local law enforcement officials either belonged to the Klan or declined to take action against it, and even those who arrested accused Klansmen found it difficult to find witnesses willing to testify against them. Other leading white citizens in the South declined to speak out against the group's actions, giving them tacit approval. After 1870, Republican state governments in the South turned to Congress for help, resulting in the passage of three Enforcement Acts, the strongest of which was the Ku Klux Klan Act of 1871.

For the first time, the Ku Klux Klan Act designated certain crimes committed by individuals as federal offenses, including conspiracies to deprive citizens of the right to hold office, serve on juries and enjoy the equal protection of the law. The act authorized the president to suspend the writ of habeas corpus and arrest accused individuals without charge, and to send federal forces to suppress Klan violence. This expansion of federal authority–which Ulysses S. Grant promptly used in 1871 to crush Klan activity in South Carolina and other areas of the South–outraged Democrats and even alarmed many Republicans. From the early 1870s onward, white supremacy gradually reasserted its hold on the South as support for Reconstruction waned; by the end of 1876, the entire South was under Democratic control once again.

## Revival of the Ku Klux Klan

In 1915, white Protestant nativists organized a revival of the Ku Klux Klan near Atlanta, Georgia, inspired by their romantic view of the Old South as well as Thomas Dixon's 1905 book "The Clansman" and D.W. Griffith's 1915 film "Birth of a Nation." This second generation of the Klan was not only anti-Black but also took a stand against Roman Catholics, Jews, foreigners and organized labor. It was fueled by growing hostility to the surge in immigration that America experienced in the early 20th century along with fears of communist revolution akin to the Bolshevik triumph in Russia in 1917. The organization took as its symbol a burning cross and held rallies, parades and marches around the country. At its peak in the 1920s, Klan membership exceeded 4 million people nationwide.

**READ MORE: How 'The Birth of a Nation' Revived the Ku Klux Klan**

The Great Depression in the 1930s depleted the Klan's membership ranks, and the organization temporarily disbanded in 1944. The civil rights movement of the 1960s saw a surge of local Klan activity across the South, including the bombings, beatings and shootings of Black and white activists. These actions, carried out in secret but apparently the work of local Klansmen, outraged the nation and helped win support for the civil rights cause. In 1965, President Lyndon Johnson delivered a speech publicly condemning the Klan and announcing the arrest of four Klansmen in connection with the murder of a white female civil rights worker in Alabama. The cases of Klan-related violence became more isolated in the decades to come, though fragmented groups became aligned with neo-Nazi or other right-wing extremist organizations from the 1970s onward. In the early 1990s, the Klan was estimated to have between 6,000 and 10,000 active members, mostly in the Deep South.

**See America's First Memorial to its 4,400 Lynching Victims**



Case 3:22-cv-01112-LCB    Document 1    Filed 08/31/22    Page 57 of 139



**GALLERY**                                    **7 IMAGES**

## Citation Information

### Article Title
Ku Klux Klan

### Author
History.com Editors

### Website Name
HISTORY

### URL
https://www.history.com/topics/reconstruction/ku-klux-klan

### Access Date
August 11, 2020

### Publisher
A&E Television Networks

### Last Updated
June 23, 2020

### Original Published Date
October 29, 2009

**FACT CHECK:** *We strive for accuracy and fairness. But if you see something that doesn't look right,* **click here** *to contact us!*

VIDEOS

RELATED **CONTENT**

Case 3:22-cv-01112-LCB    Document 1    Filed 08/31/22    Page 58 of 139



**HISTORY**

## HISTORY STORIES

UPDATED: JUL 29, 2019 · ORIGINAL: MAY 16, 2017

# Tuskegee Experiment: The Infamous Syphilis Study

ELIZABETH NIX

The Tuskegee experiment began in 1932, at at a time when there was no known treatment for syphilis. After being recruited by the promise of free medical care, 600 men originally were enrolled in the project.

The participants were primarily sharecroppers, and many had never before visited a doctor. Doctors from the U.S. Public Health Service (PHS), which was running the study, informed the participants—399 men with latent syphilis and a control group of 201 others who were free of the disease—they were being treated for bad blood, a term commonly used in the area at the time to refer to a variety of ailments.

8/11/2020

Case 3:22-cv-01112-LCB    Document 1    Filed 08/31/22    Page 59 of 139
Tuskegee Experiment: The Infamous Syphilis Study - HISTORY

The men were monitored by health workers but only given placebos such as aspirin and mineral supplements, despite the fact penicillin became the recommended treatment for syphilis in 1947. PHS researchers convinced local physicians in Macon County not to treat the participants, and research was done at the Tuskegee Institute. (Now called Tuskegee University, the school was founded in 1881 with Booker T. Washington at its first teacher.)

In order to track the disease's full progression, researchers provided no effective care as the men died, went blind or insane or experienced other severe health problems due to their untreated syphilis.

In the mid-1960s, a PHS venereal disease investigator in San Francisco named Peter Buxton found out about the Tuskegee study and expressed his concerns to his superiors that it was unethical. In response, PHS officials formed a committee to review the study but ultimately opted to continue it, with the goal of tracking the participants until all had died, autopsies were performed and the project data could be analyzed.

As a result, Buxton leaked the story to a reporter friend, who passed it on to a fellow reporter, Jean Heller of the Associated Press. Heller broke the story in July 1972, prompting public outrage and forcing the study to shut down.

By that time, 28 participants had perished from syphilis, 100 more had passed away from related complications, at least 40 spouses had been diagnosed with it and the disease had been passed to 19 children at birth.

In 1973, Congress held hearings on the Tuskegee experiments, and the following year the study's surviving participants, along with the heirs of those who died, received a $10 million out-of-court settlement. Additionally, new guidelines were issued to protect human subjects in U.S. government-funded research projects.

(In 1947, the Nuremberg Code was established in response to Nazi physicians forcibly performing gruesome experiments on prisoners in concentration camps during World War II. The document set forth basic ethical principles for medical research involving human subjects, such as the requirement that a person must give informed consent before participating in an experiment.)

As a result of the Tuskegee experiment, many African Americans developed a lingering, deep mistrust of public health officials. In part to foster racial healing, President Clinton issued a 1997 apology, stating, "The United States government did something that was wrong—deeply, profoundly, morally wrong… It is not only in remembering that shameful past that we can make amends and repair our nation, but it is in remembering that past that we can build a better present and a better future."

During his apology, the president announced plans for the establishment of Tuskegee University's National Center for Bioethics in Research and Health Care.

The final study participant passed away in 2004.

In 2010, President Barack Obama and other federal officials apologized for another unethical, U.S.-sponsored medical study, conducted decades earlier in Guatemala. In that study, from 1946 to 1948, nearly 700 men and women—prisoners, soldiers, mental patients—were intentionally infected with syphilis (hundreds more people were exposed to other sexually transmitted diseases as part of the study) without their knowledge or consent.

8/11/2020

Case 3:22-cv-01112-LCB    Document 1    Filed 08/31/22    Page 60 of 139
Tuskegee Experiment: The Infamous Syphilis Study - HISTORY

The purpose of the study was to determine whether penicillin could prevent, not just cure, syphilis infection. Some of those who became infected never received medical treatment.

The results of the study, which took place with the cooperation of Guatemalan government officials, never were published. The American public health researcher in charge of the project, Dr. John Cutler, went on to become a lead researcher in the Tuskegee experiments.

Following Cutler's death in 2003, historian Susan Reverby uncovered the records of the Guatemala experiments while doing research related to the Tuskegee study. She shared her findings with U.S. government officials in 2010.

Soon afterward, Secretary of State Hillary Clinton and Secretary of Health and Human Services Kathleen Sebelius issued an apology for the STD study and President Obama called the Guatemalan president to apologize for the experiments.

**FACT CHECK:** *We strive for accuracy and fairness. But if you see something that doesn't look right,* **click here** *to contact us! HISTORY reviews and updates its content regularly to ensure it is complete and accurate.*

RELATED CONTENT

Case 3:22-cv-01112-LCB    Document 1    Filed 08/31/22    Page 61 of 139

# WIKIPEDIA

# Fred Hampton

**Fredrick Allen Hampton** (August 30, 1948 – December 4, 1969) was an American activist and revolutionary socialist.[1] He came to prominence in Chicago as chairman of the Illinois chapter of the Black Panther Party (BPP), and deputy chairman of the national BPP. In this capacity, he founded the Rainbow Coalition, a prominent multicultural political organization that initially included the Black Panthers, Young Patriots and the Young Lords, and an alliance among major Chicago street gangs to help them end infighting and work for social change.

In 1967, Hampton was identified by the Federal Bureau of Investigation as a radical threat. The FBI tried to subvert his activities in Chicago, sowing disinformation among black progressive groups and placing a counterintelligence operative in the local Panthers. In December 1969, Hampton was shot and killed in his bed during a predawn raid at his Chicago apartment by a tactical unit of the Cook County State's Attorney's Office in conjunction with the Chicago Police Department and the Federal Bureau of Investigation; during the raid, Panther Mark Clark was also killed and several seriously wounded. In January 1970, a coroner's jury held an inquest and ruled the deaths of Hampton and Clark to be justifiable homicide.[2][3][4][5]

A civil lawsuit was later filed on behalf of the survivors and the relatives of Hampton and Clark. It was resolved in 1982 by a settlement of $1.85 million; the City of Chicago, Cook County, and the federal government each paid one-third to a group of nine plaintiffs. Given revelations about the illegal COINTELPRO program and documents associated with the killings, scholars now widely consider Hampton's death an assassination under the FBI's initiative.[6][7][8]

## Contents

**Early life and youth**

**Chicago**

**FBI investigation**

**Death**

**Aftermath**
    Inquest
    Federal grand jury
    1970 Civil rights lawsuit

### Fred Hampton



Hampton c. 1968

| | |
|---|---|
| **Born** | August 30, 1948 Summit, Illinois, U.S. |
| **Died** | December 4, 1969 (aged 21) Chicago, Illinois, U.S. |
| **Cause of death** | Gunshot wounds |
| **Resting place** | Bethel Cemetery, Haynesville, Louisiana, U.S. |
| **Citizenship** | American |
| **Education** | Proviso East High School |
| **Occupation** | Activist, revolutionary |
| **Years active** | 1966–1969 |
| **Known for** | Deputy chairman of the Illinois chapter Black Panther Party |
| **Political party** | Black Panther Party |
| **Partner(s)** | Deborah Johnson |
| **Children** | Fred Hampton Jr. |

# THE

# PRESENT STATE

## OF THE

# EMPIRE OF MOROCCO.

### ITS

ANIMALS, PRODUCTS, CLIMATE, SOIL,
CITIES, PORTS, PROVINCES, COINS,
WEIGHTS, AND MEASURES. WITH THE
LANGUAGE, RELIGION, LAWS, MAN-
NERS, CUSTOMS, AND CHARACTER,

#### OF THE

# MOORS;

### THE HISTORY OF THE
### DYNASTIES SINCE EDRIS;

THE NAVAL FORCE AND COMMERCE OF MO-
ROCCO; AND THE CHARACTER, CONDUCT, AND
VIEWS, POLITICAL AND COMMERCIAL,

#### OF THE

# REIGNING EMPEROR.

### TRANSLATED FROM THE FRENCH OF
### M. CHENIER.

---

## VOL. II.

---

LONDON:

Printed for G. G. J. and J. ROBINSON,
Paternofter-Row.

M.DCC.LXXXVIII.

[ 13 ]

# CHAP. II.

## *Of the Dynasty of Morabethoon.*

ABU - Teffifin Marabout, nephew of Abu-Beker Ben-Omar, of the tribe of Lumthunes *, and chief of the Morabethoon, profited by the commotions which had drawn the arms of the Arabs toward Egypt to produce an infurrection ; he fent Marabouts to preach, and excite the people to revolt, under the pretext of defending their liberties. The Moors, weary of the arbitrary government of thefe Arab foreigners, willingly followed the ftandard of

---

* The country which the Marabouts inhabited, lying between Mount Atlas and the defert, was called Lamtha ; whence the tribe had the name of Lamthoonah, or Lumthunes.

*Herbelot. Bib. Orien.*

Teffifin,

[ 14

Teffifin, who prefently found himfelf at the head of a numerous army.

The tribe of this chief was furnamed Morabethoon, becaufe of the rigidity with which religion was by them obferved ; the word Marabout fignifying a monk, or a man engaged to the performance of his vow. This tribe firft took birth in the neighbourhood of Tunis, but was obliged to leave that country for the weftern part of Africa, that it might efcape the perfecution of fects more voluptuous, whofe intereft it was to extirpate this rifing tribe.

Abu-Teffifin, at the head of his followers, traverfed Mount Atlas in 1051, and conquered the city of Agmet and its environs : here he fixed his refidence, at the foot of Mount Atlas, extended thence his conquefts northward, and proclaimed himfelf Emir El-Mumenin, or chief of the faithful. He is one of the firft fovereigns known of the race of Morabethoon, or more commonly called Morabites ; his armies were conftantly victorious, and, after various battles,

[ 15 ]

battles, he remained fovereign of Mauritania.

Abu-Teffifin died in 1086, and was fucceeded by his fon Jofeph, whofe fubjects proclaimed him King *. This prince not being pleafed with the fituation of the city of Agmet, at the foot of the mountains, built or finifhed that of Marakefch, or Morocco, which had been begun by his father, and there eftablifhed his feat of empire.

During his reign the province of Temfena afforded an afylum to a multitude of Zenetes, who preached new errors. Jofeph was very induftrious to prevent thefe innovations among his fubjects, and fent them Morabite preachers to reconvert them to their former religion; but the people, fond of novelty, were fo far from liftening to the remonftrances of the reformers,

---

* The Arab authors of Spain call this prince Abul-Lu Ibrahim-Ben-Jofeph-Ben-Teffifin. It was the cuftom of thefe people to call their children by the names of their anceftors.

whom



**HISTORY**

UPDATED: OCT 10, 2019 · ORIGINAL: JUN 1, 2010

# Black Codes

**HISTORY.COM EDITORS**

### CONTENTS

1. Reconstruction Begins
2. Passage of the Black Codes
3. Limits on Black Freedom
4. Impact of the Black Codes

Black codes were restrictive laws designed to limit the freedom of African Americans and ensure their availability as a cheap labor force after slavery was abolished during the Civil War. Though the Union victory had given some 4 million slaves their freedom, the question of freed blacks' status in the postwar South was still very much unresolved. Under black codes, many states required blacks to sign yearly labor contracts; if they refused, they risked being arrested, fined and forced into unpaid labor. Outrage over black codes helped undermine support for President Andrew Johnson and the Republican Party.

## Reconstruction Begins

When President Abraham Lincoln announced the impending passage of the Emancipation Proclamation in early 1863, the stakes of the Civil War shifted dramatically. A Union victory would mean no less than revolution in the South, where the "peculiar institution" of slavery had dominated economic, political and social life in the antebellum years.

In April 1865, as the war drew to a close, Lincoln shocked many by proposing limited suffrage for African Americans in the South. He was assassinated days later, however, and his successor Andrew Johnson would be the one to preside over the beginning of Reconstruction.

Did you know? In the years following Reconstruction, the South reestablished many of the provisions of the black codes in the form of the so-called "Jim Crow laws." These remained firmly in place for almost a century, but were finally abolished with the passage of the Civil Rights Act of 1964.

Case 3:22-cv-01112-LCB    Document 1    Filed 08/31/22    Page 67 of 139

Johnson, a former senator from Tennessee who had remained loyal to the Union during the war, was a firm supporter of states' rights and believed the federal government had no say in issues such as voting requirements at the state level.

Under his Reconstruction policies, which began in May 1865, the former Confederate states were required to uphold the abolition of slavery (made official by the 13th Amendment to the U.S. Constitution), swear loyalty to the Union and pay off their war debt. Beyond those limitations, the states and their ruling class—traditionally dominated by white planters—were given a relatively free hand in rebuilding their own governments.

## Passage of the Black Codes

Even as former slaves fought to assert their independence and gain economic autonomy during the earliest years of Reconstruction, white landowners acted to control the labor force through a system similar to the one that had existed during slavery.

To that end, in late 1865, Mississippi and South Carolina enacted the first black codes. Mississippi's law required blacks to have written evidence of employment for the coming year each January; if they left before the end of the contract, they would be forced to forfeit earlier wages and were subject to arrest.

In South Carolina, a law prohibited blacks from holding any occupation other than farmer or servant unless they paid an annual tax of $10 to $100. This provision hit free blacks already living in Charleston and former slave artisans especially hard. In both states, blacks were given heavy penalties for vagrancy, including forced plantation labor in some cases.

## Limits on Black Freedom

Under Johnson's Reconstruction policies, nearly all the southern states would enact their own black codes in 1865 and 1866. While the codes granted certain freedoms to African Americans—including the right to buy and own property, marry, make contracts and testify in court (only in cases involving people of their own race)—their primary purpose was to restrict blacks' labor and activity.

Some states limited the type of property that blacks could own, while virtually all the former Confederate states passed strict vagrancy and labor contract laws, as well as so-called "anti-enticement" measures designed to punish anyone who offered higher wages to a black laborer already under contract.

Blacks who broke labor contracts were subject to arrest, beating and forced labor, and apprenticeship laws forced many minors (either orphans or those whose parents were deemed unable to support them by a judge) into unpaid labor for white planters.

Passed by a political system in which blacks effectively had no voice, the black codes were enforced by all-white police and state militia forces—often made up of Confederate veterans of the Civil War—across the South.

## Impact of the Black Codes

The restrictive nature of the codes and widespread black resistance to their enforcement enraged many in the North, who argued that the codes violated the fundamental principles of free labor ideology.

After passing the Civil Rights Act (over Johnson's veto), Republicans in Congress effectively took control of Reconstruction. The Reconstruction Act of 1867 required southern states to ratify the 14th Amendment—which granted "equal protection" of the Constitution to former slaves—and enact universal male suffrage before they could rejoin the Union.

The 15th Amendment, adopted in 1870, guaranteed that a citizen's right to vote would not be denied "on account of race, color, or previous condition of servitude." During this period of Radical Reconstruction (1867-1877), blacks won election to southern state governments and even to the U.S. Congress.

As indicated by the passage of the black codes, however, white southerners showed a steadfast commitment to ensuring their supremacy and the survival of plantation agriculture in the postwar years. Support for Reconstruction policies waned after the early 1870s, undermined by the violence of white supremacist organizations such as the Ku Klux Klan.

By 1877, when the last federal soldiers left the South and Reconstruction drew to a close, blacks had seen little improvement in their economic and social status, and the vigorous efforts of white supremacist forces throughout the region had undone the political gains they had made. Discrimination would continue in America with the rise of Jim Crow laws, but would inspire the Civil Rights Movement to come.

# Citation Information

## Article Title

Black Codes

## Author

History.com Editors

## Website Name

HISTORY

## URL

https://www.history.com/topics/black-history/black-codes

## Access Date

August 11, 2020

## Publisher

A&E Television Networks

## Last Updated

May 11, 2020

## Original Published Date



# The Holy Koran

## of the

### Moorish Science Temple of America



## DIVINELY PREPARED BY THE NOBLE PROPHET

# DREW ALI

*By the guiding of his father God, Allah; the great God of the universe. To redeem man from his sinful and fallen stage of humanity back to the highest plane of life with his father God, Allah.*

## CHAPTER XLV THE DIVINE ORIGIN OF THE ASIATIC NATIONS

The fallen sons and daughters of the Asiatic Nation of North America need to learn to love instead of hate; and to know their higher self and lower self. This is the uniting of the Holy Koran of Mecca, for teaching and instructing all Moorish Americans, etc. The key of civilization was and is in the hands of the Asiatic nations. The Moorish, who were ancient Moabites, and the founders of the Holy City of Mecca. The Egyptians who were the Hammarites, and of a direct descendant of Mizraim, the Arabians, the seed of Hagar, Japanese and Chinese. The Hindus of India, the descendants of the ancient Canaanites, Hittites, and Moabites of the land of Canaan. The Asiatic nations of North, South, and Central America: the Moorish Americans and Mexicans of North America, Brazilians, Argentinians and Chileans in South America. Columbians, Nicaraguans, and the natives of San Salvador in Central America, etc. All of these are Moslems. The Turks are the true descendants of Hagar, who are the chief protectors of the Islamic Creed of Mecca; beginning from Mohammed the First, the founding of the uniting of Islam, by the command of the great universal God--Allah.

The inhabitants of Africa are the descendants of the ancient Canaanites from the land of Canaan. Old man Cush and his family are the first inhabitants of Africa who came from the land of Canaan. His father Ham and his family were second. Then came the word Ethiopia, which means the demarcation line of the dominion of Amexem, the first true and divine name of Africa. The dividing of the land between the father and the son. The dominion of Cush, North-East and South-East Africa and North-West and South-West was his father's dominion of Africa. In later years many of their brethren from Asia and the Holy Lands joined them. The Moabites from the land of Moab who received permission from the Pharaohs of Egypt to settle and inhabit North-West Africa; they were the founders and are the true possessors of the present Moroccan Empire. With their Canaanite, Hittite, and Amorite brethren who sojourned from the land of Canaan seeking new homes. Their dominion and inhabitation extended from North-East and South-West Africa, across great Atlantis even unto the present North, South, and Central America and Mexico and the Atlantis Islands; before the great earthquake, which caused the great Atlantic Ocean.





The River Nile was dredged and made by the ancient Pharaohs of Egypt, to trade with the surrounding kingdoms. Also, the Niger river was dredged by the great Pharaoh of Egypt in those ancient days for trade, and it extends eastward from the River Nile, westward across the great Atlantic. It was used for trade and transportation. According to all true and divine records of the human race there is no negro, black, or colored race attached to the human family, because all the inhabitants of Africa were and are of the human race, descendants of the ancient Canaanite nation from the holy land of Canaan. What your ancient forefathers were, you are today without doubt or contradiction. There is no one who is able to change man from the descendant nature of his forefathers; unless his power extends beyond the great universal Creator Allah Himself. These holy and divine laws are from the Prophet, Noble Drew Ali, the founder of the uniting of the Moorish Science Temple of America. These laws are to be strictly preserved by the members of all the Temples, of the Moorish Science Temple of America. That they will learn to open their meeting and guide it according to the principles of Love, Truth, Peace, Freedom and Justice.

Every subordinate Temple of the Grand-Major Temple is to form under the covenant of Love, Truth, Peace, Freedom and Justice; and to create their own laws and customs, in conjunction with the laws of the Holy Prophet and the Grand Temple. I, the Prophet, Noble Drew Ali, was sent by the great God, Allah, to warn all Asiatics of America to repent from their sinful ways; before that great and awful day that is sure to come. The time has come when every nation must worship under its own vine and fig tree, and every tongue must confess his own. Through sin and disobedience every nation has suffered slavery, due to the fact that they honoured not the creed and principles of their forefathers. That is why the nationality of the Moors was taken away from them in 1774 and the word negro, black and colored, was given to the Asiatics of America who were of Moorish descent, because they honoured not the principles of their mother and father and strayed after the gods of Europe of whom they knew nothing.

HET

e
of
Allah.

# Virginia Slave Codes

**Excerpts taken from** William W. Henning, *The Statutes at Large; Being a Collection of all the Laws of Virginia*, v.2 (1823). Some of the language has been modernized.

## Document A:   March 1661/62. Act CII: Run-aways.

Whereas there are diverse loitering runaways in this country who very often absent themselves from their masters service and sometimes in a long time cannot be found, that loss of the time and the charge in the seeking them often exceeding the value of their labor: Bee it therefore enacted that all runaways that shall absent themselves from their said masters service, shall be liable to make satisfaction by service after the times by custom or indenture is expired double their times of service so neglected, and if the time of their running away was in the crop or the charge of recovering them extraordinary the court shall limit a longer time of service proportional to the damage the master shall make appear he hath sustained...; and in case any English servant shall run away in company of any negroes who are incapable of making satisfaction by addition of a time, it is enacted that the English so running away in the company with them shall at the time of service to their own masters expired, serve the masters of the said negroes for their absence so long as they should have done by this act if they had not been slaves, every Christian in company serving his proportion; and if the negroes be lost or dye in such time of their being run away, the Christian servants in company with them shall by proportion among them, either pay four thousand five hundred pounds of tobacco of tobacco and cask or four years service for every negroe so lost or dead.

## Document B:   December, 1662. Act VI: Women servants got with child by their masters after their time expired to be sold by the Churchwardens for two years for the good of the parish.

Whereas by act of Assembly every woman servant having a bastard is to serve two years, and late experience show that some dissolute masters have gotten their maids with child, and yet claim the benefit of their service, and on the contrary if a woman got with child by her master should be freed from that service it might probably induce such loose persons to lay all their bastards to their masters; it is therefore thought fit and accordingly enacted and be it enacted henceforward that each woman servant got with child by her master shall after her time by indenture or custom is expired be by the churchwardens of the parish where she lived when she was brought to bed of such a bastard, sold for two years, and the tobacco to be employed by the vestry for the use of the parish.

## Document C:   December, 1662. Act XII: Negro women's children to serve according to the condition of the mother.

Whereas some doubts have arisen whether children got by any Englishman upon a negro woman should be slave or free, Be it therefore enacted and declared by this present grand assembly, that all children borne in this country shall be held bond or free only according to the condition of the mother, And that if any Christian shall commit fornication with a negro man or woman, he or she so offending shall pay double the fines imposed by the former act.

## Document D:   September, 1667. Act III: An act declaring that baptism of slaves doth not exempt them from bondage.

Whereas some doubts have risen whether children that are slaves by birth, and by the charity and piety of their owners made pertakers of the blessed sacrament of baptism, should by virtue of their baptism be made free; It is enacted and declared by this grand assembly, and the authority thereof, that the conferring of baptism doth not alter the condition of the person as to his bondage or freedom; that diverse masters, freed from this doubt, may more carefully endeavour the propagation of Christianity by permitting children, though slaves, or those of greater growth if capable to be admitted to the sacrament.

## Document E:   October, 1669. Act I: An act about the casual killing of slaves.

Whereas the only law in force for the punishment of refractory servants resisting their master, mistress or overseer cannot be inflicted upon negroes, nor the obstinacy of many of them by other than violent means suppressed, Be it enacted and declared by this grand assembly, if any slave resist his master (or others by his masters order correcting him) and by the extremity of the correction should chance to die, that his death shall not be considered a felony, but the master (or that other person appointed by the master to punish him) be acquit from molestation, since it cannot be presumed that malice existed(which alone makes murder a felony) [or that anything] should induce any man to destroy his own estate.

## Document F:   June, 1680. Act X: An act for preventing Negroes Insurrections.

Whereas the frequent meeting of considerable numbers of negroe slaves under pretence of feasts and burials is judged of dangerous consequence; for prevention whereof for the future, Bee it enacted by the kings most excellent majesty and with the consent of the general assembly ... that from and after the publication of this law, it shall not be lawful for any negroe or other slave to carry or arm himself with any club, staff, gun, sword or any other weapon of defense or offence, nor to go or depart from of his masters ground without a certificate from his master, mistress, or overseer, and such permission not to be granted but upon particular and necessary occasions; and every negroe or slave so offending not having a certificate as aforesaid shall be sent to the next constable, who is hereby enjoined and required to give the said negroe twenty lashes on his bare back well laid on, and so sent home to his said master, mistress or overseer. And it is further enacted by the authority aforesaid that if any negroe or other

slave shall presume to lift up his hand in opposition against any Christian, shall for every such offence, upon due proof made thereof by the oath of the party before a magistrate, have and receive thirty lashes on his bare back well laid on.

And it is hereby further enacted by the authority aforesaid that if any negroe or other slave shall absent himself from his masters service and lye hid and lurking in obscure places, committing injuries to the inhabitants, and shall resist any person or persons that shall by any lawful authority be employed to apprehend and take the said negroe, that then in case of such resistance, it shall be lawful for such person or persons to kill the said negroe or slave so lying out and resisting, and that this law be once every six months published at the respective county courts and parish churches within this colony.

[By 1682 the law "hath not had its intended effect for want of due notice thereof being taken," so it was ordered read aloud in church twice a year, and masters were fined 200 lbs tobacco if another master's slaves stayed on their plantation more than 4 hours without owner's permission.]

## Document G:   April, 1691. Act XVI: An act for suppressing outlying slaves.

Whereas many times negroes, mulattoes, and other slaves unlawfully absent themselves from their masters and mistresses service, and lie hid and lurk in obscure places killing hoggs and committing other injuries to the inhabitants of this dominion, for remedy whereof for the future, Be it enacted by their majesties lieutenant governour, council, and burgesses of this present general assembly, and the authority thereof, and it is hereby enacted, that in all such cases upon intelligence of any such negroes, mulattoes, or other slaves lying out, two of their majesties justices of the peace of that country...shall be empowered and commanded [to issue warrants to the sheriffs to summon as many men as he needs to arrest the runaways] and in case any negroes, mulattoes or other slave or slaves lying out as aforesaid shall resist, runaway, or refuse to deliver and surrender him or themselves ... in such cases it shall and may be lawful ... to kill and destroy such negroes, mulattoes, and other slave or slaves by gun or any other ways whatsoever.  Provided that where any negroe or mulattoe slave shall be killed in pursuance of this act, the owner or owners of such negro or mulatto slave shall be paid for such negro or mulatto slave four thousand pounds of tobacco by the public.

And for the prevention of that abominable mixture and spurious issue which hereafter may increase in this dominion, as well as by negroes, mulattoes, and Indians intermarrying with English, or other white women, as by their unlawful accompanying with one another, Be it enacted by the authority aforesaid, and it is hereby enacted, that for the time to come, whatsoever English or other white man or woman being free shall intermarry with a negroe, mulatto, or Indian man or woman bond or free shall within three months after such marriage be banished and removed from this dominion forever.

And forasmuch as great inconveniences may happen to this country by the setting of negroes and mulattoes free, by their either entertaining negroe slaves from their masters service, or receiving stolen goods, or being grown old bring a charge upon the country; for prevention thereof, Be it enacted by the authority aforesaid, and it is hereby enacted, That no negro or mulattoe be after the end of this present session of assembly set free by any person or persons whatsoever, unless such person or persons, their heirs, executors or administrators pay for the transportation of such negro or negroes out of the country within six months after such setting them free, upon penalty of paying ten pounds sterling to the Church wardens of the parish where such person shall dwell

with, which money, or so much thereof as shall be necessary, the said Church wardens are to cause the said negro or mulatto to be transported out of the country, and the remainder of the said money to employ to the use of the poor of the parish.

## Document H:  October, 1705. Chap. XLIX: An act concerning servants and slaves.

...And also be it enacted ... That all servants imported and brought into this country, by sea or land, who were not Christians in their native country, (except Turks and Moors in amity with her majesty, and others that can make due proof of their being free in England, or any other Christian country, before they were shipped, in order to transportation hither) shall be accounted and be slaves, and as such be here bought and sold notwithstanding a conversion to Christianity afterwards.

...And also be it enacted ... That all masters and owners of servants, shall find and provide for their servants, wholesome and competent diet, clothing, and lodging, by the discretion of the county court; and shall not, at any time, give immoderate correction; neither shall, at any time, whip a Christian white servant naked, without an order from a justice of the peace: And if any, notwithstanding this act, shall presume to whip a Christian white servant naked, without such order, the person so offending, shall forfeit and pay for the same, forty shillings sterling, to the party injured...

And for a further Christian care and usage of all Christian servants, Be it also enacted ... That no negros, mullatos, or Indians, although Christians, or Jews, Moors, Mahometans, or other infidels, shall, at any time, purchase any Christian servant, nor any other, except of their own complexion, or such as are declared slaves by this act: And if any negro, mulatto, or Indian, Jew, Moor, Mahometan, or other infidel, or such as are declared slaves by this act, shall, notwithstanding, purchase any Christian white servant, the said servant shall, ipso facto, become free and acquit from any service then due, and shall be so held, deemed, and taken.

And for a further prevention of that abominable mixture and spurious issue, which hereafter may increase in this her majesty's colony and dominion, as well as by English, and other white men and women intermarrying with negros and mulattos, as by their unlawful coition with them, Be it enacted ... That whatsoever English, or other white man or woman, being free, shall intermarry with a negro or mulatto man or woman, bond or free, shall, by judgment of the county court, be committed to prison, and there remain, without bail; and shall forfeit and pay ten pounds current money of Virginia, to the use of the parish, as aforesaid.

And be it further enacted, That no minister of the church of England, or other minister, or person whatsoever, within this colony and dominion, shall hereafter wittingly presume to marry a white man with a negro or mulatto woman; or to marry a white woman with a negro or mulatto man, upon pain of forfeiting and paying, for every such marriage the sum of ten thousand pounds of tobacco.

Case 3:22-cv-01112-LCB    Document 1    Filed 08/31/22    Page 77 of 139



UPDATED: JUN 23, 2020 · ORIGINAL: FEB 28, 2018

# Jim Crow Laws

HISTORY.COM EDITORS

## CONTENTS

1. Black Codes
2. Ku Klux Klan
3. Jim Crow Laws Expand
4. Ida B. Wells
5. Charlotte Hawkins Brown
6. Isaiah Montgomery
7. Jim Crow Laws in the 20th Century
8. Jim Crow in the North
9. When Did Jim Crow Laws End?

Jim Crow laws were a collection of state and local statutes that legalized racial segregation. Named after a Black minstrel show character, the laws—which existed for about 100 years, from the post-Civil War era until 1968—were meant to marginalize African Americans by denying them the right to vote, hold jobs, get an education or other opportunities. Those who attempted to defy Jim Crow laws often faced arrest, fines, jail sentences, violence and death.

## Black Codes

Case 3:22-cv-01112-LCB   Document 1   Filed 08/31/22   Page 78 of 139

10. Sources

The roots of Jim Crow laws began as early as 1865, immediately following the ratification of the 13th Amendment, which abolished slavery in the United States.

Black codes were strict local and state laws that detailed when, where and how formerly enslaved people could work, and for how much compensation. The codes appeared throughout the South as a legal way to put Black citizens into indentured servitude, to take voting rights away, to control where they lived and how they traveled and to seize children for labor purposes.

The legal system was stacked against Black citizens, with former Confederate soldiers working as police and judges, making it difficult for African Americans to win court cases and ensuring they were subject to Black codes.

These codes worked in conjunction with labor camps for the incarcerated, where prisoners were treated as enslaved people. Black offenders typically received longer sentences than their white equals, and because of the grueling work, often did not live out their entire sentence.

## Ku Klux Klan

During the Reconstruction era, local governments, as well as the national Democratic Party and President Andrew Johnson, thwarted efforts to help Black Americans move forward.

Violence was on the rise, making danger a regular aspect of African American life. Black schools were vandalized and destroyed, and bands of violent white people attacked, tortured and lynched Black citizens in the night. Families were attacked and forced off their land all across the South.

The most ruthless organization of the Jim Crow era, the Ku Klux Klan, was born in 1865 in Pulaski, Tennessee, as a private club for Confederate veterans.

The KKK grew into a secret society terrorizing Black communities and seeping through white Southern culture, with members at the highest levels of government and in the lowest echelons of criminal back alleys.

## Jim Crow Laws Expand

At the start of the 1880s, big cities in the South were not wholly beholden to Jim Crow laws and Black Americans found more freedom in them.

This led to substantial Black populations moving to the cities and, as the decade progressed, white city dwellers demanded more laws to limit opportunities for African Americans.

Jim Crow laws soon spread around the country with even more force than previously. Public parks were forbidden for African Americans to enter, and theaters and restaurants were segregated.

Case 3:22-cv-01112-LCB    Document 1    Filed 08/31/22    Page 79 of 139

Segregated waiting rooms in bus and train stations were required, as well as water fountains, restrooms, building entrances, elevators, cemeteries, even amusement-park cashier windows.

Laws forbade African Americans from living in white neighborhoods. Segregation was enforced for public pools, phone booths, hospitals, asylums, jails and residential homes for the elderly and handicapped.

Some states required separate textbooks Black and white students. New Orleans mandated the segregation of prostitutes according to race. In Atlanta, African Americans in court were given a different Bible from white people to swear on. Marriage and cohabitation between white and Black people was strictly forbidden in most Southern states.

It was not uncommon to see signs posted at town and city limits warning African Americans that they were not welcome there.

# Ida B. Wells

As oppressive as the Jim Crow era was, it was also a time when many African Americans around the country stepped forward into leadership roles to vigorously oppose the laws.

Memphis teacher Ida B. Wells became a prominent activist against Jim Crow laws after refusing to leave a first-class train car designated for white people only. A conductor forcibly removed her and she successfully sued the railroad, though that decision was later reversed by a higher court.

Angry at the injustice, Wells devoted herself to fighting Jim Crow laws. Her vehicle for dissent was newspaper writing: In 1889 she became co-owner of the Memphis *Free Speech and Headlight* and used her position to take on school segregation and sexual harassment.

Wells traveled throughout the South to publicize her work and advocated for the arming of Black citizens. Wells also investigated lynchings and wrote about her findings.

A mob destroyed her newspaper and threatened her with death, forcing her to move to the North, where she continued her efforts against Jim Crow laws and lynching.

# Charlotte Hawkins Brown

Charlotte Hawkins Brown was a North Carolina-born, Massachusetts-raised Black woman who returned to her birthplace at the age of 17, in 1901, to work as a teacher for the American Missionary Association.

After funding was withdrawn for that school, Brown began fundraising to start her own school, named the Palmer Memorial Institute.

Brown became the first Black woman to create a Black school in North Carolina and through her education work became a fierce and vocal opponent of Jim Crow laws.

# Isaiah Montgomery

Not everyone battled for equal rights within white society—some chose a separatist approach.

Convinced by Jim Crow laws that Black and white people could not live peaceably together, formerly enslaved Isaiah Montgomery created the African American-only town of Mound Bayou, Mississippi, in 1887.

Montgomery recruited other former enslaved people to settle in the wilderness with him, clearing the land and forging a settlement that included several schools, an Andrew Carnegie-funded library, a hospital, three cotton gins, a bank and a sawmill. Mound Bayou still exists today, and is still almost 100 percent Black.

## Jim Crow Laws in the 20th Century

As the 20th century progressed, Jim Crow laws flourished within an oppressive society marked by violence.

Following World War I, the NAACP noted that lynchings had become so prevalent that it sent investigator Walter White to the South. White had lighter skin and could infiltrate white hate groups.



**GALLERY**                                                                              **7 IMAGES**

**READ MORE:** See America's First Memorial to its 4,400 Lynching Victims

Case 3:22-cv-01112-LCB    Document 1    Filed 08/31/22    Page 81 of 139

As lynchings increased, so did race riots, with at least 25 across the United States over several months in 1919, a period sometimes referred to as "Red Summer." In retaliation, white authorities charged Black communities with conspiring to conquer white America.

With Jim Crow dominating the landscape, education increasingly under attack and few opportunities for Black college graduates, the Great Migration of the 1920s saw a significant migration of educated Black people out of the South, spurred on by publications like *The Chicago Defender*, which encouraged Black Americans to move north.

Read by millions of Southern Black people, white people attempted to ban the newspaper and threatened violence against any caught reading or distributing it.

The poverty of the Great Depression only deepened resentment, with a rise in lynchings, and after World War II, even Black veterans returning home met with segregation and violence.

**READ MORE: Red Summer of 1919: How Black WWI Vets Fought Back Against Racist Mobs**

## Jim Crow in the North

The North was not immune to Jim Crow-like laws. Some states required Black people to own property before they could vote, schools and neighborhoods were segregated, and businesses displayed "Whites Only" signs.



**GALLERY**                                                          **5 IMAGES**

**READ MORE: The Green Book: The Black Travelers' Guide to Jim Crow America**

In Ohio, segregationist Allen Granbery Thurman ran for governor in 1867 promising to bar Black citizens from voting. After he narrowly lost that political race, Thurman was appointed to the U.S. Senate, where he fought to dissolve Reconstruction-era reforms benefiting African Americans.

After World War II, suburban developments in the North and South were created with legal covenants that did not allow Black families, and Black people often found it difficult or impossible to obtain mortgages for homes in certain "red-lined" neighborhoods.

## When Did Jim Crow Laws End?

The post-World War II era saw an increase in civil rights activities in the African American community, with a focus on ensuring that Black citizens were able to vote. This ushered in the civil rights movement, resulting in the removal of Jim Crow laws.

In 1948 President Harry Truman ordered integration in the military, and in 1954, the Supreme Court ruled in *Brown v. Board of Education* that educational segregation was unconstitutional, bringing to an end the era of "separate-but-equal" education.

In 1964, President Lyndon B. Johnson signed the Civil Rights Act, which legally ended the segregation that had been institutionalized by Jim Crow laws.

And in 1965, the Voting Rights Act halted efforts to keep minorities from voting. The Fair Housing Act of 1968, which ended discrimination in renting and selling homes, followed.

Jim Crow laws were technically off the books, though that has not always guaranteed full integration or adherence to anti-racism laws throughout the United States.

## Sources

The Rise and Fall of Jim Crow. Richard Wormser.

Segregated America. Smithsonian Institute.

Jim Crow Laws. National Park Service.

"Exploiting Black Labor After the Abolition of Slavery." The Conversation.

"Hundreds of black Americans were killed during 'Red Summer.' A century later, still ignored." Associated Press/USA Today.

"Here's What's Become Of A Historic All-Black Town In The Mississippi Delta." NPR.

## Citation Information

### Article Title

Jim Crow Laws

### Author

History.com Editors

## Website Name

HISTORY

## URL

https://www.history.com/topics/early-20th-century-us/jim-crow-laws

## Access Date

August 11, 2020

## Publisher

A&E Television Networks

## Last Updated

June 23, 2020

## Original Published Date

February 28, 2018

**FACT CHECK:** *We strive for accuracy and fairness. But if you see something that doesn't look right,* click here *to contact us!*

VIDEOS

RELATED CONTENT

*Francis Lieber*

# THE

# NEGRO LAW

OF

# SOUTH CAROLINA,

COLLECTED AND DIGESTED BY

## JOHN BELTON O'NEALL,

**One of the Judges of the Courts of Law and Errors of the said State,**

UNDER A RESOLUTION OF THE STATE AGRICULTURAL SOCIETY OF SOUTH CAROLINA:

Read before them, at their September Semi-Annual Meeting, 1848, at Spartanburg
Court House—by them directed to be submitted to the Governor, with a
request that he would lay it before the Legislature, at its approach-
ing Session, November, 1848, and by him ordered to be
published for the information of the Members.

COLUMBIA:

PRINTED BY JOHN G. BOWMAN.

1848

*50 cents*

5097



ENTERED, according to Act of Congress, in the year 1848, .
BY JOHN G. BOWMAN,
In the Clerk's Office of the District Court of South Carolina.

*5097.*

# University of California.

FROM THE LIBRARY OF

DR. FRANCIS LIEBER,

Professor of History and Law in Columbia College, New York.

THE GIFT OF

MICHAEL REESE,

Of San Francisco.

1873.



TO HIS EXCELLENCY, DAVID JOHNSON,
*Governor and Commander-in-Chief in and over South Carolina.*

This work, passing through your hands to the Legislature of the State, may, I trust, be appropriately dedicated to you, as a slight testimonial of the friendship which, for more than thirty years. at the Bar, on the Bench, in your present high and dignified office, and in all the relations of life, has existed, and I hope ever will exist between us.

JOHN BELTON O'NEALL.

*Springfield, Oct. 3, 1848.*

*To the State Agricultural Society of South Carolina :*

The undersigned, charged with the preparation of a digest of Law in relation to Negroes, (slave or free,) and directed to n such suggestions of amendment as to him may seem expedient, leave to submit the following as the result of an examination of subject committed to him, so far as his time and opportunity allo

JOHN BELTON O'NEAL

*Springfield, August* 14, 1848.

---

|  | £ | s | d |  | £ |
|---|---|---|---|---|---|
| Proclamation Money, | 133, | 6, | 8, | for | 100 |
|  | s | d |  | s | d |
| Currency, | 32, | 8, | for | 4, | 8 |

# NEGRO LAW OF SOUTH CAROLINA.

## CHAPTER I.

### *The Status of the Negro, his Rights and Disabilities.*

SECTION 1. The Act of 1740, sec. l, declares all negroes and Indians, (free Indians in amity with this Government, negroes, mulattoes and mestizoes, who now are free, excepted) to be slaves:—the offspring to follow the condition of the mother: and that such slaves are chattels personal.

SEC. 2. Under this provision it has been uniformly held, that color is prima facie evidence, that the party bearing the color of a negro, mulatto or mestizo, is a slave: but the same prima facie result does not follow from the Indian color.

SEC. 3. Indians, and descendants of Indians are regarded as free Indians, in amity with this government, until the contrary be shown. In the second proviso of sec. 1, of the Act of 1740, it is declared that "every negro, Indian, mulatto and mestizo is a slave unless the contrary can be made to appear"—yet, in the same it is immediately thereafter provided—"the Indians in amity with this government, excepted, in which case the burden of proof shall lie on the defendant," that is, on the person claiming the Indian plaintiff to be a slave. This latter clause of the proviso is now regarded as furnishing the rule. The race of slave Indians, or of Indians not in amity to this government, (the State,) is extinct, and hence the previous part of the proviso has no application.

SEC. 4. The term negro is confined to slave Africans, (the ancient Berbers) and their descendants. It does not embrace the free inhabitants of Africa, such as the Egyptians, Moors, or the negro Asiatics, such as the Lascars.

SEC. 5. Mulatto is the issue of the white and the negro.

SEC. 6. When the mulatto ceases, and a party bearing some slight taint of the African blood, ranks as white, is a question for the solution of a Jury.

6                      NEGRO LAW OF SOUTH CAROLINA.

The State vs. Cantey, 2 Hill, 615, 616. Johnson vs. Boon, 1 Speer's, 270-1. White & Bass vs. the Tax Collector of Kershaw, 3 Rich'n, 136-7-8-9, 140-1. The State vs Davis & Hanna, 2 Bail. 560. Turner vs. the Tax Collector of Marion, decided in Charleston, Feb. 1841.

SEC. 7. Whenever the African taint is so far removed, that upon inspection a party may be fairly pronounced to be white, and such has been his or her previous reception into society, and enjoyment of the privileges usually enjoyed by white people, the Jury may rate and regard the party as white.

SEC. 8. No specific rule, as to the quantity of negro blood which will compel a Jury to find one to be a mulatto, has ever been adopted. Between $\frac{1}{4}$ and $\frac{1}{8}$ seems fairly to be debateable ground. When the blood is reduced to, or below $\frac{1}{8}$, the Jury ought always to find the party *white*. When the blood is $\frac{1}{4}$ or more African, the Jury must find the party a mulatto.

The State vs. Hayes, 1 Bail. 276. The State vs. Scott, 1 Bail. 273. The State vs. Cantey, 2 Hill, 614.

SEC. 9 The question of color, and of course of caste, arises in various ways, and may in some cases be decided without the intervention of a Jury. As when a party is convicted and brought up for sentence, or a witness on the stand objected to as a free negro, mulatto, or mestizo, in these cases, if the color be so obvious that there can be no mistake about it, the Judge may refuse to sentence, or may exclude the witness; still if the party against whose color the decision may be made, should claim to have the question tried by a Jury, it must, I apprehend, be so tried.

2d Sec. 9th Art. Con. of S. C. 1 Stat. 191.

State vs. B. Scott, 1 Bail, 296. Johnson vs. Boon, 1 Speer's, 270-1. The State vs. Cantey, 2 Hill 614. Cromer vs. Miller, N. P. Decis. Charleston, May, '47.

SEC. 10. There are three classes of cases, in which the question of color, and of course, of caste, most commonly occurs. 1st. Prohibition against inferior Courts, or the Tax Collector. 2d. Objections to witnesses offered to testify in the Superior Courts. 3d. Actions of slander for words charging the plaintiff with being a mulatto.

The State vs. Scott, 1 Bail. 296.

SEC. 11. In the first class, free negroes, mulattoes and mestizoes are liable to be tried for all offences, by a magistrate, and five free holders, (except in Charleston, where two magistrates must sit,) and of course, any person claiming to be white, (over whom, if that be true, they have no jurisdiction,) charged before them criminally, may object to their jurisdiction, and if they persist in trying him or her, may apply for, and on making good the allegation, is entitled to have the writ of prohibition. It seems if the party submits to have the question of jurisdiction tried by the Inferior Court, he will be concluded.

SEC. 12. The writ of prohibition is generally granted, nisi, on a suggestion sworn to by the relator, by any Judge at Chambers, on notice being given to the Court claiming jurisdiction; but if the fact be uncontroverted, or so plain as not to admit of doubt, that the relator is white, the Judge may at once grant an absolute prohibition. Generally, however, an issue is ordered to be made up on granting the prohibition, nisi, in which the relator is plaintiff, and on the Jury finding the relator to be a free white person, the prohibition is made absolute.



## NEGRO LAW OF SOUTH CAROLINA.

SEC. 13. In this class, too, the Tax Collectors frequently issue tax executions for capitation taxes, against persons whom they suppose to be free negroes, mulattoes, or mestizoes, ("free persons of color," as they are sometimes loosely called.) If the person or persons against whom they be issued, be not liable to the tax, they may, on a suggestion, move for, and have the writ of prohibition.

SEC. 14. In such cases, where, from the affidavits accompanying he suggeston, it appears that the relator or relators has or have been received in society as white, and has or have enjoyed the privileges of a white person, or of white people. I have uniformly made the order for prohibition to become absolute, if the Tax Collector did not within a given time, file his suggestions contesting the status of the relator or relators. This course has been adopted, because the Tax Collector has no jurisdiction over the person of the relator, and has no judicial authority whatever to decide the question of caste. His execution is predicated of an assumed fact. He is, therefore, bound to make that good, before he can collect the tax. This course has been found extremely convenient, as it has cut off an immense amount of litigation. For, generally, the Tax Collectors exercise a sound and honest discretion, in pursuing only those cases where there seems to be no room to doubt the degraded caste of the relator or relators.

SEC. 15. Where, however, there is to be a question as to the color of the relator or relators, the Court may in its discretion cast the burden of proof on the Tax Collector, or the relator. Generally, I think, it should be cast on the Tax Collector, as his execution is the first allegation of the color of the relator. As the issue may result, the writ of prohibition is made absolute or dissolved.

SEC. 16. In all the cases, of the first class, the decision'is conclusive; in all subsequent cases, civil or criminal. For the prohibition is in the nature of a criminal proceeding, operating in rem, and binds not only the parties, but also all the people of the Commonwealth. So it seems, that any decision made in favor of the caste of the relator, as white, may be given in evidence in his favor.

SEC. 17. In the 2d class, the objection to the competency of the witness, makes the issue collateral, and it is tried instanter, without any formal issue being made up, and the finding is upon the record on trial. The verdict, in such a case, concludes nothing beyond the question of competency in that case. It, however, might be given in evidence for or against the witness, not as conclusive, but as a circumstance having weight in settling the question of status, in all other cases.

SEC. 18. In the 3d class, where justification is pleaded and found, it would seem to forever conclude the Plaintiff from re-agitating the

Burg
lecton
ter. 1
415.
John
Boon
276-1
Bass
Colle
shaw
136.

See
note ,
lum
simor
254.
M'Co
Fitzsi
Rich'

Crom
ler, N
Charl
1847.

8                                NEGRO LAW OF SOUTH CAROLINA.

question.  But, where the defence is as usual, that the **Defendant** had good reason to suspect and believe that the Plaintiff was, as he alleged, a mulatto, in such case, a finding of nominal **damages** sustains the defence, yet it concludes not the Plaintiff from afterwards averring and proving that he was white.

SEC. 19.  Free Indians and their descendants, unmixed by African blood, are entitled to all the privileges of white men, except that of suffrage and office.  The former, and of consequence the latter, has been denied to a pure Indian, living among the whites.  The foregoing principle resulting from the case cited in the margin, is, I am persuaded, wrong.  The term white, ("free white man,") used in our Constitution, is comparative merely: it was intended to be used in opposition to the colors resulting from the slave blood.  The case should be reviewed, and I trust the decision will be, reversed; for the case in which it was made, will always condemn it.  The relator, the Rev. John Mush, was an Indian of the Pawmunki tribe of Indians, in Virginia; he was a soldier of the Revolution, he had as such, taken the oath of allegiance.  He was sent out as a Missionary to the Catawbas.  He, however, did not reside among them; he lived among the white inhabitants of York District, where he had resided for many years.  He was a man of unexceptionable character.  Yet, strange to say, he was held not to be entitled to vote.  If that decision be right, how long is the objection to prevail?  When is the descendant of an Indian to be regarded as white?  Is it, that he is not to be so regarded, until a jury shall find him to be white, on account of the great preponderance of the white blood?  But the Indian blood, like that of the white, is the blood of freedom; there is nothing degrading in it, and hence, therefore, the Indian and his descendants may well claim to be white within the legal meaning of our Constitution.

SEC. 20.  A mestizo is the issue of a negro and an Indian, and is subject to all the disabilities of a free negro and mulatto.

SEC. 21.  The burden of proof of freedom rests upon the negro, mulatto, or mestizo, claiming to be free.

SEC. 22.  Under the Act of 1740. 1st sec. 1st proviso, and the Act of 1799, it is provided, if any negro, mulatto, or mestizo shall claim his or her freedom, he may on application to the Clerk of the Court of Common Pleas of the District, have a guardian appointed, who is authorized to bring an action of trespass, in the nature of ravishment of ward, against any person claiming property in the said negro, mulatto or mestizo, or having possession of the same; in which action, the general issue may be pleaded, and the special circumstances given in evidence; and upon a general or special verdict found, judgment shall be given according to the very right of the case, without any

*The State ex relatione, John Marsh,(the name should be John Mush,) vs. the Managers of election for York Dist. 1st Bail 215*

*Miller vs. Dawson and Brown, Dudley's Report, 174, 176. 2d Proviso of 1st Sec. of the Act of 1740, P. L. 164. 7 Stat. 393.*

*2d Faust, 324.*

*Wesner ads. Guardian of Tom Brister, 1st M'Mull., 135.*

## Negro Law of South Carolina.

regard to defects in the proceeding, in form or substance. In such case, if the verdict be that the ward of the Plaintiff is free, a special entry shall be made declaring him to be free—and the jury is authorized to assess damages which the Plaintiff's ward may have sustained, and the Court is directed to give judgment, and award execution for the damages and cost; but if judgment is given for the Defendant, then the Court is authorized to inflict corporal punishment on the ward of the Plaintiff, not extending to life or limb. Under the 2d sec. of the Act of 1740, it is provided that the Defendant in such action, shall enter into a recognizance with one or more sufficient P. L. 164. sureties to the Plaintiff, in such sum as the Court of Common Pleas may direct, conditioned to produce the ward of the Plaintiff, at all times when required by the Court, and that while the action or suit is pending, he shall not be eloigned, abused or misused.

Sec. 23. Under the 1st proviso, the action of trepass in the nature of ravishment of ward, is an action sounding altogether in damages. The finding for the Plaintiff, is altogther of damages, which may be made up of the value of the services of the Plaintiff's ward, and recompense for any abuse, or injury, which he may sustain. For such damages and the costs, the judgment is entered up, and execution issues.

Sec. 24. Under the Act, the Court is authorized, on such finding Rice ads. ᶴ for the Plaintiff, to make a special entry, that the ward of the Plain- and Galbre Harp. Repo tiff is free. This entry ought to recite the action, the finding of the Jury, and then should follow the order of the Court, that the Plaintiff's ward is free, and that he be discharged from the service of the Defendant. This should be spread on the minutes of the Court. This entry is, it seems, evidence of the freedom of the Plaintiff's The State Hill, 2d Sp ward in all other cases, and against all other persons. It is only 16(1). conclusive. however, against the Defendant; against all other persons, it is *prima facie* merely. Under the 2d sec., the proceeding is by petition, setting out the action brought to recover the freedom of the negro, the possession by the Defendant, with a prayer, that the Defendant enter into the recognizance required by law. If this order be disobeyed, the Defendant may be attached for a contempt, until it be obeyed; or it may be in analogy to the decision under the Trover Act, that the Sheriff might arrest the Defendant under the Poole vs. non, 2d Hill order, and keep him in custody until he entered into the recognizance. I never knew the order made but once, and that was in the case of Spear and Galbreath, Guardians of Charles, vs. Rice, Harp. 20. In that case, the order was complied with by the Defendant on notice of it.

Sec. 25. The evidence of freedom is as various as the cases.

Sec. 26. Proof that a negro has been suffered to live in a commu- State vs. Ha 2d Speerr, 1 nity for years as a freeman, is *prima facie* proof of freedom. (note.)

2

**10**                    NEGRO LAW OF SOUTH CAROLINA.

Miller,Adm'r. of
Bennett, vs.
Reigne, et al, 2d.
Hill, 592. The
State vs. Hill, 2d
Speers, 161.

SEC. 27. If before the Act of 1820, a negro was at large, withou
an owner, and acting as a freeman for twenty years, the Cour
would presume *omnia esse rita acta*, and every muniment necessar
to give effect to freedom to have been properly executed.

SEC. 28. This rule applies also, when freedom has been begun t
be enjoyed before the Act of 1820, and the 20 years are completec
after.

Cooper's Justini-
an Notes, 416.
Salley vs. Beatty,
1. Bay, 260.
Bowers vs. New-
man, 2. M'Mull.
491–2.

SEC. 29. Before the Act of 1800, (hereafter to be adverted to,)
any thing which shewed that the owner had deliberately parted
with his property, and dissolved the *rinculum suvitii*, was enough
to establish freedom.

Monk vs. Jen-
kins, 2 Hill, C. R.
13, Rice ads.
Spear and Gal-
breath, Harper's
Law Report 20.

SEC. 30. The validity of freedom depends upon the law of the
place where it begins. Hence, when slaves have been manumitted
in other States, and are found in this State, their freedom *here*, will
depend on the validity of the manumission at the place whence they
came.

7 Stat. 442, 443.

SEC. 31. By the 7th, 8th and 9th sections of the Act of 1800, it
was provided, that emancipation could only take effect by deed; that
the owner intending to emancipate a slave, should, with the slave,
appear before a Justice of the Quorum, and five Freeholders of the
vicinage, and upon oath, answer all such questions as they might
ask touching the character and capability of the slave to gain a live-
lihood in an honest way. And if, upon such examination, it appeared
to them the slave was not of bad character, and was capable of gain-
ing a livelihood in an honest way, they were directed to indorse a
certificate upon the deed to that effect; and upon the said deed and
certificate being recorded in the Clerk's office, within 6 months from
the execution, the emancipation was declared to be legal and valid,
otherwise, that it was void. The person emancipating was directed
by the 8th section, to deliver to the slave a copy of the deed of
emancipation, attested by the Clerk, within 10 days after such deed
shall have been executed.

SEC. 32. The person emancipating, neglecting or refusing to deli-
ver such copy, was, by the 9th section, declared to be liable to a fine
of $50, with costs, to be recovered by any one who shall sue for the
same.

SEC. 33. It was also provided by the 9th section, that a slave
emancipated contrary to this Act, may be seized, and made property
by any one.

SEC. 34. It was held, for a long time, that when a will directed
slaves to be free, or to be set free, that they were liable to seizure,
as illegally emancipated. But the cases of Lenoir vs. Sylvester, and
Young vs. the same, put that matter right. In them. it was held,
that a bequest of freedom was not void. under the Act of 1800—that
it could have no effect until the Executor assented—that when he did

1st Ball. 632, 633.

assent. it was his duty to so assent as to give legal effect to the bequest.  As legal owner, he could execute the deed, appear before the Magistrate and Freeholders, answer the questions, and do every act required by the law, and thus make the emancipation legal.

Sec. 35. A slave illegally emancipated, was free, as against the rights of the owner, under the Act of 1800; he could only restore himself to his rights by capture.  The Act of 1820, declares that no slave shall be emancipated but by Act of the Legislature.  Still it has been held, in Linam vs. Johnson, and many subsequent cases, that if a slave be in any other way emancipated, he may. under the provision of the Act of 1800, be seized as derelict. *Linam vs. Johnson, 2nd Bail. 140. Monk vs. Jenkins, 2 Hill, C. R. 13. 7 Stat. 459.*

Sec. 36. The delivery of the deed of emancipation to the Clerk to be recorded, is all the delivery necessary to give it legal effect; and the delivery to the Clerk is equivalent to recording. *Monk vs. Jenkins, 2 Hill, C. R. 14–15.*

Sec. 37. The Act of 1820, declaring that no slave should hereafter be emancipated, but by Act of the Legislature, introduced a new, and. as I think. an unfortunate provision in our law.  All laws unnecessarily restraining the rights of owners are unwise.  So far as may be necessary to preserve the peace and good order of the community, they may be properly restrained.  The Act of 1800 was of that kind. The Act of 1820, instead of regulating, cut off the power of emancipation.  Like all of its class, it has done harm instead of good.  It has caused evasions without number.  These have been successful, by vesting the ownership in persons legally capable of holding it, and thus substantially conferring freedom, when it was legally denied. *Cline vs. Caldwell, 1 Hill, 423. State vs. Singletary and others, Dudley's Rep. 220. Carmille vs. Admr. of Carmille et al. 2d McMull, 424. The State vs. Singletary and Rhame, Dud. 220.*

Sec. 38. So too. bequests or gifts, for the use of such slaves, were supported under the rule, that whatever is given to the slave belongs to the master. *Carmille vs. Admr. of Carmille, 2 McMull, 424.*

Sec. 39. Since the Act of 1820, if a negro be at large, and enjoy freedom for twenty years, he or she is still a slave; as an Act of Emancipation passed by the Legislature, will not be presumed. *Vingard vs. Passalaigue, 2 Strob.*

Sec. 40. The Act of 1820, was plainly intended to restrain emancipation within the State; it was, therefore, held by the Court of Appeals, that where a testator directed slaves to be sent out of the State, and there set free, such bequest was good. *Frazier vs. Frazier, 2 Hill C. R. 305.*

Sec. 41. In '41. the Legislature, by a sweeping Act, declared, 1st. That any bequest, deed of trust, or conveyance, intended to take effect after the death of the owner, whereby the removal of any slave or slaves without the State, is secured or intended, with a view to the emancipation of such slave or slaves, shall be void—and the slave or slaves' assets. in the hands of any Executor or Administrator. 2d. That any gift of any slave or slaves, by deed, or otherwise, accompanied by a trust. secret or implied, that the donee shall remove such slaves from the State to be emancipated, shall be void, and directed *11 Stat. 154.*

Google

12                          NEGRO LAW OF SOUTH CAROLINA.

the donee to deliver up the slave or slaves, or account to the distributees, or next of kin, for their value.  3d. That any bequest, gift, or conveyance of any slave or slaves, with a trust or confidence, either secret or expressed, that such slave or slaves shall be held in nominal servitude only, shall be void, and the donee is directed to deliver the slave or slaves, or to account for their value to the distributees, or next of kin.  4th. That every devise or bequest to a slave or slaves, or to any person upon a trust or confidence, secret or expressed, for the benefit of any slave or slaves, shall be void.

Carmille vs. the Admr. of Carmille, 2d McMull 424.

SEC. 42. This Act, reversing the whole body of the law, which had been settled by various decisions from 1830, can have no effect on any deed, will, gift, or conveyance, made prior to its passage, 17th December, 1841.

SEC. 43. This Act, it has been always said, was passed to control a rich gentleman in the disposition of his estate.  Like everything of the kind, he defeated it, and the expectations of his next of kin, by devising his estate to one of his kindred, to the exclusion of all the rest.

SEC. 44. My experience as a man, and a Judge, leads me to condemn the Acts of 1820 and 1841.  They ought to be repealed, and the Act of 1800 restored.  The State has nothing to fear from emancipation, regulated as that law directs it to be.  Many a master knows that he has a slave or slaves, for whom he feels it to be his duty to provide.  As the law now stands, that cannot be done.  In a slave country, the good should be especially rewarded.  Who are to judge of this, but the master?  Give him the power of emancipation, under well regulated guards, and he can dispense the only reward, which either he, or his slave appreciates.  In the present state of the world, it is especially our duty, and that of slave owners, to be just and merciful, and in all things to be *exceptione majori*.  With well regulated and mercifully applied slave laws, we have nothing to fear for negro slavery.  Fanatics of our own, or foreign countries, will be in the condition of the viper biting the file.  They, not us, will be the sufferers.  Let me, however, assure my countrymen, and fellow-slaveholders, that unjust laws, or unmerciful management of slaves, fall upon us, and our institutions, with more withering effect than anything else.  I would see South Carolina, the kind mother, and mistress of all her people, free and slave.  To all, extending justice and mercy.  As against our enemies, I would say to her, *be just, and fear not*.  Her sons faltered not on a foreign shore; at home, they will die in the last trench, rather than her rights should be invaded or despoiled.

SEC. 45. Free negroes, mulattoes, and mestizoes, are entitled to all the rights of property, and protection in their persons and property, by action or indictment, which the white inhabitants of this State are entitled to.

SEC. 46. They are legally sui juris. (The Act of '22, section 8, 7 S.at. 462. requires every male free negro, above the age of 15, to have a guardian, who must be a respectable freeholder of the District, who may be appointed by the Clerk.) Notwithstanding this provision, the free negro is still, as I have said sui juris, when of and above the age of 21. The guardian is a mere protector of the negro, and a guarantor of his good conduct to the public.

Sec. 47. They may contract, and be contracted with. Their marriages with one another, and even with white people, are legal.— They may purchase, hold, and transmit, by descent, real estate.— They can mortgage, aliene, or devise the same. They may sue, and be sued, without noticing their respective guardians. *[Bowers vs. Newman, 2d McMull, 472. Real Estate of Mrs. Hardcastle, ads. the Escheator of Pineville, reported in the arg't. Bowers vs. Newman, 2d McMull. 479–480.]*

SEC. 48. They are entitled to protect their persons by action, indictment, and the writ of Habeas Corpus, (except that the writ of Habeas Corpus is denied to those who enter the State contrary to the Act of 1835.) They cannot repel force by force; that is, they cannot strike a white man, who may strike any of them. *[The State vs. Harden. note A. 2 Speers. 152. The State vs. Hill, Idem, 150–151.]*

SEC. 49. It has, however, been held, in a case decided in the Court of Appeals, and not reported, that insolence on the part of a free negro, would not excuse an Assault and Battery. From that decision, I dissented, holding as in the State vs. Harden, 2d Speers (note) 155, " That words of impertinence or insolence addressed by a free negro to a white man, would justify an Assault and Battery." "As a general rule, I should say, that whatever, in the opinion of the Jury, would induce them, as reasonable men, to strike a free negro, should in all cases be regarded as a legal justification, in an indictment." *[The State vs. B. Scott, 1 Bail 294. 1st sec. Act of 1844, 11 Stat. 293.]*

SEC. 50. In addition to the common law, remedies, by action of Assault and Battery, and False Imprisonment, and indictments for the same, the Act of '37 furnishes another guaranty for the protection of free negroes, mulattoes, or mestizoes, by declaring any one convicted of their forcible abduction, or assisting therein, to be liable to a fine not less than $1000, and imprisonment not less than 12 months. *[6 Stat. 674.]*

SEC. 51. Free negroes, mulattoes, and mestizoes, cannot be witnesses or jurors in the Superior Courts. They can be jurors no where. They cannot even be witnesses in Inferior Courts, with the single exception of a Magistrate's and Freeholders' Court, trying slaves or free negroes, mulattoes or mestizoes, for criminal offences, and then without oath. This was however, not always the case, to the entire extent which I have stated. It was at one time held, that any *person of color*, if the issue of a free white woman, is entitled to give evidence, and ought to be admitted as a witness, in our Courts. This was predicated of a clear mistake of the civil law maxim of partus sequitur ventrem, and of the provision in the 1st section of the Act of 1740, that the offspring should follow the condition of the mother, which only mean, that slavery or freedom should be the condi- *[White vs. Holmes, McC. 430. Groning vs. Devans. 2d Bail. 192. 13th and 14th sec. of Act of 1740. P. L. 166. The State vs. Dowell, 2 Brev. 146. The State vs. R. Scott, 1 Bail. 273. The State vs. Hays, 1 Bail. 275.]*

14                              NEGRO LAW OF SOUTH CAROLINA.

tion of the offspring, but where the words mulatto or mestizo are ever used as designating a class, they are to be interpreted by their common acceptation.

P. L. 166-167.    SEC. 52. It is singular that the 13th and 14th sections of the Act
7 Stat. 401-402.  of 1740. directing who may be witnesses against slaves, free negroes, &c., should have been confined to free Indians and slaves, who are to be examined without oath. From which it would seem, that free negroes, mulattoes, &c., might be examined in such cases, as at common law, upon oath. But the practice under the Act has been uniform, as I have before stated it. I think it a very unwise provision, and course of practice, to examine any witnesses in any court, or case, without the sanction of an oath. Negroes, (slaves or free) will feel the sanctions of an oath, with as much force as any of the ignorant classes of white people, in a Christian country. They ought, too, to be made to know, if they testify falsely, they are to be punished for it, by human laws. The course pursued on the trial of negroes, in the adduction and obtaining testimony, leads to none of the certainties of truth. Falsehood is often the result, and innocence is thus often sacrificed on the shrine of prejudice.

SEC. 53. Free negroes, mulattoes, and mestizoes, may make all
Glenn vs. Lopez, necessary affidavits on collateral matters, in cases in the Superior
Harp. Rep. 109.  Courts, in which they may be parties, as on motions of postponement, &c. So too, they may in such Court take the oaths under the Insolvent Debtor's or Prison Bounds Act, and under the Acts of Congress to obtain a pension.

SEC. 54. Free negroes, mulattoes, and mestizoes, (except such as
Act of '47, p. 426.  are proved to the satisfaction of the Tax Collector, to be incapable
The State vs.
Graham, 2d Hill,  of making a livelihood,) are liable to a capitation tax, (fixed by
457. 2d sec. Act
of '45, 11 Stat. 343.  each tax Act;) they may make a return personally—or any member of the family may make a return for the rest; or if one be sick, he or she may make such return by agent. They are liable to be double taxed for not making a return of themselves.

Acts of 1805, p. 6.   SEC. 55. This tax seems to have originated in 1805. The Act of
Act of '33, 2d
sec. p. 4. The    1833 directs the issuing of executions against free negroes, mulat-
State vs. Gra-
ham, 2d Hill,    toes and mestizoes, who may fail to pay the tax, and that under
458.             them, they may be sold for a term, not exceeding one year; provided, however, that they shall in no instance be sold for a longer term than may be necessary to pay the taxes due; but they cannot be sold under the double tax executions to be issued against them for not making returns of themselves. Such executions go against pro-
2d sec. 9th Art.  perty merely. The constitutionality of the provision for the sale of
Con. S. C.       free negroes in payment of their taxes, is exceedingly questionable.

SEC. 56. The term "free person of color," used in many of our Acts, since 1840, has given rise to many imperfect and improper notions. Its meaning is confirmed by the Act of 1740, and all proper

NEGRO LAW OF SOUTH CAROLINA.                              15

constructions of our *code noir* to *negroes. mulattoes and mestizoes.* In common parlance, it has a much wider signification, *hence the danger of its use*; for all who have to execute the Acts of the Legislature are not *learned lawyers*, or Judges. The Legislature ought to use the words of the Act of 1740. "Free negroes, mulattoes and mestizoes," and then every one would have a certain guide to understand the words used.

SEC. 57. The Act of '35, declares it to be unlawful for any free negro, or *person of color*, to migrate into this State, or to be brought or introduced within its limits, by land or water. *Act of 1835- 1st sec. 7 Stat. 470.*

SEC. 58. Any free negro, or person of color, not being a seaman on board any vessel arriving in this State, violating this law, shall and may be seized by any white person, or by the Sheriff or Constable of the district, and carried before any Magistrate of the district. city or parish—who is authorized to bail or commit the said free negro—and to summon three freeholders, and form a Court for the trial and examination of the said free negro, or person of color, within six days after his arrest; and on conviction, order him to leave the State—and at the time of conviction, to commit him to jail, until he can leave the State, or to release him on bail. not longer than 15 days. And, if after being bailed and ordered to leave the State, the free negro or person of color, shall not leave within 15 days, or having left shall return, shall be arrested, and on conviction before a Court of one Magistrate and three freeholders, he shall be liable to such corporal punishment as the court shall order; if after such punishment, the offender shall still remain in the State "longer than the time allowed," (which is. I suppose, the time previously fixed, 15 days.) or shall return, upon proof and conviction before a court of one Magistrate and three freeholders, the free negro or person of color may be sold, and the proceeds appropriated, one half to the use of the State, the other half to the use of the informer.

SEC. 59. If the free negro or person of color come into this State. on board any vessel, as a cook, steward, mariner, or in any other employment, the Sheriff of the district is to apprehend, and confine in jail, such free negro or person of color, until the vessel be hauled off from the wharf, and ready for sea. The Act provides. that on the apprehension of any free negro or person of color, on board any vessel, the Sheriff shall cause the Captain to enter into a recognizance with good and sufficient security, in the sum of $1000 for each free negro or person of color, who may be on board his said vessel, that he will comply with the requisitions of this Act. which are, that he will. when ready for sea, carry away the said free negro or person of color. and pay the costs of his detension; but if the Captain be unable or refuse so to do, he is to be required by the Sheriff to haul his vessel in the stream, 100 yards distance from the shore, and there remain until ready for sea. If this be not complied with, in 24 hours, *2d sec. 7 Stat. 471.*

Google

16                              NEGRO LAW OF SOUTH CAROLINA.

the Captain is liable to be indicted, and on conviction, is to be fined not exceeding $1000, and imprisoned not exceeding 6 months.

SEC. 60. Whenever any free negro or person of color, shall be apprehended and committed for coming into this State by sea, it is the duty of the Sheriff to call upon some Magistrate to warn the offender, never again to enter the State, and at the time of giving such warning, the Magistrate is to enter the name of such free negro or person of color, in a book to be kept by the Sheriff, with a description of his person and occupation, which book is evidence of the warning, and is to be deposited in the Clerk's office, as a public record. If the offender shall not depart the State, in case the Captain shall refuse or neglect to carry him or her away, or having departed, shall ever again enter into the State, he or she is liable to be dealt with, and incur the forfeiture prescribed in the 1st sec.

SEC. 61 If any free negro or person of color, before the passage of the Act of '35, or since, has left, or shall leave the State, they are forever prohibited from returning, under the penalty of the 1st sec.

SEC. 62. The 8th sec. of the Act, excepts from its operation free negroes and persons of color, coming into the State from shipwreck, but declares them liable to arrest and imprisonment, as provided in the 2d sec., and to incur all its penalties, if within thirty days they shall not leave the State.

SEC. 63. The 9th sec. excepts free negroes and persons of color, who shall arrive as cooks, stewards or mariners, or in other employment, in any vessel of the United States; or on board any national vessel of the navies of any of the European or other powers in amity with the United States, unless they shall be found on shore, after being warned by the Sheriff to keep on board their vessels. The Act does not extend to free American Indians, free Moors, or Lascars, or other colored subjects beyond the Cape of Goop Hope, who may arrive in any merchant vessel.

SEC. 64. Free negroes, and *free persons of color*, (meaning of course mulattoes and mestizoes,) are prohibited, (unless they have a ticket from their guardian,) from carrying any fire arms, or other military or dangerous weapons, under pain of forfeiture, and being whipped at the discretion of a Magistrate and three freeholders. They cannot be employed as pioneers, though they may be subjected to military fatigue duty.

SEC. 65. The first, second, third and fifth sections of the Act of '35, are to my mind, of so questionable policy, that I should be disposed to repeal them. They carry with them so many elements of discord with our sister States, and foreign nations, that, unless they were of paramount necessity, which I have never believed, we should at once strike them out. I am afraid too, there are many grave constitutional objections to them, in whole or in part.



## CHAPTER II.

### *Slaves, their Civil Rights, Liabilities, and Disabilities.*

SEC. 1. In a previous part of this digest, I have had occasion incidentally to state the meaning of the civil law maxim, "*partus sequitur ventrem*," and of the provision of the 1st section of the Act of 1740, "the offspring to follow the condition of the mother." Both mean, that the offspring of a slave mother must also be a slave.

SEC. 2. The maxim, as well as the provision of the Act, has a further meaning in relation to property. It determines to whom the issue belongs. The owner of the mother has the same right in her issue, born while she belongs to him. which he has in her. If for example, the person in possession is tenant for life, then such an one takes an estate for life in the issue. If there be a vested estate in remainder, or one which takes effect on the termination of the life estate, the remainder man is entitled to the issue, on the falling in of the life estate, as he is entitled to the mother. If there be no estate carved out beyond the life estate, then as the mother reverts, so also does the issue. <span style="font-size:smaller">M'Vaughter vs. Elder, 2d Brev. Rep. 314. Ellis vs. Shell, Eq. Rep. (DeS.) 611.</span> <span style="font-size:smaller">Geiger vs. Brown, 4 M'C. 418.</span>

SEC. 3. The estate of a tenant for life in slaves, engaged in making a crop, if he die after the 1st of March, is continued by the Act of '89, until the crop be finished, or until the last day of December, in the year in which the tenant dies. <span style="font-size:smaller">P. L. 499. Lenoir vs Sylvester, Young vs. the same, 1 Bail. 645.</span>

SEC. 4. The issue of a white woman and a negro, is a mulatto within the meaning of that term, and is subjected to all the disabilities of the degraded caste, into which his color thrusts him. The rule "*partus sequitur ventrem*" makes him a free man. The result of mingling the white and negro blood is to make him a mulatto, and that carries with it, the disqualifications heretofore pointed out. <span style="font-size:smaller">The State vs. R. Scott, 1 Bail. 273. The State vs. Hayes, 1 Bail. 275.</span>

SEC. 5. The 1st section of the Act of 1740, declares slaves to be chattels personal.

SEC. 6. The first consequence legally resulting from this provision would have been without any Act of the Legislature, that the stealing of a slave, should be a larceny (grand or petit) at common law.

SEC. 7. But in 1754, an Act was passed, which. by its first section, made it a felony without the benefit of clergy, to inveigle, steal *and* carry away, or to hire, aid or counsel. any person or persons to inveigle, steal *or* carry away, any slave or slaves, or to aid any slave in running away, or departing from his master's or employer's service. <span style="font-size:smaller">P. L. 235.</span> <span style="font-size:smaller">7 Stat. 426. The State vs. Miles, 2 N. & M'C. 1. The State vs. Whyte, et. al. 2 N. & M'C. 174. The State vs. Covington, 2d Bail. 569.</span>

SEC. 8. This law, beginning in our Colonial times, and made for us by our rulers, given to us by Great Britain, has remained ever since unchanged, and has been sternly enforced as a most valuable safeguard to property. Yet public opinion was gradually inclining to the belief, that its provisions were too sanguinary, and that they might be *safely* mitigated when the torrents of abuse poured upon the <span style="font-size:smaller">The State vs. LaCreux, 1 M'Mull. 48.8 State vs. M'Coy, 2 Speers, 711. The State vs. John L. Brown, 2 Speers, 129.</span>

3

18                    NEGRO LAW OF SOUTH CAROLINA.

State, and the Judge presiding on the trial from abroad, and the free States of the Union, on account of the conviction of a worthless man, John L. Brown, for aiding a slave to run away and depart from her master's service, *stopped the whole movement of mercy.* It is *now*, however, due to ourselves, that this matter should be taken up, the law changed, and a punishment less than death be assigned for the offence.

SEC. 9. Slaves are in our law, treated as other personal chattels, so far as relates to questions of property, or liability to the payment of debts, except that by the county court Act, (which in this respect is perhaps still of force.) slaves are exempted from levy when other property be shown; and also by the Act of '87, for recovering fines and forfeited recognizances, the sheriff is directed to sell under the executions to be issued, every other part of the personal estate, before he shall sell any negro or negroes.

P. L. 379.

P. L. 420.

SEC. 10. In consequence of this slight character which they bear in legal estimation, as compared with real estate, (which has itself, in our State, become of too easy disposition,) slaves are subjected to continual change—they are sold and given by their masters without writing; they are sold by administrators and executors, and by the sheriff, (and may even be sold by constables.) These public sales by administrators, executors or the sheriff, may be for payment of debts or partition—they (slaves) are often sold under the order of the Ordinary, without any inquiry, whether it be necessary for payment of debts or division. This continual change of the relation of master and slave, with the consequent rending of family ties among them, has induced me to think, that if by law, they were annexed to the freeholds of their owners, and when sold for partition among distributees, tenants in common, joint tenants and coparceners, they should be sold with the freehold, and not otherwise—it might be a wise and wholesome change of the law. Some provision, too, might be made, which would prevent, in a great degree, sales for debts. A debtor's lands and slaves, instead of being sold, might be sequestered until, like *vivum vadium*, they would pay all his debts in execution, by the annual profits. If this should be impossible on account of the amount of the indebtedness, then either court, law or equity, might be empowered to order the sale of the plantation and slaves together or separately; the slaves to be sold in families.

Act of 1789, P. L. 493.

SEC. 11. Although slaves, by the Act of 1740, are declared to be chattels personal, yet, they are also in our law, considered as persons with many rights, and liabilities, civil and criminal.

SEC. 12. The right of protection, which would belong to a slave, as a human being, is by the law of slavery, transferred to the master.

SEC. 13. A master may protect the person of his slave from injury, by repelling force with force, or by action, and in some cases by indictment.

Tennent vs. Dendy. Dudley's Rep. 83. Helton vs. Caston. 2d Bail. 98, 99.

Case 3:22-cv-01112-LCB    Document 1    Filed 08/31/22    Page 102 of 139

SEC. 14. Any injury done to the person of his slave, he may re- Caston vs. Murray, Harp 113.
dress by action of trespass, *vi et armis*, without laying the injury Helton vs. Caston, 2d Bail 96.
done, with a *per quod servitium amisit*, and this even though he may Tennent vs. Dendy, Dudley's
have hired the slave to another. Rep. 83.

SEC. 15. By the Act of 1821, the murder of a slave is declared to Acts of 1821, p. 12.
be a felony. without the benefit of clergy; and by the same Act, to
kill any slave, on sudden heat and passion, subjects the offender, on
conviction. to a fine not exceeding $500, and imprisonment not ex-
ceeding 6 months.

SEC. 16. To constitute the murder of a slave, no other ingredients The State vs.
are necessary than such as enter into the offence of murder at com- Cheatwood, 2d Hill, 459.
mon law. So the killing. on sudden heat and passion, is the same as The State vs. Gaffney, Rice's
manslaughter. and a finding by the jury on an indictment for the mur- Rep. 432.
der of a slave, of a killing on sudden heat and passion. is good, and sub- The State vs. Fleming, decided at Columbia,
jects the offender to the punishment of the act; or on an indictment for Spring, 1848.
the murder of a slave, if the verdict be guilty of manslaughter, it is
good, and the offender is to receive judgment under the Act.

SEC. 17. An attempt to kill and murder a slave by shooting at him, The State vs. Mann, 2 Hill 453.
was held to be a misdemeanor, and indictable as an assault with an
intent to kill and murder. This was a consequence of making it
murder to kill a slave.

SEC. 18. The Act of 1841 makes the *unlawful* whipping or beating 11 Stat. 155.
of any slave, without sufficient provocation by word or act, a misde-
meanor, and subjects the offender, on conviction, to imprisonment not
exceeding 6 months, and a fine not exceeding $500.

SEC. 19. This Act has received no judicial construction by our
Court of Appeals. It has been several times presented to me on
Circuit. and I have given it construction. The terms " shall *unlaw-
fully* whip or beat any slave not under his charge," " without reason-
able provocation." seem to me convertible. For if the beating be
excusable from reasonable provocation, it cannot be unlawful. So if
the beating be either without provocation, or is so enormous, that the
provocation can be no excuse, then it is unlawful. What is sufficient
provocation by word or deed, is a question for the jury. The ques-
tion is, whether as slave owners, and reasonable men, if they had
been in the place of the defendant, they would have inflicted the
whipping or beating which the defendant did ? If they answer this
question in the affirmative, then the defendant must be acquitted,
otherwise, convicted.

SEC. 20. The Acts of 1821 and 1841, are eminently wise, just, and
humane. They protect slaves, who dare not raise their own hands
in defence, against brutal violence. They teach men, who are whol-
ly irresponsible in property, to keep their hands off the property of
other people. They have wiped away a shameful reproach upon us,
that we were indifferent to the lives or persons of our slaves. They

20                              NEGRO LAW OF SOUTH CAROLINA.

have had too, a most happy effect on slaves themselves.  They know *now*, that the shield of the law is over them, and thus protected, they yield a more hearty obedience and effective service to their masters.

*P. L. 173.*

SEC. 21. By the last clause of the 37th section of the Act of 1740, it is provided if any person shall wilfully cut out the tongue, put out the eye, castrate, or cruelly scald, burn, or deprive any slave of any limb, or member, or shall inflict any other cruel punishment, other than by whipping, or beating with a horse-whip, cowskin, switch, or small stick, or by putting irons on, or confining or imprisoning such slave, every such person shall, for every such offence, forfeit the sum of £100 current money, equal to $61 23-100.  This provision it has been held extends to any cruel beating of a slave.

The State vs. Wilson.  Chev. Rep. (So. Ca. Rep.) p. 168.

SEC. 22. The provision is humane, but the punishment is too slight for such scandalous offences.

SEC. 23. To secure convictions under this part of the 37th section, and also where slaves were killed, it was provided, in the 39th section, that if a slave suffered in life or limb, or was cruelly beaten or abused, where no white person was present, or being present, shall neglect or refuse to give evidence—in every such case the owner or person having the care and management of the slave, and in whose possession or power the slave shall be, shall be adjudged guilty, unless he can make the contrary appear by good and sufficient evidence, or *shall, by his own oath, clear and exculpate himself.*  This provision has been considered as applicable to trials under the Act of 1821, and a prisoner charged with the murder of a slave, has been allowed to exculpate himself.

*P. L. 173.*

The State vs. Rains, 3d McC. 533.

SEC. 24. This is the greatest temptation ever presented to perjury, and the Legislature ought to speedily remove it.

SEC. 25. The 38th section of the Act of 1740, requires the owners of slaves to provide them with sufficient *clothing, covering and food,* and if they should fail to do so, the owners respectively are declared to be liable to be informed against to the next nearest Justice of the Peace, (Magistrate now.) who is authorized to hear and determine the complaint; and if found to be true, or in the absence of proof, if the owner will not exculpate himself by his own oath, the magistrate may make such order as will give relief, and may set a fine not exceeding £20, current money, equal to $13 66-100, on the owner, to be levied by warrant of distress and sale of the offender's goods.

P. L. 173.
7 Stat. 411.

SEC. 26. This provision, it must be remarked, (leaving out the exculpatory part) is a very wise, and humane one, *except that the penalty is entirely too slight.*  I regret to say, *that there is in such a State as ours,* great occasion for the enforcement of such a law, *accompanied by severe penalties.*  It might be proper, that this matter should by the direction of an Act, hereafter to be passed, be given in charge to the Grand Jury, at each and every term, and they be

solemnly enjoined to enquire of all violations of duty, on the part of masters, owners, or employers of slaves, in furnishing them with sufficient clothing, covering, and food; and the law might also direct that every one by them reported, should be ordered instantly to be indicted.

SEC. 27. It is the settled law of this State, that an owner cannot abandon a slave needing either medical treatment, care, food or raiment. If he does, he will be liable to any one who may furnish the same. In Fairchild vs. Bell, that good man, and great Judge, Wilds, whose early death, South Carolina had good cause to deplore, said, in the noble language of a Christian and patriot, "the law would infer a contract against the evidence of the fact, to compel a cruel and capricious individual to discharge that duty, which he ought to have performed voluntarily. For as the master is bound by the most solemn obligation to protect his slave from suffering, he is bound by the same obligation to defray the expenses or services of another to preserve the life of his slave, or to relieve the slave from pain and danger. *The slave lives for his master's service. His time, his labor, his comforts, are all at his master's disposal.* The duty of humane treatment and of medical assistance, (when clearly necessary) ought not to be withholden. *Fairchild vs. Bell, 2 Brev. Rep. 129.*

*City Council vs. Cohen, 2d Speer's, 408.*

SEC. 28. By the 22nd section of the Act of 1740, slaves are protected from labor on the Sabbath day. The violation of the law in this respect subjects the offender to a fine of £5 current money, equal to $3 7-100, for every slave so worked. *P. L. 168. 7 Stat. 404*

SEC. 29. By the 44th section of the same Act, owners or other persons having the care and management of slaves, are prohibited from working or putting the said slaves to work for more than 15 hours from the 25th March to 25th September, and 14 hours from 25th September to 25th March, under a penalty of £20 current money, equal to $13 66-100 for every offence. *P. L. 174. 7 Stat. 413.*

SEC. 30. The time limited and allowed for labor in this section is too much. Few masters now demand more than 12 hours labor from 1st March to 1st October, and 10 hours from the 1st October to 1st March. This, after allowing suitable intervals for eating and rest, is about as much as humane prudent masters will demand.

SEC. 31. A slave may, by the consent of his master, acquire and hold *personal* property. All, thus acquired, is regarded in law as that of the master. *Hobson vs. Perry. 1 Hill, 277. Carmille vs. the Adm'r. of Carmille, 2 McMull 470-471.*

SEC. 32. The only exception is under the 34th section of the Act of 1740, which makes goods acquired by traffic and barter for the particular and peculiar benefit of such slave, boats, canoes, or periaugers in the possession of a slave, as his own, and for his own use; horses, mares, neat cattle, sheep or goats, kept, raised or bred for the use of any slave, liable to be seized by any one, and forfeited by the judg- *P. L. 171. The State vs. Mazyck, 3d Rich. 291 Norwood vs. Mazyck, 3d Rich. 296.*

22.

## NEGRO LAW OF SOUTH CAROLINA.

ment of any Justice (magistrate) before whom they may be brought.

SEC. 33. Under this section, it has been lately held, that no one can enter on the plantation of the master to make such seizure.

SEC. 34. A seizure can therefore only be made when a slave is found, as owner, in possession of the contraband articles, outside of his master's plantation.

SEC. 35. This qualification may render the law harmless. Still it ought to be repealed. The reasons which led to its enactment have all passed away. It is only resorted to, *now*, to gratify the worst passions of our nature. The right of the master, to provide as comfortably as he pleases for his slave, could not be, and ought not to be abridged in the present state of public opinion. The law may very well compel a master to furnish his slave with proper, necessary, wholesome, and abundant raiment and food; but certainly no legislator *now*, would venture to say to a master, you shall not allow your slave to have a canoe to fish with, or to carry vegetables to market, or that he should not be allowed to have a horse to attend to his duties as a stock-minder in the swamps, savannas, and pine forests of the lower part of the State, or that a family of slaves should not have a cow to furnish them with milk, or a hog to make for them meat, beyond their usual allowance. All these are matters between the master and the slave, in which neither the public nor any prying, meddling, mischievous neighbor, has any thing to do. Experience and observation fully satisfy me that the first law of slavery is that of kindness from the master to the slave. With that properly inculcated, enforced by law, and judiciously applied, slavery becomes a family relation, next in its attachments to that of parent and child.— It leads to instances of devotion on the part of the slave, which would do honor to the heroism of Rome herself.* With such feelings on our plantations, what have we to fear from fanaticism? Our slaves would be our sentinels to watch over us; our defenders to protect our firesides from *those prowling harpies, who preach freedom, and steal slaves from their happy homes.*

SEC. 36. A slave cannot contract, and be contracted with. This principle was broadly laid down by the Constitutional Court, in a case in which a note was given by the defendant to the plaintiff's slave by name, and the plaintiff brought the action upon it. From this decision, Judge Cheves dissented, upon, I presume, the ground that the master had the right to affirm the contract, and make it his own, and consider it for his own benefit. In it, I think, he was right, on

Richardson vs. Brough on. Cola. Spring, 1848. 1 Law Reporter, new series. 120. Clarke ads. Blake. 3d McC. 179.

2 Moultrie's Mem. 355–356.

Gregg vs. Thomson, 2d Con. Rep. (Mill 331.)

---

* In 1812, February, Professor Chas. Dewar Simmons on his return to Columbia from Charleston, found the Haughabook Swamp entirely over the road. In attempting to cross on horseback, he was washed off the road and separated from his horse. He first succeeded in reaching a tree, then constructed a raft of rails tied with his comfort. Three times his slave Marcus, swam in to his rescue. His master told him he could not help him, save himself; but he persisted until both perished together.

the principle that the acquisition of the slave is his master's, and that a slave's contract is like an infant's with an adult.  It is not binding on the slave, but if the master affirm it, the defendant cannot be discharged.  .

SEC. 37.  A slave cannot even legally contract marriage.  The marriage of such an one is morally good, but in point of law, the union of slave and slave, or slave and free negro, is concubinage *merely*.

SEC. 38.  The consequence is, that the issue of a marriage between a slave and a free negro, are illegitimate, and cannot inherit from father or mother. who may be free.

The hardship of such a case, where the issue of free negroes married to one another can inherit, might very well lead to a judicious enactment to remedy it.

SEC. 39.  A slave cannot testify, except as against another slave, free negro, mulatto, or mestizo, and that without oath.  13 and 14th sec. of Act of 1740. P. L. 166-7.

SEC. 40.  The propriety of this is *now* so doubtful, that I think the 7 Stat. 401-2. Legislature would do well to repeal this provision. and provide that slaves in all cases against other slaves, free negroes, mulattoes, and mestizoes, may be examined *on oath.*

SEC. 41.  By the Act of 1834. slaves are prohibited to be taught Acts of '34, p. 13. to read or write, under a penalty (if a white person may offend) P. L. 174. 45th sec. of 1740. not exceeding $100 fine and six months imprisonment, if a "*free person of color,*" not exceeding 50 lashes and a fine of $50.

SEC. 42.  This Act grew out of a feverish state of excitement produced by the *impudent* meddling of persons out of the slave States, with their peculiar institutions.  That has, however. subsided, and I trust we are now prepared to act the part of wise, humane and fearless masters, and that this law, and all of kindred character, will be repealed.  When we reflect, *as Christians, how can we justify it, that a slave is not to be permitted to read the Bible?*  It is in vain to say there is danger in it.  The best slaves in the State, are those who can and do read the Scriptures.  Again, who is it that teach your slaves to read?  It generally is done by the children of the owners. Who would tolerate an indictment against his son or daughter for teaching a favorite slave to read?  *Such laws look to me as rather cowardly.*  It seems as if we were afraid of our slaves.  Such a feeling is unworthy of a Carolina master.  .

SEC. 43.  The 2d section of the Act of 1834, prohibits the employ- 7 Stat. 468-469. ment of a slave, or free person of color, as a clerk or salesman, under a penalty not exceeding $100 fine, and imprisonment not exceeding 6 months.

SEC. 44.  The 1st section of the Act of 1800. prohibits the assem- 7 Stat. 440-1. blies of slaves, free negroes. mulattoes, or mestizoes. with or without white persons, in a confined or secret place of meeting, or with gates

24                              NEGRO LAW OF SOUTH CAROLINA.

11th sec. of the or doors of such place of meeting barred or bolted, so as to prevent
Patrol Act of '39.
11 Stat. 59.-60.   the free ingress and egress to and from the same; and Magistrates
Sheriffs, Militia Officers and Officers of the patrol, are authorized to
enter, and if necessary, to break open doors, gates, or windows, (i
resisted) and to disperse the slaves, free negroes, mulattoes or mesti
zoes, found there assembled. And the officers mentioned in the Ac
are authorized to call such force and assistance from the neighbor
hood, as they may deem necessary; and may, if they think necessary,
impose corporal punishment on such slaves, free negroes, mulattoes,
or mestizoes, and if within Charleston, they may deliver them to the
Master of the Work House, who is required to receive them and inflict
any such punishment as any two Magistrates of the City may award,
not exceeding 20 lashes. If out of the City, the slaves, free negroes,
mulattoes and mestizoes found assembled contrary to this Act, may
be delivered to the nearest Constable, who is to convey them to the
nearest Magistrate, and to inflict under his order, punishment not
7 Stat. 441.    exceeding 20 lashes.

7 Stat. 448.       SEC. 45. The 2d section of the Act of 1800, which prohibited meet-
Bell ads. Gra-  ings for the religious or mental instruction of slaves, or free negroes,
ham, 1 N. and
Mc. 278.        mulattoes or mestizoes, before the rising of the sun, or after the going
down of the same, was very properly altered by the Act of 1803, so
13th sec. of Pa- as to prohibit the breaking into any place of meeting, wherein the
trol Act of '39,  members of any religious society are assembled, before 9 o'clock at
11 Stat. 60.
night, provided a majority are white people. After 9 o'clock at night,
or before, if the meeting be composed of a majority of negroes,
(although white persons may be present,) it may be dispersed by
Magistrates, Sheriffs, Militia Officers, and Officers of the patrol, and
slaves, free negroes, mulattoes and mestizoes may be punished not
1 N. and McC.   exceeding 20 lashes.
278.
SEC. 46. In the case of Bell ads. Graham, it was held that these
Acts could not justify a patrol in intruding on a religious meeting, in
the day time, in an open meeting-house, where there were some white
people, although there might be a majority of negroes.
SEC. 47. The 2d section of the Act of 1800, and the amendatory
Act of 1803, are treated now, as dead letters. Religious meetings of
negroes, with only one or more white persons, are permitted by night
as well as by day. They ought to be repealed. They operate as a
reproach upon us in the mouths of our enemies, in that we do not
afford our slaves that free worship of God, which he demands for all
his people. They, if ever resorted to, are not for doing good, but to
gratify hatred, malice, cruelty or tyranny. This was not intended,
and ought to have no countenance or support, in our Statute law.
SEC. 48. The 40th section of the Act of 1740, regulates the appa-
rel of slaves, (except livery men or boys) and prohibits them from
wearing any thing finer, other or of greater value than negro cloth,

duffils, kerseys, osnaburgs, blue linen, check linen, or *coarse garlix*, P. L. 173.
or calicoes, checked cottons or Scotch plaids; and declares all gar-
ments of finer or other kind, to be liable to seizure by any constable
as forfeited.

SEC. 49. This section has not, within my knowledge, ever been
enforced. Indeed, if enforced now, it would make an immense booty
to some hungry, unprincipled seeker of spoils. It ought to be
repealed.

SEC. 50. The 42d section of the Act of 1740, prohibits a slave or P. L. 174.
slaves from renting or hiring any house, room, store or plan-
tation, on his own account. Any person offending against this Act,
by renting or hiring to a slave or slaves. is liable to a fine of £20 cur-
rency, equal to $13 66-100, to be recovered on complaint made to any
magistrate, as is directed in the Act for the trial of small and mean P. L. 213.
causes.

SEC. 51. The 43d section of the Act of 1740, which declares it to P. L. 174.
be unlawful for more than 7 male slaves in company, without some
white person accompanying them, to travel together any of the pub-
lic roads, and on doing so, makes it lawful for any white person to
take them up and punish them by whipping, not exceeding 20 stripes,
is, I am afraid, of force, unless it be considered as impliedly repealed
by the restriction on the patrol, to whip slaves found out of their 13th sec. of Act
of '39, 11 Stat. 60.
owner's plantation without a ticket in writing.

SEC. 52. The occasion for such a law has passed away. Public
opinion has considered it unnecessary, and like every useless severity,
mercy has condemned it. It would be well that it should be repealed.

SEC. 53. The Act of 1819, 5th section, repeals the 23d section of Acts of 1819 p.
the Act of 1740. The law now, makes it unlawful for any slave, 31.
P. L. 168.
except in the company and presence of some white person, to carry or The State vs.
Cattel, 2d Hill,
make use of any fire arms or other offensive weapon, without a ticket 291.
or license, in writing. from his owner or overseer; or unless such
slave be employed to hunt and kill game, mischievous birds or beasts
of prey, within the limits of his master's plantation, or unless such
slave shall be a watchman in and over his owner's fields and planta-
tion. If this law be violated, any white person finding a slave carry-
ing or using a gun or other offensive weapon, without a ticket or
license in writing, from his owner or overseer, or not used to hunt
game, &c. within the plantation, or as a watchman in the same, may seize
and appropriate to his own use, such gun or offensive weapon. But
to make the forfeiture complete and legal, the party making the seiz-
ure, must, within 48 hours after the seizure, go before the next Magis-
trate, and make oath of the manner of taking, and then, after 48
hours notice to the owner or overseer having charge of the slave, by
summons to shew cause why the articles should not be condemned,
(the service of the summons being proved on oath,) the Magistrate

4

26                    NEGRO LAW OF SOUTH CAROLINA.

may, by certificate under his hand and seal, (if he be satisfied tha
the arms have been seized according to the Act of 1819) declare the
same to be forfeited.

7 Stat. 462.    SEC. 54. The 6th section of the Act of 1822 declares it to be unlaw-
ful to hire to male slaves their own time; and if this law be violated,
the slaves are declared liable to seizure and forfeiture according to
the provisions of the Act in the case of slaves coming into this State.

SEC. 55. Whether this provision relates to the 4th section of the
Act of 1816, 7 Stat. 453, or to the 5th section of the Act of 1803, 7
Stat. 450, is indeed somewhat uncertain. The Act of 1816. and all
its provisions were repealed by the Act of 1818, 7 Stat. 458. The
Act of 1803, seems to be unrepealed, and hence, therefore. I presume
the proceeding to forfeit must be under it. By it the proceeding is
to be in the name of the State, in the nature of an action of detinue.

P. L. 172.    SEC. 56. The latter part of the 36th section of the Act of 1740,
declares that any master, or overseer, who shall permit or suffer his or
their negro or other slave or slaves. at any time to beat drums. blow
horns, or use any other loud instruments. or whosoever shall suffer
and countenance any public meeting or feastings of strange negroes
or slaves. on their plantation, shall forfeit £10 current money, equal
to $6 88-100 upon conviction, or proof, provided information or suit be
commenced within one month.

SEC. 57. This provision is one so utterly unnecessary, that the
sooner it is expunged from the Statute book. the better. Indeed it is
not only unnecessary, but it is one under which most masters will be
liable, whether they will or not. Who can keep his slaves from
blowing horns or using other loud instruments?

7 Stat. 450.    SEC. 58. The 2d section of the Act of 1803, prohibits the importa-
tion of any negro. mulatto, mestizo, or other person of color, bond or
free, from the Bahama, West India Islands, or South America, and
also from other parts, of all of those persons who have been resident
in any of the French West India Islands.

SEC. 59. The 3d section provides that no male slave above the age
of 15 years shall be brought into this State from any of our sister
States, unless the person importing such negro shall produce and file
in the office of the Clerk of the District, where the person so import-
ing may reside, a certificate under the hands of two magistrates. and
the seal of the Court of the District where the slave so imported resi-
ded for the last twelve months previous to the date of the certificate,
that he is of good character, and has not been concerned in any insur-
rection, or rebellion.

SEC. 60. Under the 5th section, if slaves be brought into this State
in violation of the provisions of the 2nd and 3d sections, they are de-
clared to be forfeited, one half to the State. the other half to the
informer; to be recovered in the name of the State, by action in the

nature of an action of detinue, in which it is not necessary to prove that the defendant was in possession, at the commencement of the suit, and the informer is a competent witness.

SEC. 61. The 3d section of this Act has been so often violated, that it could hardly be enforced at present, without great injustice. Still the provision is a wise one. No greater curse has ever been inflicted on South Carolina, than the pouring upon her of the criminal slaves of our sister States. It might be well for the Legislature, in revising (which I hope they will speedily do) our *Code Noir*, to re-enact this provision.

SEC. 62. The Act of '35, makes it unlawful to bring into this State originally. or to bring back into this State, after being carried out of it, any slave from any port or place in the West Indies, or Mexico, or any part of South America, or from Europe, or from any sister State, situated to the north of the Potomac River, or city of Washington, under the penalty of $1000, for each slave, to be recovered in an action of debt, and forfeiture of the slave. *[6th sec. 7 Stat. 472.]*

This provision does not extend to runaway slaves.

SEC. 63. By the Act of '47, any slave carried out of this State, in the capacity of Steward, Cook. Fireman. Engineer, Pilot, or Mariner, on board any steamer. or other vessel trading with any port or place in the Island of Cuba, may be brought back into this State, if he may not in his absence have visited some other port or place in the West Indies other than the Island of Cuba, or a port or place in Europe, Mexico, South America or any State north of the river Potomac and City of Washington. *[Act of '47, 11 Stat. 436.]*

SEC. 64. The 7th section of the Act of '35, providing for the condemnation and forfeiture of a slave by a Court of a Magistrate and Freeholders. was declared by the whole Court of Errors, in the State vs. Simmons. et al., to be unconstitutional. How the forfeiture declared in the 6th section is to be carried out, is somewhat doubtful. I suppose it might be a part of the judgment on the indictment and conviction of the owner for bringing back a slave, which he had carried to the prohibited places. The whole provision had better be repealed. Slaves visiting free States find nothing to enamour them of negro freedom *there:* in general. after all the *labors of love* of our negro-loving brethren of the free States. they, in general, return to their Southern homes, better slaves. Forfeitures, too, may occur under this Act. which none of us would bear. Every servant, (negro, mulatto. or mestizo,) who has been in Mexico during the war. and who has returned. is liable to be forfeited, and his master to pay a fine of $1000. Could the law be enforced in such a case? We have nothing to fear, if the whole Act of '35 be repealed. It ought to be, for no law should stand, which public opinion, in many cases, would not suffer to be enforced. Indeed there are few. very few cases, where the *[The State vs. Simmons, et al. 2 Speers, 761.]*



28               NEGRO LAW OF SOUTH CAROLINA.

Act of '35 could meet with public favor.   I speak unreservedly, for I am talking to friends, slave-holders—citizens of a State, whom I love, and whom I would have to be, "without fear, and without reproach."

---

## CHAPTER III.

*Crimes of Free Negroes, Mulattoes, Mestizoes, and Slaves—Their Punishment and Mode of Trial, including the Law as to Runaways and the Patrol.*

SEC. 1. The general rule is, that whatever would be a crime at common law, or by Statute, in a white person, is also a crime of the same degree, in a free negro, mulatto, mestizo, or slave.   In some instances the punishment has been altered, in others new offences have been created.   There are also cases, in which the slave or free negro, mulatto or mestizo, from his status, would be guilty of a higher crime than a white person would be, under the same circumstances.

The State vs. Crank, 2d Bail. 76.

These will be tried to be fully noticed, in this digest.   Whenever a slave commits a crime by the command, and coercion of the master, mistress, owner, employer, or overseer, it is regarded as the crime of the master, mistress, owner, employer, or overseer; and the slave is not criminally answerable.

SEC. 2. A free negro, mulatto or mestizo, cannot lawfully strike any white person, even if he be first stricken, and therefore, if he commit homicide of a white person, generally, he cannot be guilty of manslaughter; he is either guilty of murder, or altogether excused. *I suppose* if one without authority to govern or control a free negro, mulatto, or mestizo, were in the act of endangering life or limb of the free negro, mulatto, or mestizo, and he, to defend himself and save life or limb, were to slay his assailant. *it might* be excusable. A free negro, mulatto, mestizo, or slave, slaying one of the same *status*, would be guilty of murder, manslaughter, or be excused, se defendendo, as in the case of white people, at common law.

P. L. 167.
7 Stat. 402.

SEC. 3. The 17th section of the Act of 1740, declares a slave who shall be guilty of homicide of any sort, upon any white person, except it be *by misadventure*, or in defence of his master or other person, under whose care and government such slave shall be, shall, upon conviction, suffer death.

This seems to conflict in some degree, with what is said, 3d chap. 1st section. Still, I think what is affirmed *there*, is law. A homicide committed by the command and coercion of the master, is not one of which the slave is guilty, but the master is alone guilty of it.

SEC. 4. By the 24th section of the Act of 1740, it is provided, if *a* slave shall grievously wound. maim, or bruise any white person, unless it be by the command, and in the defence of the person or property of the owner, or other person having the care or government of such slave, such slave on conviction, shall suffer death. *[P. L 160. 7 Stat. 405.]*

SEC. 5. The 18th section of the Act of 1751 (which having altered the Act of 1740, is by the Act of 1783, continuing the Act of 1740 continued, instead of the parts altered) gives to the Courts trying any negro or other slave, for any offence under the Acts of 1740. or 1751. where any favorable circumstances appear, the power to mitigate the punishment by law directed to be inflicted. *[7 Stat. 425. P. L. 312. 1st sec. State vs. Nicholas, Charleston, Jan. 1848, 2 Strob.]*

SEC. 6. The meaning of the words grievously wound, maim. or bruise, has never received any precise adjudication. In the case of the State vs. Nicholas, a portion of the Court indicated their opinion to be, that to grievously wound. maim, or bruise, meant such an injury as might endanger life or limb. This is, I think, the true meaning. The subject. before '48, passed under my review, in the unfortunate case, in York. which led to the passage of the Act of '43. In that case. the lady on whose body the outrage was attempted, was seriously bruised, yet so, as in no way to endanger life. I thought, and so decided, that the slave was not guilty of a capital felony.

SEC. 7. By the Act of 1843. any slave or *free person of color*. (meaning any free negro, mulatto. or mestizo) who shall commit an assault and battery on a white woman, with intent to commit a rape, shall on conviction, suffer death. without the benefit of clergy. *[11 Stat. 258.]*

SEC. 8. The 24th section of the Act of 1740. declares any slave, who shall strike any person, unless it be by the command and in defence of the person and property of the master, or other person having the care and government of such slave, for the 1st and 2nd offence. liable to such punishment as the Court may think fit, not extending to life or limb, and for the 3d offence. to the punishment of death. Under the 4th section, and this of the 3d chapter, it ought to be remarked. that *that portion* of the 24th section of the Act of 1740. which exempts a slave from punishment for acting in obedience to his master and in his defence. requires more to make out his exemption than the Act intended. For it not only requires that the striking, wounding, maiming. and bruising, should be under the command of the master. but also in defence of his person or property. Either the command of the owner or other person having the care or government of the slave. the defence of his person or property should be enough. *The law ought to be so amended.* Any slave seeing a white *[P. L 169. 7 Stat. 405]*

30                        NEGRO LAW OF SOUTH CAROLINA.

man about to knock his master down, or in the act of stealing his
property, ought not to wait for a command—his blow in defence,
under such circumstances, is good and ought to be lawful.

P. L. 167.    SEC. 9. The 16th section of the Act of 1740, provides that any
7 S.at. 390.   slave, free negro, mulatto, Indian, or mestizo, who shall *wilfully and
*maliciously*, burn or destroy any stack of rice, corn, or other grain, of
the produce, growth, or manufacture of this State, or shall wilfully
and maliciously set fire to, burn or destroy any tar kiln, barrels of
pitch, tar, *turpentine* or rosin, or any other goods or commodities, the
growth, produce or manufacture of this State, or shall feloniously
steal, take, or carry away any slave, being the property of another,
*with intent to carry such slave out of the State*, or shall wilfully and
maliciously poison, or administer any poison to any person, *freeman*,
woman, servant, or slave, shall suffer death. Over these and all
other offences, for which, under the Act of 1740, death may be the
punishment, the Court, under the 18th section of the Act of 1751,
mentioned in the 5th section of the 3d Chapter of this Digest, have
the power of mitigating the punishment. The term Indian, used in
this 16th section of the Act of 1740, means either a freed Indian, (one
who was once a slave) or an Indian not in amity with this govern-
ment. (See 3d section of 1st Chap.) In the case of the State vs.
1 N. and McC.  Whyte and Sadler, it was held that the Act of 1754, making it a
175.           felony without clergy, to inveigle, steal, or carry away any slave,
applied to slaves, as well as to free people, and hence therefore, that
it repeals that provision of the Act of 1740, which made it capital, on
the part of a slave, " to steal, take, or carry away any slave, the pro-
perty of another, *with intent to carry such slave out of the State*. I
think the decision very questionable. For in 1783, the Act of 1740
was continued as law, without noticing this supposed repeal of 1754.
If the Act of '54, in this respect, and not the Act of '40, is to govern
slaves, then every slave aiding another in running away, is liable to
be hanged. This certainly is rather a hard consequence.

P. L. 167. 7 Stat.    SEC. 10. By the 17th section of the Act of 1740, and the 14th
390, 424, 425.        section of the Act of 1751, amending the same, any slave, who shall raise
or attempt to raise an insurrection, or shall delude and intice any
slave to run away and leave this State, and shall have actually pre-
pared provisions, arms, ammunition, horse or horses, or any boat,
canoe, or other vessel, whereby the guilty intention is manifested,
is liable, on conviction, to be hanged, unless the Court, from favora-
able circumstances, should mitigate the sentence, or from several
being concerned, should be disposed to select some, on whom they
would inflict other corporal punishment.                            \

P. L. 19th sec.    SEC. 11. A slave who shall harbor, conceal or entertain any slave
170—7 Stat, 417.   that shall run away, or shall be charged or accused with any crimi-

nal matter, shall suffer such corporal punishment, not extending to life or limb, as the Court may direct.

SEC. 12. A free negro, mulatto, or mestizo, who in 29th section of the Act of 1740, was liable to a penalty for harboring a slave, is by the Act of 1821, (which operates as an implied repeal,) if he or she harbor, conceal or entertain any fugitive or run away slave, liable on conviction to such corporal punishment. not extending to life or limb, as the Court may in their discretion think fit. *Acts of 1821, p-20. 7 Stat. 460, Righton vs. Wood, Dud. 164.*

SEC. 13. The 30th section of the Act of 1740, prohibits any slave residing in Charleston from buying, selling, dealing, trafficking, bartering, exchanging or using commerce for any goods. wares, provisions, grain, victuals of any sort or kind whatsoever, (except slaves who, with a ticket in writing from their owner or employer, may buy or sell fruit, fish and garden stuff. or may be employed as porters, carters, or fishermen—or may purchase any thing for the use of their masters, owners, or other person, who may have the care and government of such slaves in open market.) All goods, wares, provisions, grain, victuals or commodities, in which such traffic by slaves is carried on, are liable to be seized and forfeited, and may be sued for and recovered before any Magistrate of Charleston, one half to the informer, the other half to the poor of the parish of St. Philip's, and the Magistrate by whom the forfeiture is adjudged, is authorized to inflict corporal punishment on the slave engaged in such traffic, not exceeding twenty stripes.   The 31st section prohibits any slave belonging to Charleston, from buying any thing to sell again, or from selling any thing on their own account in Charleston.   All goods, wares and merchandize purchased or sold in contravention of this section, are liable to be forfeited by the judgment of any Magistrate of Charleston, one half to the use of the poor, the other half to the informer. *P. L. 170, 171, 7 Stat, 402-8.* *31st sec Act of 1740, 7 Stat. 409.*

SEC. 14. If any slave. (without the command of his or her master, mistress, or overseer, evidenced by a ticket in writing,) shall shoot or kill between the 1st of January, and the last day of July in each year, any fawn, (deer,) or any buck, (deer,) between the 1st of Sept. and last day of Oct., and between the 1st day of March and last day of April, such slave, upon conviction before a Magistrate, by the oath of a sufficient witness, or the confession of the said slave, shall, by order of the Magistrate, receive 20 lashes on the bare back, unless security be given for the payment within one month of the fine imposed by the Act, on white or free persons, £2 proclamation money, equal to $6 44-100 for each fawn or buck killed. If the slave shall kill a doe, between the 1st day of March, and the 1st of Sept., without the consent and privity of the owner or overseer, such slave is liable, on conviction before a Magistrate and four *P. L. 275.* *P. L. 497, 498, 3d and 7th sec. Act of '89.*

32                         NEGRO LAW OF SOUTH CAROLINA.

freeholders (sworn according to the 4th section) to receive 39 lashes on the bare back.

SEC. 15. A slave detected in fire hunting, or who shall kill in the *P. L. 497.* night-time, any deer. horse or neat cattle, or stock of any kind, not the property of his master or owner, without the privity or consent of the owner or overseer of the said slave. such slave, on conviction before a Court of one Magistrate and four freeholders, sworn to the best of their judgment, without partiality, favor or affection, to try the cause now depending between the State, Plaintiff, and B. the slave of C. Defendant, and a true verdict give, according to evidence, is liable to receive 39 lashes on the bare back.

SEC. 16. Any slave. who, not in the presence and by the direction of some white person, shall mark or brand any horse, mare, gelding, colt, filly, ass, mule, bull. cow, steer, ox, calf, sheep, goat or hog *P. L. 486, 6th sec. Act of '39.* is liable to be whipped, not exceeding 50 lashes, by the order of any Magistrate before whom the offence shall be proved by the evidence of any white person or slave.

SEC. 17. The Act of 1834, authorizes the Court, before which a *Acts of '34, p. 12.* slave or free person of color is convicted of any offence, not capital to punish the offender by imprisonment, provided this Act shall not abolish the punishments which were then by law imposed. Under this Act. the question will arise. whether the punishment by imprisonment is cumulative; or whether, when resorted to, it is in place of the other punishment to which the offender is liable. I incline to the opinion. that the punishment is not cumulative, but may be substituted for other punishment, at the discretion of the Court.

*The State, ex relatione, Boylston vs. Mag. and freeholders of Marion, Dist. 2 Strob.* SEC. 18. A slave guilty of insolence to a white person, may be tried by a Court of a Magistrate and freeholders, and punished at their discretion. not extending to life or limb.

SEC. 19. " *No free person of color*," (meaning, I suppose, "no free negro. mulatto, or mestizo.") or slave, can keep, use or employ a still or other vessel, on his own account. for the distillation of spirituous *Act of 1831, 1st and 2d sec. p. 13.* liquors. or be employed or concerned in vending spirituous liquors of any kind or description, and on conviction thereof, is regarded as guilty of a misdemeanor, and is to be punished not exceeding fifty lashes, at the discretion of the Court; and the still or other vessel is forfeited, and the same is to be sold under an execution to be issued by the Magistrate granting the warrant to apprehend the free negro or slave. and the proceeds of the sale are directed to be paid to the Commissioners of the Poor.

*Act of 31, 4th sec. p. 13.* SEC. 20. A slave. or free person of color, (meaning as is above suggested) who shall commit a trespass. which would subject a white person to a civil action. and for which no other penalty is prescribed is regarded as guilty of a misdemeanor, and is to be punished at the discretion of the Court trying him, not extending to life or limb. A

question will arise under this Act, whether any civil remedy by way of trespass, can now be had against any negro, mulatto, or mestizo, for a trespass by him or her committed?

SEC. 21. A free negro, mulatto, mestizo, or slave, being a distiller. vendor, or retailer of spirituous liquors, who shall sell, exchange, give or otherwise deliver spirituous liquors to a slave, except upon the written and express order of the owner, or person having the care of the slave, shall, upon conviction, (if a slave) be whipped not exceeding fifty lashes; if a free negro, mulatto, or mestizo, be also whipped not exceeding fifty lashes, and fined not exceeding $50; one half of the fine to the informer, the other half to the State. *Act of '34, last paragraph, 3d sec. 11 Stat. 469. Act of '44. 11 Stat. 294.*

SEC. 22. A slave, or free person of color. (meaning as before suggested) convicted of a capital offence, is to be punished by hanging; if convicted of an offence not capital, a slave is to be punished by whipping, confinement in the stocks, or treadmill, or as is prescribed by the Act of '34, (see ante 1st sec.) imprisonment may be resorted to. A free negro, mulatto, or mestizo, is liable to the same punishment, *or may be fined.* *Act of '33, 2d sec. p. 41. p. 40.*

SEC. 23. In all parts of the State, (except in Charleston,) slaves or free persons of color, (meaning as suggested ante-19th sec.) are to be tried for all offences by a Magistrate and five freeholders; the freeholders are to be obtained by the Magistrate, who issues the warrant, summoning eight neighboring freeholders, out of whom the prisoner, (if he be a free negro, mulatto, or mestizo) or the owner or overseer, (if a slave) may select five to sit upon the trial, and upon good cause shewn against any freeholder, to be determined by the Magistrate, another shall be substituted in his place. If the prisoner, the owner, or overseer, should refuse or neglect to make the selection of the five freeholders to sit, the Magistrate may himself make the selection. *Act of '39, sec. 28 and 32. The State vs. Nicholas, Charleston, Jan. 1848.*

SEC. 24. In Charleston, (including the Parishes of St. Philips and St. Michael's) slaves, free negroes, mulattoes and mestizoes, are liable to be tried for capital offences by two Judicial Magistrates and five freeholders, *or slaveholders,* who, I suppose, ought to be obtained as directed—ante 22nd section—and in such cases there must be a concurrence of all of the freeholders, and one of the Magistrates; in cases not capital, they are to be tried by two Judicial Magistrates and three freeholders or slaveholders, a concurrence of a majority of the jurors and the presiding Magistrate, is enough for conviction; if the jurors be unanimous, then in that case the concurrence of the Magistrate is dispensed with. In all cases, the ministerial Magistrate, issuing the warrant, is to attend the Court, and act as prosecuting officer. *6th sec. Act of '27, p. 63. 15th s. c. Act of '29. p. 30. Act of 1830, sec. 4-5. p. 25. Act of '32, sec. 1-2, p. 59-60. The State vs. Nicholas, Charleston, Jan. 1848.*

SEC. 25. The anomaly is presented *here* of two different systems of



34                                    NEGRO LAW OF SOUTH CAROLINA.

jurisprudence for the State and Charleston. Both cannot be right, one should give way to the other.

**Act of '39, sec. 28, p. 22.** SEC. 26. The jurors when organized, should be sworn by the Magistrate, to well and truly try the case now pending before you, and adjudge the same according to evidence. So help you God.

**Act of 1754, sec. 4. 7 Stat. 427. Act of '39, sec. 28, p. 22.** SEC. 27. A slave, free negro, mulatto or mestizo, charged with a criminal offence, is to be tried within six days, if it be practicable to give at least one day's notice of the time and place of trial to the free negro, mulatto, mestizo, the owner, overseer, or other person having the care and government of the slave—*which notice must, in all cases, be fairly given before the trial can proceed.*

**Act of '39, p. 22.** SEC. 28. On the trial of a slave, free negro, mulatto, or mestizo, it is the duty of the Magistrate to state in writing, plainly and distinctly, the offence charged against the prisoner, and for which he is on trial; to this charge the prisoner ought to be required to answer, either by himself, or through his guardian, master, owner, overseer, or other person having the care and government of such slave on trial, or by the attorney employed to defend such prisoner. In every such trial, the prisoner is entitled to the benefit of the services of an attorney at law, to defend him. The Magistrate is bound to keep a correct statement of the testimony given against and for the prisoner, and to annex it to *the charge*, (the accusation.) The judgment of the Court in the country Districts and Parishes, must be in writing, and signed by the Magistrate and any four of the freeholders, or by the whole, if they agree. In Charleston, it must be made up as directed, (ante sec. 23.) and must be signed by those required to concur in it. It is in all parts of the State to be returned to the Clerk's office of each judicial district, and be there filed.

**Act of '33, sec. 3. p. 41. Act of '39, sec. 28, p. 23.** SEC. 29. When a slave, free negro, mulatto or mestizo, is capitally convicted, an application may be made to any one of the Judges of the Courts of Law of this State, in open Court, or at Chambers, for a new trial. The Magistrate presiding, is required for such purpose to furnish a full report of the trial; and if from that, as well as from affidavits on the part of the prisoner, (which before being laid before the Judge must be shewn to the Magistrate presiding,) the Judge should be satisfied the conviction is erroneous, a new trial is to be ordered, on which neither the Magistrate, nor Magistrates, nor any of the freeholders, who before sat on the case, are to sit again. To afford opportunity for this appeal to be made, or for an application to the Governor for a pardon, time, reasonable time, must be allowed by the Court between the conviction and the execution of the sentence.

SEC. 30. Under these provisions, there is not any very well settled practice. Before a motion for new trial ought to be heard, reasonable notice of the time and place of such motion should be given to the

Magistrate presiding.   When a new trial is ordered, I have always directed the Clerk of the Court to summon the Magistrate and freeholders, who should try the case *de novo*, and to give notice to all concerned, of the time and place of trial, and if necessary, to issue summons for the witnesses.   This seemed to secure, in the best way I could devise, consistently with the law, an impartial administration of it.

SEC. 31.  The right of appeal, in cases not capital, and to afford sufficient time in such cases, for an application for pardon, ought to be provided for.   For many are the errors and abuses of power committed in this behalf.   The whippings inflicted by the sentence of Courts trying slaves and free negroes, are most enormous—utterly disproportioned to offences, and should be prevented by all the means in our power.   In all cases where whipping is to be resorted to, I would limit the punishment by law, in all cases affecting both black and white, to forty, save one, and direct it to be inflicted in portions, and at considerable intervals of time.   Thus mingling imprisonment and whipping together, and holding the rod suspended, in the contemplation of the party, until the delay itself would be worse punishment than the infliction.

SEC. 32.  The tribunal for the trial of slaves and free negroes, (a Magistrate and freeholders of the vicinage) is the worst system which could be devised.   The consequence is, that the passions and prejudices of the neighborhood, arising from a recent offence, enter into the trial, and often lead to the condemnation of the innocent.— The Charleston scheme is better than that which prevails in the country.   Still I think it none of the best.   I would establish a tribunal to consist of one judicial Magistrate, to be appointed by the Legislature, to try all criminal cases against free negroes, mulattoes, mestizoes or slaves.   He should be compelled to hold his Court on the first Wednesday in every month, at the Court House ; and he should have the power to direct a Constable, (whom he should be authorized to appoint to attend his Courts) to summon 24 freeholders or slaveholders of the District, and out of them a jury of 12 should be empannelled to try the prisoner, allowing him as far as ten, a peremptory challenge, and on cause shewn, to the balance of the pannel.   The Magistrate issuing the warrant, should be required to state the offence and act as prosecuting officer.   To the charge thus presented, the prisoner should be required to answer ; and he should have the benefit of an attorney's services, to defend him, on the law and evidence.   The judicial Magistrate should be required to charge the jury on the law and the facts, as a Judge of the Law Courts now does.   The jury should simply say guilty or not guilty.   The Magistrate presiding, should pronounce the judgment of the law.   The prisoner on conviction should have the right of appeal to the Court of Appeals, and no sentence should be passed until the case was



36                                NEGRO LAW OF SOUTH CAROLINA.

there heard, and the prisoner remanded for judgment. The judicial Magistrate, his Constable, and the Magistrate issuing the warrant, should be compensated by fees, to be paid, in all cases, by the State.

*Act of '29, p. 28, sec. 1.*

*P. L. 168.*

SEC. 33. Under the law, as it now stands, the State is liable for all the costs attending negro trials, (except free negroes, mulattoes, and mestizoes, in the Parishes of St. Philips, and St. Michael's, who if convicted, and able to pay, are declared liable to pay the same, and also under the 21st section of the Act of 1740, if the prosecution against a slave, free negro, mulatto, or mestizo, appears to be malicious, the Court trying the case, and satisfied of that fact, may order and compel the prosecutor to pay the costs.) This provision of the

*Acts of '29, p. 28, sec. 2.*

21st section of the Act of 1740, is re-enacted, as to slaves, in the Magistrates' and Constables' Acts for St. Philip's and St. Michael's, passed in 1829.

*Exparte Brown, 2d Bail. 323.*

SEC. 34. A slave cannot be twice tried, and punished, for the same offence.

*5th sec. Act 1740.*
*P. L. 165.*

SEC. 35. If a slave be out of the house or plantation, where such slave resides, or without some white person in company, and should refuse to submit to, and undergo the examination of any white person, it is lawful for such white person to pursue, apprehend, and moderately correct such slave, and if such slave shall assault and strike such white person, *such slave may be lawfully killed.*

*Sec. 36, Act of 1740.*
*P. L. 172.*

SEC. 36. Masters, overseers, or other persons, have the power to apprehend and take up any slave found out of his or her master's or owner's plantation at any time, but more especially on Saturday nights or Sundays, or other holidays, not being on lawful business, or not with a ticket from the master, or not having some white person in company, and even with a ticket, if armed with wooden swords or other mischievous and dangerous weapons, and to disarm such slave, and all such mentioned in this section, to whip.

*35th sec. of the Act of 1740.*
*P. L. 169. 1st sec.*
*Act of '83.*
*P. L. 441.*
*53d sec. Act of 11 Stat. 16.*

*18th sec. Ordinance of the city of Charleston, '39, City Laws, 315.*

SEC. 37. Any person is authorized to take up any runaway slave, and it seems, it is *now* the duty of the person taking up a runaway, (when he knows, or can be informed without difficulty, to whom such slave belongs) to send such slave to the said owner, but if the owner be unknown, then in Charleston District, it is the duty of the person taking up such runaway slave to send within five days, the same to the Work House in the city of Charleston, the master of the Work House is to admit every such slave upon a certificate from a Magistrate of the District, or Mayor, or one of the Aldermen of the city, containing the particulars of the apprehension of such fugitive slave, and requiring his confinement; in all other parts of the State the runaway slave is to be sent to the Gaol of the District. It is the duty of the Master, Gaoler or Sheriff, to securely keep the slave so committed, and if the same escape by negligence, the Master or Sheriff, (for the gaoler is merely the Sheriff's keeper,) is liable to the owner



for the value of the slave or such damages as may be sustained by such escape. Information of the slave so committed to the care of the Master of the Work House, is to be by him sent to the owner, if known; if he be unknown, the Master of the Work House is to advertise such slave in the city paper. (under the advice of the City Att'y.) giving the name, age, and other further description, so that the owner may be informed the slave is in custody. In other parts of the State, the runaway is to be advertised once a week for 3 months, in some public gazette, by the Sheriff or Gaoler, who is also required, if the owner's name and address can be obtained, to give him specific notice of the confinement of the said runaway. The advertisement must contain the name, age, and other particular description of such slave, and the name of the person said to be the owner. The Gaoler or Sheriff, and the Master of the Work House, is liable to a fine of 10s. or $2 14 for such slave committed as a runaway, neglected to be advertised. The runaway is to be kept for 12 months, if not claimed by the owner, and in Charleston, proof of property made on oath before one of the Judges of the Common Pleas, or any Magistrate, within twelve months from the date of the advertisement in Charleston, in other parts of the State, from the commitment, the runaway is to be sold. In Charleston the sale is to be made by the City Sheriff, he giving one month's notice of the time, place, and reason of such sale; he is to give to the purchaser a receipt for the money arising from such sale, specifying the reasons of the sale, and he (the City Sheriff) is directed to pay the said proceeds to the City Treasury. Out of the fund so paid over, is to be deducted the expenses of the said runaway, as provided and allowed by law. The balance is to be retained by the City Treasurer, for the owner, but if not claimed within a year and a day it is to be paid into the State Treasury, and out of it, I presume, the Commissioners of Public Buildings of Charleston District are entitled to draw it, under the general law of '39. In other parts of the State, the Sheriff of the District is to advertise the runaway for a month, and then to sell; and after paying the charges or expenses allowed by law, the balance is to be paid to the Commissioners of Public Buildings, and is to belong to them absolutely, if not claimed by the owner of the slave so runaway, within two years. The title to be executed by the Sheriff to the purchaser of such runaway, is good, and bars the rights of the owner. Any neglect or default in the duties required by the 53d section of the Act of '39, subjects a Gaoler or Sheriff to an action on the case.

Sec. 38. A person taking up a runaway, and failing to send the same to the work house, or the District gaol within five days, is liable to pay 20s. or $4 28-100 for every day the same may be retained. The person taking up a runaway, is entitled to 10s. or $2 14-100 for taking up such runaway, 4d. or 7-100 for every mile from the place

*[margin notes:]* 16th sec. Ord. '39, City of Charleston, City Laws, 315.

13th and 19th sec. Ord. of Charleston, '39, City Laws, 315.

53d sec. of Act of '39. 11 Stat. 36.

Act of '88. P. L 441.

18th sec. Ord. city Charleston, City Laws, 315.

38                                    NEGRO LAW OF SOUTH CAROLINA.

where taken to the owner's residence, (if the runaway be carried to the owner,) or to the district gaol or the work house, and half a dollar per day for the travel, computing the journey at 25 miles to the day. To entitle the person taking up a runaway, to these allowances, he must carry the slave to a neighboring Magistrate, who may examine on oath the captor, touching the time and distance he has necessarily travelled, and shall go with such slave, and the said Magistrate shall give a certificate on a just estimate of such time and distance, and on presenting such certificate, the gaoler is to give his note for the same payable to the bearer. The Master of the Work House is to pay the same. instead of giving a note. These fees are to be paid to the Gaoler, or Master of the Work House, by the owner, or out of the sale of the said runaway, if he should not be claimed by the owner and be sold.

36th and 37th sec. of the Act of 1740.
P. L. 169.
11 Stat. 11.
20th sec. Ord. of '39, City Laws, 315.

SEC. 39. It is the duty of the Master of the Work House, Gaoler, or Sheriff, to provide sufficient food, drink, clothing and covering, for every runaway slave delivered into the custody of either. The Gaoler or Sheriff is entitled to charge 20 cents per day for each runaway confined, and also for all necessary expenses in providing clothes or blankets. In the Work House, a runaway slave is directed to be put to labor on the tread-mill, and therefore no charge for diet is made.

1st, 2d, and 3d sec. Act of '39. 11 Stat. 58.

SEC. 40. Each militia beat company, by its commander, (except the company or companies on Charleston Neck,) is divided into convenient patrol districts. All the free white male inhabitants, above the age of eighteen years, of each patrol district, are liable to do patrol duty, except aliens or transient persons above the age of forty-five years, or who have not resided within the State for six months, or persons who are above the age of forty-five. who do not own slaves, or alien enemies. Persons liable to do patrol duty, may send in their places, respectively, an able-bodied white man, between the ages of sixteen and sixty, as a substitute; and for failing to discharge patrol duty, in person or by substitute, each person liable to do the same, without a legal excuse, is liable to pay a fine of $2 for each default, and ten per cent. on his general tax of the preceding year.

3d and 4th sec. Act of '39 11 Stat. 58.

SEC. 41. It is the duty of the commanding officer of each beat company, to make out a roll of the inhabitants of each patrol division, liable to do patrol duty, and from such roll, at each regular muster of his company, to prick off, *at his discretion*, any number of persons to do patrol duty until the next muster, and appoint *some prudent and discreet person* to command the said patrol. If the officer commanding the beat company, fails to prick off, at each muster, the patrol of each division, or the commandant of the patrol fails in his duty, each of them is liable to a fine not exceeding $30.



SEC. 42. It is the duty of the commandant of the patrol to call them out at least once a fortnight, and to take up, and correct with stripes, not exceeding 20, with a switch or cowskin, all slaves found outside of their owner's or employer's plantation, without a ticket or letter to shew the reasonableness of his absence, or some white person in company to give an account of the business of such slave; and also, if the slave have a ticket, and has in his possession, a gun, pistol or other offensive weapon, unless such slave be on lawful business, or in company with some white person not less than ten years of age. Fire arms, and other offensive weapons, found by the patrol in the possession of a slave, in violation of the above provisions, are liable to seizure by them, and condemnation and forfeiture to the use of the regiment to which the patrol may belong. To obtain such forfeiture, the leader of the patrol making the seizure, must, within ten days, go before the nearest Magistrate, and make oath of the manner, time and place of taking, and if the Magistrate shall be satisfied of the legality of the seizure, he shall summon the owner of the slave from whom the arms have been taken, to appear before him within ten days, to shew cause why the arms should not be condemned. If the owner should fail to appear, or appearing, should shew insufficient cause, the said arms or weapons shall, by certificate under the hand of the Magistrate, be "*declared condemned*," and may be sold within ten days, and the proceeds, after payment of the costs, paid to the paymaster of the regiment.

SEC. 43. The patrol have the power, and are required to enter into any disorderly house, vessel or boat, suspected of harboring, trafficking or dealing with negroes, whether the same be occupied by white persons, free negroes, mulattoes, mestizoes or slaves; and to apprehend and correct all slaves found there, by whipping, (unless, as I apprehend, such slaves shall have not only a ticket to be absent, but also a ticket to trade.) The patrol is required to inform a Magistrate of such white persons, free negroes, mulattoes or mestizoes, as may be found in such house, vessel or boat, and to detain, until recovered by law, such produce or articles for trafficking, as may be therein found, if such detention be authorized by any three freeholders or any Magistrate. It is the duty of the owner of each boat or vessel navigating the public rivers or canals of this State, to keep and produce to the Magistrates or patrols, when required, a list of all the negroes composing the crew, with their owners' names, and a description of their persons.

SEC. 44. The patrol may, as is stated in the 44th and 45th sections of chapter 2nd of this digest, break up unlawful assemblies of slaves, and inflict punishment on slaves there found, not exceeding 20 stripes, with a switch or cowskin.

SEC. 45. Every owner of a settled plantation, who does not live on

40                          NEGRO LAW OF SOUTH CAROLINA.

15th sec. of Act of '39, p. 61. 11 Stat. the same six months in every year, and who employs upon the same fifteen or more slaves, is required to keep upon the same, some white man, capable of performing patrol duty, under a penalty of fifty cents per month for each and every working slave employed on the said plantation.

16th sec. Act of '39. 11 Stat. p. 61. SEC. 46. Patrols are not liable, in the discharge of their duty, to the payment of any tolls.

18th sec. Act of '39. 11 Stat. p. 61. SEC. 47. In incorporated towns and villages, the power and duty of regulating the patrol in the same, is vested in and devolved upon the municipal authorities of the same.

The State vs. Cole and others, 2 McC. 122. SEC. 48. The Captain of a Beat Company, cannot constitute himself the Captain of a Patrol.

Hogg vs. Keller, et. al. 2 N. & McC. 113. P. L. 164, 3d sec. 1740. SEC. 49. The ticket or pass to a slave, need not state the place to which he or she is to go, and a patrol whipping a slave, with such a pass, are trespassers. The form given in the Act of 1740, "Permit this slave to be absent from the plantation of A. B. until ———," or any other equivalent form, will be sufficient.

7th and 8th sec. Act of '39. 11 Stat. 60. SEC. 50. It is the duty of Captains or Commanders of Patrol, to keep their respective commands in good order and demeanor, when on duty ; and any patrol man misbehaving himself or neglecting or disobeying the orders of his commandant, is liable to a fine of not less than $2, nor more than $20. If the Captain of a Patrol acts disorderly, so as to defeat the proper execution of the patrol laws, he is liable to be returned by any member of his command, or any other person competent to give evidence, to the commanding officer of the Beat Company, who is to return him to a Court Martial for trial, and if found guilty, he may be fined not less than $5, nor more than $50.

10th sec. Act of '39. 11 Stat. p. 60. SEC. 51. Each Captain of the Patrol is required, at the net regular muster of the Beat Company, after his appointment, to make a return, on oath, of the performance of his duties. Failing to make such return. he is liable to a fine of $20.

17th sec. Act. of '39. p. 61. 11 Stat. SEC. 52. The penalties to be incurred by the commanding officers of Beat Companies, commandants of the patrols, and patrol men, for neglect of duty, or violation of law, may be imposed by Courts Martial.

19th sec. Act of '39. 11 Stat. 61. SEC. 53. If the patrol be sued, and the party suing, fail to recover, he is liable to treble costs ; which is full costs, to which is added one half, and then half of that half.

SEC. 54. The Act of '39 in repealing all other laws on the subject of the patrol, *unfortunately* excepts the Act regulating the performance of patrol duty on Charleston Neck. The Act of '23, so saved from repeal, differs in many respects from the general Act of '23, sec. 1, law, which it is now necessary to state. 1st. A majority of the company officers is to direct how the company is to be divided into patrol districts, and the Captain is so to divide it, and it is so to continue

until altered by a majority of said officers.   The officers failing to do this duty, are liable to a fine of $30, to be recovered in the Court of Law. (by indictment) as no mode is appointed by the Act.   2d. All 2d section? white males above 18 and under 60, residing in said patrol districts, (except ministers of the Gospel) all females owning ten slaves above the age of ten years, and *all persons* having settled farms, or a house and lot, with five or more slaves above the age of 16, residing within the said *companies*, are liable to do patrol duty.   Females required to do patrol duty, must of course do so by substitute.   3d. The com- 3d section. manding officer. or officers of a company are to appoint *in writing*, the leader of the patrol, whose qualification and term of office is the same as pointed out in section 40.   The person so appointed refusing to accept, the commanding officer or officers of companies or the leaders of patrol, not peforming the duties required. are liable to a fine of $20. to be recovered by indictment, in the Court of Law, and paid to the Commissioners of Cross Roads.   No person can be compelled to serve as leader, more than once in 12 months.   4th. The patrol is not only authorized to enter disorderly houses, &c., as stated in section 5th section. 42; but if resisted, they are authorized to break open doors, windows, and locks; they are required to produce to the Magistrate, whom they may inform of white persons, free negroes, mulattoes and mestizoes, found in such houses, the produce or articles for trafficking found there, *to be disposed of according to law.*   5th. The leader of a patrol is, as is stated in section 49, to keep his command in good order, &c. ; 6th and 7th sec- any patrol man, misbehaving, &c., is liable to a fine of $2, to be tion. imposed by the officers of the company to which he belongs, and to be paid to the Commissioners of Cross Roads, Charleston Neck.— A leader acting disorderly may be proceeded against as stated in section 49; he is to be tried by a Court consisting of the officers of his company. or any 3 officers of the Regiment, and may be fined $10, to be paid to the same authorities. Commissioners of Cross Roads, Charleston Neck.   6th. A substitute for patrol must be between 18 8th section. and 60.   7th. Free negroes, mulattoes, or mestizoes. found on 10th section. Charleston Neck, are to be treated by the patrol, as slaves, unless they produce their free papers, office copies, or other satisfactory evidence of freedom.   If found out of their own houses, or the enclosure of their employer, not having a regular ticket from their guardian. after 9 P. M., from 20th Sept. to 20th March, and 10 P. M., from 20th March to 20th Sept. they are declared liable to be treated as slaves without a pass.   8th. No grocery, retail shop, or any store, shop, or place, wherein are vended spirituous liquors, is to be kept open on the 11th section. Sabbath day. or any other day after 9 P. M., from 20th Sept. to 20th March, and after 10 P. M., from 20th March to 20th Sept., any owner, or occupant violating this law, or trading, trafficking or bartering therein, with any slaves, free negroes, mulattoes, or mestizoes, is

6

42                        NEGRO LAW OF SOUTH CAROLINA.

liable to a fine of $50, to be recovered by indictment, in the Court of Law, and paid to the Commissioners of Cross Roads. Charleston Neck. 9th. Each inhabitant of Charleston Neck, liable to patrol duty, is required to provide and carry with him on service, a good gun or pistol, in order, with at least 6 ball cartridges for the same. or cutlass, under the penalty of $2, and 10 per cent on his general tax of the year preceding. 10th. The commanding officer of the company or companies on Charleston Neck, may appoint a Secretary, whose duty it shall be to prepare and lay before the Military Courts herein before, mentioned, all necessary papers, and to keep a record of the proceedings of the same, which is to be open to the inspection of all interested. For this duty, he is exempted from patrol duty. 11th. The leader of each patrol may appoint a warner to summon the patrol; and for this duty he is exempted from the patrol. 12th. It is the duty of the officers commanding the companies on Charleston Neck, and all Magistrates, to inform the leaders of the patrols. of unlawful assemblies, of negroes, (slaves,) free negroes. mulattoes, and mestizoes. The leaders on receipt of this information. are to turn out their patrols, and discharge the duty required by law; failing to do this, they are respectively liable to a fine of $20, to be paid to the Commissioners of Cross Roads, Charleston Neck. For uniformity sake, I think this Act of '23, should be repealed.

SEC. 55. The Commissioners of Cross Roads on Charleston Neck, by the Act of '45, were authorized to build a Guard House. and it provides that all free negroes, mulattoes. mestizoes, and slaves. on Charleston Neck, charged or found guilty of violating the law, shall be therein confined, and *there* punished; and also slaves. free negroes, mulattoes, and mestizoes, taken up by the patrol, shall there be whipped according to the patrol law, unless the owner or person having charge of such slaves, free negroes, mulattoes. or mestizoes. or their guardians, shall pay to the Commissioners of Cross Roads, one dollar for each of said slaves, free negroes, mulattoes or mestizoes.

## CHAPTER IV.

*The Rights—Civil and Criminal Remedies—And Liabilities of the Master. Also the Law to Prevent the Disturbance of the Peace in relation to Slaves and Free Negroes.*

SEC. 1. The right of a master in a slave, and all which appertains or belongs to him, is that of property. If the slave be in the possession of another, his owner may maintain detinue for his specific delivery, or may have a bill in Equity, to compel his possession to be restored, (unless he may have been bought for sale, in which case the owner is left to his remedy at law,) or may bring trover to recover the damages sustained in his conversion. The owner may bring trespass for any forcible taking of the slave from his possession, or for any forcible injury done to his person. So too, if a slave wander from the possession of the owner, and another employ him, the owner may bring assumpsit for his labor, or trover for the time he may be in the employment of a third person, or if such person *knew he was a slave*, the action on the case might be sustained. So too, if a bailee abuse or employ a slave differently from the contract of bailment, and he is killed or injured, the bailee would be liable to the owner.— So too, a common carrier transporting a slave from one place to another, is liable for an injury to, the death, or loss of the slave, as he would be for other articles, with this exception, if he shews that he used proper care and diligence, and the injury, loss, or death, resulted from the act of the slave, then he would not be liable. Any employment of a slave, without the consent of the master, by which the slave is killed, or injured, makes the person so employing him, liable for the damages sustained by the owner. For personal property, in the possession of the slave, and commonly called the property of the slave, the master may maintain the same actions against one possessing himself of it, as he could for the slave himself. For harboring a runaway slave, knowing him to be such, an action on the case can be maintained by the owner.

*[margin: Sarter vs. Gordon, 2d Hill C. R. 121. Bell vs. Lakin, 1 McMull. 364, 370–2. Helton vs. Caston. 2d Bail, 95. Duncan vs. Rail Road Co. 2d Rich. 613. Clark ads. McDonald, 4 McC. 223. Wright vs. Gray, 2d Bay, 464.]*

SEC. 2. A contract for the hire of a slave for a year is an entire contract, yet if the slave die, his wages will be apportioned. But if the slave be sick, or runaway, no deduction is to be made on either account. The owner is not liable generally, for medical services rendered to his slave, while in the possession of one to whom he may be hired. The master is liable for medical services rendered to his slave without his knowledge, if the slave be in great danger.

*[margin: Bacot vs. Parnell, 3d Bail. 424. Wells vs. Kennerly, 4 McC. 123. Johnston vs. Barrett, 2d Bail. 562.]*

SEC. 3. By the 5th section of the Act of '39, provision is made, if any white man shall beat or abuse any slave, quietly and peaceably being in his master's plantation, or found any where without the same, with a lawful ticket, that he shall forfeit $50, to be recovered by and to the use of the owner, by action of debt, besides being liable

*[margin: 5th sec. Act of '39. 11 Stat. 58.]*

**44**             NEGRO LAW OF SOUTH CAROLINA.

Caldwell et. al. ads. Langford, 1 McMull. 475.

to the owner, in an action of trespass for damages. Under this provision, it has been held, that where a slave was found out of his master's plantation, but had a ticket, and was whipped by the party finding him, that the master could maintain the action under the Act, and recover.

Acts of 1823, p. 54.

SEC. 4. The Act of '23, for the regulation of patrol duty on Charleston Neck, section 4, provides if any white man shall *wantonly* beat. or abuse any slave, quietly and peaceably being in his or her owner's enclosure, or found anywhere without the same. with a lawful ticket, he shall forfeit $50, to be recovered by the owner, and to his use, besides being liable to the owner in an action of trespass for damages. This provision is identical with that of '39. except that in the Act of '23, the beating or abusing must be *wantonly*. In the Act of '39, no such word is used. It may be under the Act of '23, malice, or cruelty, would have to be shewn.

3d sec. Act of 1747. P. L. 215.

1st section.

Last paragraph 3d section.

SEC. 5. The 3rd section of the Act of 1747. provides. that if any overseer or manager shall employ upon his own account or business, any of the negroes committed to his care, by sending them on errands, or in any other manner whatever. such overseer or manager shall pay the sum of 10s. (equal to $2 14-100,) for every day he or they shall so employ any negro committed to the care of such overseer or manager. (This penalty, another part of the Act, section 1st. directs to be recovered before a Justice of the Peace, Magistrate now, in the manner and form prescribed for the recovery of small debts and damages.) The 3rd section further provides. that to establish the fact of the employment of the owner's slaves by the overseer or manager, *the information of the negroes* shall be sufficient, unles *the overseer or manager* will exculpate himself on oath.

1 McMull. Rep. 450.

In the case of Dillard vs. Wallace, I ruled that this provision was obsolete from non-user. The Court of Appeals, admitting that its enforcement had been hitherto unknown, and ninety years had then elapsed from its enactment, held that it was still not obsolete. It is therefore a law, however anomalous in its provision about evidence, still to be enforced.

5th sec. Act of 1740. P. L. 165.

SEC. 6. If any slave shall be beat, bruised, maimed or disabled, in the lawful business or service of his master, owner, overseer or other person having charge of such slave, by any person or persons, not having sufficient cause or authority, (of which cause the Magistrate trying the case is to judge.) he or they shall forfeit 40s. current money, equal to 5s. 8d. sterling. or $1 20-100. to the use of the poor of the District or Parish. If the slave or slaves be maimed or disabled from performing his or her or their work, the person or persons beating the slave, shall also forfeit and pay to the owner, 15s. current money. equal to about 44 cents, for every day he may be unable to discharge his usual service, and the charge of the cure of such slave.

If the damages in the whole do not exceed £20 current money, equal to $12 27-100 they, as also the penalty for the use of the poor. may be recovered before a Magistrate ; and if the offender shall produce no goods on which the same may be levied, the Magistrate is authorized to commit him to gaol until the same be paid.

These provisions have been very little noticed, and furnish so poor a relief for the abuse to which they apply, that they will rarely be resorted to. The action of trespass is an abundantly better remedy. Still. this law exists. and may. in the case described in the Act, be resorted to by owners, if they choose so to do. They cannot, however, have this remedy, and also an action of trespass.

Sec. 7. Any person who shall give a ticket or written permit to a slave, the property of or under the charge of another, (without the consent. or against the will of such owner, or person having charge,) authorizing such slave to be absent, or to deal, trade or traffic, such person is liable to be indicted, and on conviction, to be punished by fine not exceeding $1000. and imprisonment not exceeding 12 months. *Acts of '36, p. 83.*

Notwithstanding this Act, a person who might give a ticket to a slave, with a view to aid a slave in running away and departing from his master's service, might be tried and capitally convicted under the Act of 1754. *The State vs. Blease, 1 McMull. 472.*

Sec. 8. If a white person *harbor, conceal or entertain* any runaway or fugitive slave. he or she is liable to be indicted for a misdemeanor, or prosecuted in a civil action for damages, at the election of the owner or person injured. If indicted and convicted, the offender is liable to a fine not exceeding $1000, and imprisonment not exceeding 12 months. The owner may proceed by indictment, and also civilly, at the same time, he cannot be put to his election until the trial. *Acts of '21, p. 20.* *The State vs. Stein, 1 Rich. 189.*

Sec. 9. If a person be maimed, wounded, or disabled. in pursuing. apprehending or taking any slave that is run away, or charged with any criminal offence, or in doing any thing else, in obedience to the Act of 1740, he shall receive such reward from the public as the General Assembly may think fit; and if he be killed, his heirs, executors or administrators shall receive the same. *8th sec. Act of 1740. P. L. 165.*

I do not know that any claim has ever been made under this law. Still, however, it seems to be of force, and a claimant would be entitled to the benefit of its provisions.

Sec. 10. The Court trying and capitally convicting a slave, is to appraise the same, not exceeding $200, and certify such appraisement to the Treasurer of the Division within which the slave may be condemned ; and in the event of the slave being executed, in pursuance of the sentence, the Treasurer is directed to pay the appraisement to the owner. *Act of '43. 1st sec. 11 Stat. 264.*

Sec. 11. If a white person game with a free negro, mulatto or mestizo, or slave, or shall bet upon any game played, wherein one of *Act of 1834. 6th sec. 7 Stat. 469.*

46                                    NEGRO LAW OF SOUTH CAROLINA.

The State vs. Nates, 3d Hill, 200.

the parties is a free negro, mulatto, mestizo or slave, or shall be willingly present, aiding and abetting, where any game of chance is played, as aforesaid, in such case, such white person, upon conviction by indictment, is liable to receive 39 lashes, and to be fined and imprisoned at the discretion of the Court; one half of the fine is to go to the informer, the other half to the State.

Act of '44, 11 Stat. 294.

SEC. 12. Any shop-keeper, trader or other person, by himself or any other person acting for him or her, who shall buy or purchase from any slave, in any part of this State, any corn, rice, peas, or other grain, bacon, flour, tobacco, indigo, cotton, blades, hay, or any other article whatsoever, or shall otherwise deal, trade or traffic with any slave not having a permit so to deal, trade or traffic, or to sell any such article, from or under the hand of his master or owner, or such other person as may have the care and management of such slave, upon conviction, is liable to be fined not exceeding $1000, and to be imprisoned not more than 12 months, nor less than 1 month. It is the business of the party trading with a slave, to produce and prove the permit.

1st sec. Act of '17. 7 Stat. 451.

2d section.

SEC. 13. If a slave enter a shop, store, or house of any kind, used for dealing, trading and trafficking, with an article, and come out without the same, or enter without an article, and come out with one, it is sufficient evidence to convict the owner or person occupying the same for trade, in an indictment under the Act of 1817.

5th sec. Act of '34. 7 Stat. 469.

State vs. Stone, Rice's Rep. 147

SEC. 14. If a white person, being a distiller, vendor or retailer of spirituous liquors, shall sell, exchange, give, or in any otherwise deliver any spirituous liquors to any slave, except upon the written and express order of the owner or person having the care and management of the slave, he shall, upon conviction, be fined not exceeding $100, and imprisoned not exceeding six months; one half of the said fine to the use of the informer, and the other half to the use of the State.

3d sec. Act of '34. 7 Stat. 469.

Act of '44. 11 Stat. 294.

SEC. 15. One effect resulting from the Act, and certainly neither intended nor anticipated by the Legislature, was to repeal the penalty of the Act of 1817, quoad distillers, vendors and retailers, (the very persons who, above all others ought to bear the heaviest penalties ) in relation to the sale or exchange of spirituous liquors. The rule of evidence established by the Act of 1817, as to the production and proof of the permit, still remains in force.

The State vs. Evans, 3d Hill, 191.

The State vs. Stone. Rice's Rep. 147.

SEC. 16. In an indictment for trading with a slave, or giving or delivering spirituous liquors to a slave, it is necessary that the slave should be described, when possible, by his own and his owner's name, or if that be not possible, by some equivalent description of the slave.

The State vs. Schroder, 3d Hill, 61

SEC. 17. In indictments under the Act of 1834, although the rule of evidence established by its 5th section does not apply, and so too, under the Act of 1817, where the trading is not in " a shop, store, or

The State vs. Avants, 2d Strob

47

house of any kind, used for trading." yet if the slave be seen to enter with an article, and come out without it, or to enter without an article, and come out with one. it is a fact, from which. at common law. a presumption may arise of guilt, and on which the jury may convict.

The State vs. Saber, Fall Term 1818.

SEC. 18. It was decided immediately after the passage of the Act of 1817, that the sale to a slave. *of any article whatsoever*. or purchase from a slave of any *article whatsoever*. belonging to the slave, his master, or any other person. was a violation of the law.

The State vs. Von G. on. 1 McMull. 187.
The State vs. Anone. 2 N. and McC. 27.

SEC. 19. If the master. or overseer. or other person having charge of the slave, send a slave with goods to detect another, in dealing trading or trafficking with a slave. and stand by, and see the trading, it does not excuse the defendant, he still is guilty.

The State vs. Stroud. 2 N. and McC. 34  Note.
The State vs. Anone. 2 N. and McC. 27.

SEC. 20. If the owner, or overseer. or other person having charge of the slave. go with him to make the sale or purchase. and stand by and assent to the same; the vendor would not be guilty.  For then, the trading might be regarded as that of the master by his slave.

The State vs Coleman, (not reported.)
The State vs. Isaacs, 1 Speers, 224.

SEC. 21. If the trader be in the habit of trading with slaves. and had authorized his clerk so to trade, he may be convicted for a trading with a slave, by his clerk in his absence.  But the principal cannot be criminally answerable for the act of his clerk, unless done with his knowledge and consent actual, or implied.  The same rule holds. as to a partner.

The State vs. Anone. 2 N. and McC. 27.
The State vs. Mathien. decided at Columbia, May '35.
The State vs. Coleman, Dud. 32.
The State vs. Chandler, 2 Strob.

SEC. 22. An overseer trading with his employer's slaves, may be indicted and convicted, under the Act of 1817.

SEC. 23. Before the Act of '34, a person who sold liquor to a slave. might be indicted for trading with a slave without a ticket. and also for retailing.  It follows, since the Act of '34 is substituted for that of '17,' so far as the penalty is concerned, that a person now may be indicted for selling, giving. exchanging or delivering spirituous liquors to a slave, and for retailing without a license, although there be but one sale and delivery.

The State vs. Sonnerkalb, 2 N. and McC 280.
The State vs. O'Sullivan, at Nisi Prius.

SEC. 24. If one sell spirituous liquor to a slave, or to another for him, without a permit from his owner. employer, or other person having charge of him, and the slave die in consequence of the too free use of the liquor so sold, the person so selling. is liable, in an action on the case, for the value of the slave to the owner.

Harrison vs. Berkley, 1 Strob. 525.

SEC. 25. A license to retail, cannot be granted to an applicant, unless he will swear that he will not, during his license, sell, give. exchange, barter or otherwise deliver spirituous liquors to any slave contrary to the law on that subject.  If he has been engaged before in the business. he must also swear, that he has not during his past license, sold, given. delivered, exchanged, bartered. or otherwise delivered spirituous liquors to a slave contrary to law.

4th section Act of '34, 11 Stat. p. 469.

SEC. 26. If a master or other person having charge of a slave who may be accused of any capital or other crime. shall conceal or convey

20th sec. Act of 1740. P. L. 168.

48                    NEGRO LAW OF SOUTH CAROLINA.

away such slave, so he cannot be brought to trial and punishment, such master or other person shall be liable to forfeit £250 current money. equal to £35 16s. 5d. or $153 58-100, if the crime be capital; if not capital, then the forfeiture is £50 currency, equal to £7 3s. 3d. or $30 70.  This provision, in capital felonies, supersedes the common law offence of accessory. after the fact in a crime committed by a slave, so far as owners and other persons having charge of a slave may be concerned.

*The State vs. McAbley, Col'a. May 1840.*

SEC. 27. A master is liable for the acts of his slave. done negligently, unskilfully. or willully, in the course of any public employment or business carried on by him, under the authority or with the consent of his master.  *As where*, a slave navigating his master's vessel, so *negligently* managed his craft as to injure a wharf, or to run down a car of fish, or where a slave carpenter, with his master's assent, actual or implied, undertakes to repair a house. and in doing it, does it so *unskilfully*, that the whole building falls down, or where a slave blacksmith, in shoeing a horse, becomes enraged with him, and *wilfully* knocks out the horse's eye with his shoeing hammer, in all these cases, the master is liable, according to the principles which I have above stated.

*Drayton ads. Moore. Parker vs. Gordon, Dud. 268. O'Connell vs. S rong. Dud. 26;. Snee vs. Trice,1 Brev. 178.*

SEC. 28. The master is not liable for the unauthorized acts of his slave, done without his knowledge or consent. actual or implied, and not in any public business or employment. in which he nas placed his slave.

*Snee vs. Trice, 2 Bay 345. Wingis vs. Smith. 3 McC. 400.*

SEC. 29. Any person or persons. who shall, on his, her, or their own behall. or under color, or in virtue of any commission. or authority from any State or public authority of any State in this Union. or any foreign power. come within this State. with the intent to disturb, hinder, or counteract the operation of laws made or to be made, in relation to slaves. free negroes. mulattoes, and mestizoes. are liable to be arrested, and if not bailed. committed to gaol by any of the Judges of this State. including the Recorder. for a high misdemeanor, and on conviction is liable to be sentenced to banishment from the State, and to be fined and imprisoned at the discretion of the Court.

*1st sec. Act '44. 11 S.at. 292.*

SEC. 30. Any person within this State, who shall at any time accept any commission or authority from any State, or public authority of any State in this Union, or from any foreign power. in relation to slaves or free persons of color, and who shall commit any overt act with an intent to disturb the peace or security of this State. or with intent to disturb, counteract, or hinder the laws of this State, made or to be made. in relation to slaves or free negroes, mulattoes, or mestizoes, shall be deemed guilty of a misdemeanor, and upon conviction thereof. shall be sentenced to pay for the first offence, a fine not exceeding $1000, and to be imprisoned not exceeding one year; and for the second offence, he shall be

*2nd sec. Act of '44. 11 Stat. 292*

NEGRO LAW OF SOUTH CAROLINA.                                    49

imprisoned 7 years, and pay a fine not less than $1000, or be banished from the State, as the Court shall see fit.

SEC. 31. The Governor's duty is to require all persons who come *3d section.* into this State, for the purposes, and under the circumstances stated in the 1st section of the Act of '44, and the preceding 29th section of this digest, to depart from the State in 48 hours after such notice, and such persons shall thereupon be bound to depart, and failing to do so, they are guilty of a high misdemeanor, and upon conviction, are to be sentenced to be banished from the State, and to such fine and imprisonment, as the Court may think expedient.

SEC. 32. Any person convicted a second or any subsequent time, *4th section.* under the 1st and 3d sections of the Act of '44, set out in the preceding 29th and 31st sections of this digest, is to be imprisoned not less than 7 years, to pay a fine not less than $1000, and to be banished from the State.

SEC. 33. It is the duty of the Sheriff of the District to execute the *5th section.* sentence of banishment, by sending the offender out of the State; and if he shall return, (unless by unavoidable accident,) the Sheriff of the District where he may be found is " *to hold*" him in close confinement under the original sentence, until he shall enter into a recognizance to leave the State and never to return.

SEC. 34. Free negroes. mulattoes, and mestizoes, entering this *1st sec. Act of* State as cook, steward, or mariner, or in any other employment, on *'44, 11 Stat. 293.* board any vessel, in violation of the provisions of the 2d section of the Act of '35, and which is set out and prescribed in the 59th section of Chapter 1, of this digest, and who may be apprehended and confined by the Sheriff, are not entitled to the writ of Habeas Corpus.

SEC. 35. If the Sheriff shall by the usual posse comitatus and the *2d sec. Act of '44.* civil authorities, not be able to enforce the provisions of the Act of *11 Stat. 293.* '35, the Governor, on a requisition made on him, and signed by the Sheriff, is required to order out a sufficient number of the militia, to meet the exigency of the case, to be placed under the command of discreet officers, who shall be ordered to give the Sheriff the aid necessary to execute the said Act.

7

## ERRATA.

In the unavoidable hurry of revising the proof-sheets, a few errors escaped correction.  Slight verbal inaccuracies, and those merely involving an inversion or omission of a letter, the intelligence of the reader will easily correct.

Page 10, line 3, for *"rita,"* read *"rite."*
"    "    " 10, for *"suvitii,"* read *"servitii."*

 

*FBI Records: The Vault*

**Select Language** ∨    ✉ Get FBI Updates

Vault Home · COINTELPRO

# COINTELPRO

COINTELPRO The FBI began COINTELPRO—short for Counterintelligence Program—in 1956 to disrupt the activities of the Communist Party of the United States. In the 1960s, it was expanded to include a number of other domestic groups, such as the Ku Klux Klan, the Socialist Workers Party, and the Black Panther Party. All COINTELPRO operations were ended in 1971. Although limited in scope (about two-tenths of one percent of the FBI's workload over a 15-year period), COINTELPRO was later rightfully criticized by Congress and the American people for abridging first amendment rights and for other reasons.

White Hate Groups

New Left

Puerto Rican Groups

Black Extremist

Hoodwink

Cuba

Socialist Workers Party

Espionage Programs

Accessibility | eRulemaking | Freedom of Information Act | Legal Notices | Legal Policies and Disclaimers | Links | Privacy Policy | USA.gov | White House
FBI.gov is an official site of the U.S. government. **U.S. Department of Justice**



UPDATED: JUN 23, 2020 · ORIGINAL: MAR 8, 2018

# Tulsa Race Massacre

HISTORY.COM EDITORS

*Corbis/Getty Images*

## CONTENTS

1. Black Wall Street

2. What Caused the Tulsa Race Massacre?

3. Greenwood Burns

4. Aftermath of the Tulsa Race Massacre

5. News Blackout

6. Tulsa Race Riot Commission Established, Renamed

7. Sources

During the Tulsa Race Massacre (also known as the Tulsa Race Riot), which occurred over 18 hours on May 31-June 1, 1921, a white mob attacked residents, homes and businesses in the predominantly Black Greenwood neighborhood of Tulsa, Oklahoma. The event remains one of the worst incidents of racial violence in U.S. history, and one of the least-known: News reports were largely squelched, despite the fact that hundreds of people were killed and thousands left homeless.

## Black Wall Street

In much of the country, the years following World War I saw a spike in racial tensions, including the resurgence of the white supremacist group the Ku Klux Klan, numerous lynchings and other acts of racially motivated violence, as well as efforts by African Americans to prevent such attacks on their communities.

By 1921, fueled by oil money, Tulsa was a growing, prosperous city with a population of more than 100,000 people. But crime rates were high, and vigilante justice of all kinds wasn't uncommon.

Tulsa was also a highly segregated city: Most of the city's 10,000 Black residents lived in a neighborhood called Greenwood, which included a thriving business district sometimes referred to as the Black Wall Street.

**READ MORE: Tulsa's 'Black Wall Street' Flourished as a Self-Contained Hub in the Early 1900s**



**GALLERY**                                                   **8 IMAGES**

## What Caused the Tulsa Race Massacre?

On May 30, 1921, a young Black teenager named Dick Rowland entered an elevator at the Drexel Building, an office building on South Main Street. At some point after that, the young white elevator operator, Sarah Page, screamed; Rowland fled the scene. The police were called, and the next morning they arrested Rowland.

By that time, rumors of what supposedly happened on that elevator had circulated through the city's white community. A front-page story in the *Tulsa Tribune* that afternoon reported that police had arrested Rowland for sexually assaulting Page.

As evening fell, an angry white mob was gathering outside the courthouse, demanding the sheriff hand over Rowland. Sheriff Willard McCullough refused, and his men barricaded the top floor to protect the Black teenager.

Around 9 p.m., a group of about 25 armed Black men—including many World War I veterans—went to the courthouse to offer help guarding Rowland. After the sheriff turned them away, some of the white mob tried unsuccessfully to break into the National Guard armory nearby.

With rumors still flying of a possible lynching, a group of around 75 armed Black men returned to the courthouse shortly after 10 pm, where they were met by some 1,500 white men, some of whom also carried weapons.

## Greenwood Burns

After shots were fired and chaos broke out, the outnumbered group of Black men retreated to Greenwood.

Over the next several hours, groups of white Tulsans—some of whom were deputized and given weapons by city officials—committed numerous acts of violence against Black people, including shooting an unarmed man in a movie theater.

The false belief that a large-scale insurrection among Black Tulsans was underway, including reinforcements from nearby towns and cities with large African American populations, fueled the growing hysteria.

As dawn broke on June 1, thousands of white citizens poured into the Greenwood District, looting and burning homes and businesses over an area of 35 city blocks. Firefighters who arrived to help put out fires later testified that rioters had threatened them with guns and forced them to leave.

According to a later Red Cross estimate, some 1,256 houses were burned; 215 others were looted but not torched. Two newspapers, a school, a library, a hospital, churches, hotels, stores and many other Black-owned businesses were among the buildings destroyed or damaged by fire.

By the time the National Guard arrived and Governor J. B. A. Robertson had declared martial law shortly before noon, the riot had effectively ended. Though guardsmen helped put out fires, they also imprisoned many Black Tulsans, and by June 2 some 6,000 people were under armed guard at the local fairgrounds.

## Aftermath of the Tulsa Race Massacre

In the hours after the Tulsa Race Massacre, all charges against Dick Rowland were dropped. The police concluded that Rowland had most likely stumbled into Page, or stepped on her foot. Kept safely under guard in the jail during the riot, he left Tulsa the next morning and reportedly never returned.

The Oklahoma Bureau of Vital Statistics officially recorded 36 dead. A 2001 state commission examination of events was able to confirm 36 dead, 26 Black and 10 white. However, historians estimate the death toll may have been as high as 300.

Even by low estimates, the Tulsa Race Massacre stood as one of the deadliest riots in U.S. history, behind only the New York Draft Riots of 1863, which killed at least 119 people.

In the years to come, as Black Tulsans worked to rebuild their ruined homes and businesses, segregation in the city only increased, and Oklahoma's newly established branch of the KKK grew in strength.

**READ MORE: How 'The Birth of a Nation' Revived the Ku Klux Klan**

## News Blackout

For decades, there were no public ceremonies, memorials for the dead or any efforts to commemorate the events of May 31-June 1, 1921. Instead, there was a deliberate effort to cover them up.

The *Tulsa Tribune* removed the front-page story of May 31 that sparked the chaos from its bound volumes, and scholars later discovered that police and state militia archives about the riot were missing as well. As a result, until recently the Tulsa Race Massacre was rarely mentioned in history books, taught in schools or even talked about.

Scholars began to delve deeper into the story of the riot in the 1970s, after its 50th anniversary had passed. In 1996, on the riot's 75th anniversary, a service was held at the Mount Zion Baptist Church, which rioters had burned to the ground, and a memorial was placed in front of Greenwood Cultural Center.

## Tulsa Race Riot Commission Established, Renamed

The following year, after an official state government commission was created to investigate the Tulsa Race Riot, scientists and historians began looking into long-ago stories, including numerous victims buried in unmarked graves.

In 2001, the report of the Race Riot Commission concluded that between 100 and 300 people were killed and more than 8,000 people made homeless over those 18 hours in 1921.

A bill in the Oklahoma State Senate requiring that all Oklahoma high schools teach the Tulsa Race Riot failed to pass in 2012, with its opponents claiming schools were already teaching their students about the riot.

According to the State Department of Education, it has required the topic in Oklahoma history classes since 2000 and U.S. history classes since 2004, and the incident has been included in Oklahoma history books since 2009.

In November 2018, the 1921 Race Riot Commission was officially renamed the 1921 Race Massacre Commission.

"Although the dialogue about the reasons and effects of the terms riot vs. massacre are very important and encouraged," said Oklahoma State Senator Kevin Matthews, "the feelings and interpretation of those who experienced this devastation as well as current area residents and historical scholars have led us to more appropriately change the name to the 1921 Race Massacre Commission."

## Sources

James S. Hirsch, Riot and Remembrance: The Tulsa Race War and Its Legacy (New York: Houghton Mifflin, 2002).

Scott Ellsworth, "Tulsa Race Riot," The Encyclopedia of Oklahoma History and Culture.

1921 Tulsa Race Riot, Tulsa Historical Society & Museum.

Nour Habib, "Teachers talk about how black history is being taught in Oklahoma schools today," Tulsa World (February 24, 2015).

Sam Howe Verhovek, "75 Years Later, Tulsa Confronts Its Race Riot," New York Times (May 31, 1996).

## Citation Information

### Article Title

Tulsa Race Massacre

### Author

History.com Editors

### Website Name

HISTORY

### URL

https://www.history.com/topics/roaring-twenties/tulsa-race-massacre

### Access Date

August 11, 2020

### Publisher

A&E Television Networks

### Last Updated

June 23, 2020

### Original Published Date

March 8, 2018

**FACT CHECK:** *We strive for accuracy and fairness. But if you see something that doesn't look right,* **click here** *to contact us!*

VIDEOS

RELATED CONTENT